# CASES ARGUED AND DETERMINED

## *June Term, 1874.*

THE ATTORNEY GENERAL VS. THE CHICAGO AND NORTH-
WESTERN RAILWAY COMPANY.

THE ATTORNEY GENERAL VS. THE CHICAGO, MILWAUKEE
AND ST. PAUL RAILWAY COMPANY.

JURISDICTION: SUPREME COURT: INJUNCTION: CORPORATIONS. (1, 2)
*Original jurisdiction of supreme court.* (3) *Its jurisdiction of injunc-*
*tion.* (4–6) *Jurisdiction of equity to restrain corporations from excess*
*or abuse of franchise, etc.* (7–11) *Questions touching the exercise of such*
*jurisdiction.*
STATUTES: CONSTRUCTION: CONSTRUCTIVE REPEAL. (12–15) *Rules as to*
*constructive repeal.* (16) *Misnomer of corporation in statute.* (17, 18)
*Ch. 273, Laws of 1874, an amendment of special charters, and not affected*
*by constitutional amendment of 1871.*
RAILROADS: LEGISLATIVE REGULATION OF TOLLS: CONSTITUTIONAL
LAW. (19–28) *Power of the legislature to alter railroad charters granted*
*by the state, and to limit tolls. Sec. 1, art. XI of state constitution.*
(29–40) *Power of state legislature as to territorial acts of incorporation.*
(41) *Ch. 273, Laws of 1874, how far valid.*
INFORMATIONS BY ATTORNEY GENERAL: PRACTICE. (42) *Temporary*
*injunction; unverified information.* (43) *Election of remedies.* (44)
*Such election enforced in this case.* (45) *Temporary injunction, from*
*this court, will be by writ.*

1. That clause of sec. 3, art. VII of the constitution of this state, which
empowers the supreme court "to issue writs of *habeas corpus,*
*mandamus,* injunction, *quo warranto, certiorari,*" etc., and to "hear
and determine the same," was designed to give this court original
jurisdiction of all judicial questions affecting the sovereignty of the
state, its franchises and prerogatives, or the liberties of its people.

| | |
|---|---|
| 35 | 425 |
| 74 | 134 |
| 35 | 425 |
| 81 | 473 |
| 81 | 489 |
| 35 | 425 |
| 83 | 120 |
| 83 | 156 |
| 35 | 425 |
| 86 | 647 |
| 35 | 425 |
| 87 | 589 |
| 35 | 425 |
| 88 | 519 |
| 35 | 425 |
| J92 | 425 |
| 35 | 425 |
| 97 | 423 |
| 35 | 425 |
| 98 | 141 |
| 98 | 545 |
| 35 | 425 |
| 102 | 512 |
| 102 | 513 |
| 102 | 514 |
| f103 | 611 |
| 103 | 615 |
| 35 | 425 |
| 106 | 424 |
| 35 | 425 |
| 107 | 179 |
| 107 | 447 |
| 107 | 514 |
| 35 | 425 |
| f109 | 626 |
| 109 | 627 |
| 110 | 1629 |
| 52 LRA | 135 |
| 35 | 425 |
| 112 | 2236 |
| 112 | 2299 |
| 35 | 425 |
| 85 Minn | 514 |
| 35 | 425 |
| 60 LRA | 828 |
| 60 LRA | 830 |

The Attorney General vs. Railroad Companies.

2. Hereafter, in all cases in which an exercise of this original jurisdiction is sought, *leave* must be obtained of the court upon a *prima facie* showing that the case is a proper one for its cognizance.

3. This court has original jurisdiction of the writ of injunction, as a *quasi* prerogative writ, where that is the proper remedy, in matters *publici juris*, within the scope of the jurisdiction upon information of the attorney general; but not in suits between private parties or for the determination of mere private rights.

4. Courts of equity have jurisdiction, upon information of the attorney general, to restrain corporations from excess or abuse of corporate franchise, or violation of public law to the public detriment.

5. This jurisdiction of equity was already established at the time of the adoption of our state constitution; and sec. 5, art. I of that instrument (which declares that " the right of trial by jury shall remain inviolate, and shall extend to all cases at law "), has no application to it. But the defenses to the present informations rest only in questions of law, and the granting of the injunctions sought will not have the effect to deprive defendants of any trial by jury.

6. Secs. 13 and 14, ch. 148, R. S., neither confer any jurisdiction upon this court, nor limit its jurisdiction. Whether they limit the jurisdiction of the circuit courts in cases of injunction against corporations, is not here determined.

7. Ch. 273, Laws of 1874, after fixing the maximum tolls chargeable by railroad companies in this state, gives certain civil remedies against the companies to persons injured by violations of the rates so fixed, and also provides penalties against the *agents* of the companies who may be guilty of such violations; but it does not provide penalties against the companies themselves. *Held*, that the legal remedies so provided furnish no sufficient ground for denying the relief here sought by injunction against the corporations.

[8. *It seems* that the rule that equitable proceedings will not lie to enforce a statute which provides penalties for all violations thereof, is not applicable to an information of the attorney general to restrain a violation of public right by a corporation. But it was not necessary to decide that question here.]

9. It is no objection to the granting of an injunction in such a case, that the information does not show any specific injury done to the public; but it is sufficient that facts are alleged which satisfy the court that there is disobedience of the law by the defendant, productive of public mischief.

10. In such cases the court cannot speculate whether obedience to the law by the defendant may not cause greater mischief to the public than is caused by disobedience.

11. The rule that the granting or withholding of an injunction rests in the sound discretion of the court, relates only to *judicial* discretion, and to injunctions in aid of private rights. The granting of an injunction (or a *mandamus*) as a *quasi* prerogative writ, when necessary to protect public right, is not a matter of discretion.

12. Where there are two affirmative statutes upon the same subject, without any express words of repeal, one is not to be construed as repealing the other, if both may consist together; and the court ought to seek such a construction as will reconcile them together.

13. Chapters 292 and 341, Laws of 1874 (approved March 12), are both susceptible of being so construed as to consist with ch. 273 of the same year (approved March 11); and the last named act is not repealed by either of the former.

14. The question of repeal being one of legislative *intent*, the facts that the three acts were pending together, and were all passed within two successive days, and that the legislature, by a subsequent joint resolution, directed the publication of ch. 273 to be delayed so that it should not become a law until after the other two acts had taken effect — may be considered by the court, as showing that the legislature did not intend any repeal.

[15. Possibly if the acts were inconsistent, ch. 273, by reason of such later publication, would repeal such parts of the other acts as were irreconcilable with it.]

16. Ch. 273, Laws of 1874, in its classification of the railroads of this state, names among those in "Class A.," the "Milwaukee & St. Paul Railway Company." One of the defendant companies was formerly known by that name, and was so designated in previous acts of the legislature, granting powers here claimed by said company by virtue of such acts, including an act approved March 10, 1874. In February, 1874, however, under a general statute providing for such changes of corporate names, said company had changed its name to the "Chicago, Milwaukee & St. Paul Railway Company," by which name it is here made defendant. No other company has ever been known in this state by the name first above stated. *Held*, that the provisions of said act relating to the "Milwaukee & St. Paul Railway Company" must be regarded as applying to said defendant.

17. The constitutional amendment of 1871 (which prohibits the legislature from passing special laws, amongst other purposes, "for granting corporate powers or privileges, except to cities," and directs it to provide general laws for such purposes, "which shall be uniform throughout the state"), relates only to acts of incorporation thereafter to be granted, and does not impair the power of alteration or repeal, reserved to the legislature by the state constitution, in respect to charters granted prior to such amendment.

18. Whether said ch. 273, considered as an amendment of the general rail road law of 1872, would be invalid under said constitutional amend ment of 1871, because not uniform in its operation throughout the state, is not here decided; the provisions of said act touching the de fendant companies being regarded as an alteration of their special charters.

19. Under the decisions of the supreme court of the United States in *Dart-mouth College v. Woodward*, and subsequent cases, this court must hold that charters granted to private corporations, including railroad com-panies, are *contracts*, within the meaning of subd. 1, sec. 10, art. I of the constitution of the United States, which prohibits the passage by a state of any " law impairing the obligation of contracts."

20. Although the legislature has a general authority to regulate the tolls of railroads under the *police* power, where the exercise of that power is not in some way suspended or restrained, yet such power cannot be exercised where the right of a railroad company to take tolls at its discretion is fixed by its charter, without any reserved right in the legislature to alter such charter.

[21. Under a grant to a railroad company of a right to take such tolls as it shall think reasonable, *it seems* that a person aggrieved by the exac-tion of unreasonable tolls would still have a remedy by an action at law, and that the courts would have power to determine whether the tolls charged were reasonable in fact.]

22. Sec. 1, art. XI of the constitution of this state, after empowering the legislature to create " corporations without banking powers or privi-leges," provides that " all general laws or special acts .enacted under the provisions of this section may be altered or repealed by the legis-lature at any time after their passage." *Held*, that this reserved power to alter or repeal operates as a qualification of every such grant of corporate franchises made by the legislature of this state, and a sub-sequent exercise of such reserved power cannot be regarded as im-pairing the obligation of the contract.

23. The power so reserved is limited only by the words used to express the reservation. A corporate charter of one kind cannot be changed into one of an entirely different kind, under the power to alter, but may be changed in detail, so long as the general identity of the corporation remains. And where the charter of a railroad company empowers it to exact tolls at its discretion, an act of the legislature restricting the company to the maximum rates prescribed, is an alteration within the scope of such reserved power.

24. This power to alter or repeal the charters of corporations does not af-fect their rights in their property, other than the franchises; but such rights remain inviolable.

25. Whether or not a corporation owning a railroad in this state would have a right to take tolls as an attribute of ownership, without any franchise to do so (a question not considered), still, where it has accepted a franchise to take tolls, it must be held to take the right under the grant, and subject to the power of the legislature to alter the same.

26. A mortgage of a railroad *and its franchises*, made by permission of the legislature, does not confer on the mortgagee any greater rights than the mortgagor had, nor affect the power of the legislature to alter the franchises.

[27. *It seems* that valid alterations of its charter are obligatory upon a private corporation, without its assent thereto; but if otherwise, it must accept, or discontinue its operations as a corporate body.]

[28. *It seems*, also, that where such corporations have proceeded under their charters after the passage of a valid act making alterations therein, this raises a presumption that they exercised their right of election (if they had any) by accepting the alterations. But it was not necessary to determine this or the preceding question in a suit to restrain such companies from future violations of the amending act.]

[29. *It seems* that a charter granted to a railroad company by the territorial legislature of Wisconsin, and accepted by the company prior to the adoption of the state constitution, without any power of alteration or repeal reserved in the charter itself or by any general law of the territory in force when such charter was passed or accepted, would have been unaffected by the reservation of power contained in sec. 1, art. XI of our state constitution.]

[30. *It seems*, also, that if a corporation organized under such a charter were permitted by an act of the state legislature to mortgage its property and franchises, and if, upon default made in payment of the mortgage debt, another corporation, created by act of the state legislature, were permitted to purchase at a foreclosure sale the property *and franchises* so mortgaged, such second company would hold the franchises so purchased unaffected by the right of repeal or alteration reserved in the state constitution.]

[31. A power reserved by such a territorial charter to the legislature of the territory or state, to "resume the rights and privileges granted" by it, in case of any violation of its provisions, would be only a power of *repeal*, and would not authorize an act merely limiting the tolls; and would require for its exercise a *judicial* determination of the fact that the charter had been violated. Whether the territorial or state legislature could exercise such a judicial function under such a clause, and thereupon repeal the charter, *quære.*]

32. An act of the territorial legislature approved February 11, 1847, entitled "an act to incorporate the Milwaukee & Waukesha Railroad

Company," appoints commissioners to take subscriptions of stock in said company, and provides that as soon as a certain amount of the stock shall be subscribed and a certain sum actually paid on each share, and a certain statement showing these facts deposited with the treasurer of Milwaukee county, the subscribers of such stock shall be a corporation vested with the franchises specified in the act. *Held,*

(1.) That the corporation did not come into existence until such stock was subscribed and certified (those acts being named in the statute as conditions precedent), and perhaps not until directors were elected.

(2.) That under such a charter, where the present existence of the corporation appears, there is a *presumption* that it was organized immediately after the passage of the charter.

33. An act of the territorial legislature amendatory of the foregoing, approved March 11, 1848, authorizes the "Milwaukee & Waukesha Railroad Company" to extend its road from Waukesha to the Mississippi River, and provides that whenever said company shall decide to so extend its road, it may increase for that purpose its capital stock, etc. *Held,* that this act, in the absence of proof to the contrary, would create a presumption that the corporation was in existence at the time of its passage.

34. It appearing, however, that the statement of subscription and payment of capital stock of said company was not made and deposited as required by the act of 1847, until April, 1849, and that the first board of directors was not elected until May, 1849, this is conclusive that the charter was accepted, and the corporation organized, after the adoption of the state constitution (in 1848), although it also appears that as early as November, 1847, and from thence until May, 1849, action was taken, by the commissioners named in the charter, to receive subscriptions of said stock, and that they elected a president and secretary, opened books of subscription, and applied to the territorial legislature for the supplementary act of March 11, 1848.

35. The rules that acceptance of a charter applied for, or beneficial to the corporation, may be presumed, and that, in similar cases, slight acts of the corporators looking towards an acceptance are sufficient to establish it, relate to charters which name the corporators and declare them incorporated, without preliminary steps; and they do not apply to a charter not naming the corporators, but prescribing conditions by which indeterminate persons may become incorporated.

36. Under said act of 1847, the commissioners could do no act tending to prove acceptance of the charter, because they had no right to accept; and the stock subscribers could do no act tending to prove acceptance before subscription of the whole capital stock, because until then they had no right to accept.

37. The act of March 11, 1848, is not *conclusive* evidence of the existence, at the time of its passage, of the corporation there named. Its terms are consistent with a belief on the part of the legislature that the company was not then organized; and even if it declared in terms that the corporation had been organized, *it seems* that such declaration could not prevail over the contrary fact clearly established by evidence.

38. The rule that legislative recognition, in a subsequent statute, of a corporation *de facto*, will cure irregularities in its organization and waive forfeiture incurred, does not apply to this case, in which there was no corporation *de facto* at the time of the passage of the act of 1848.

39. Sec. 2, art. XIV of the state constitution, provided that all laws then in force in the territory *not repugnant to said constitution* should remain in force until they should expire by their own limitation, *or be altered or repealed by the legislature. Held,* that the territorial acts of 1847 and 1848, providing for the incorporation of the "Milwaukee & Waukesha Railroad Company," were continued in force after the establishment of the state government, by virtue of said sec. 2, art. XIV of the constitution; and upon the subsequent acceptance of the franchises by said company, its charter became *a contract with the state,* subject to the power of alteration or repeal expressly reserved to the state legislature by said section.

[40. A general act concerning corporations in the territorial revised statutes of 1839, reserved to the legislature power to amend, alter or repeal all subsequent acts of incorporation. By the first state revision, of 1849, said act of 1839 (with many other acts) was repealed (the repeal taking effect January 1, 1850), with a proviso that such repeal should not affect any right already accrued. Whether the legislative right reserved by the act of 1839 entered into and became a part of the contract between the state and the "Milwaukee & Waukesha Railroad Company," upon the acceptance of its charter; whether, as a right accrued, this reserved right would remain unaffected by the subsequent repeal of the act of 1839; whether, without such reserved power attending them, the acts of 1847–8 would not have been *repugnant* to the state constitution; and whether the acceptance by the company of the charter after the adoption of the state constitution was not an acceptance subject to the legislative power reserved by the act of 1839 and by sec. 1, art. XI of the constitution, are questions not here decided.|

41. Those provisions of ch. 273, Laws of 1874, which limit the tolls chargeable by the *Chicago & Northwestern Railway Company* and the *Chicago, Milwaukee & St. Paul Railway Company,* upon their lines of railway within this state, are valid, and are applicable to the road of the last

named company extending from Milwaukee to Prairie du Chien, which it owns as successor to the property and franchises of the "Milwaukee & Waukesha Railroad Company." But this decision relates only to cases where the transportation is wholly within this state. As to commerce between states, nothing is here decided.

42. An information of the attorney general, *ex officio*, is equivalent to a bill in chancery verified on information and belief, and, like such a bill, in proper cases, calls for an answer under oath; but a temporary injunction will not usually go upon such an information, or such a bill, unsupported by positive affidavit, until the defendant has had an opportunity to contradict it on oath and has failed to do so. In the present cases, affidavits were filed by the attorney general before the motions for temporary injunctions were made, which affidavits. not being answered, are sufficient to show the disregard by defendants of the maximum rates fixed by the act of 1874.

43. The attorney general has his election to proceed against the defendant companies for their alleged violations of legal duty, either by information in the nature of *quo warranto*, or by injunction; but the court will require him to make his election, and not to proceed by both remedies.

44. Before permitting the temporary injunctions to issue in these cases, the court requires the attorney general to dismiss the informations in the nature of *quo warranto* pending against the same defendants, and to file in these causes a stipulation (signed by him *ex officio* and approved by the court or one of the justices thereof) that the state will not proceed by way of *quo warranto* for ·forfeiture, or for contempt in violating the injunctions so to issue, for any violation by defendants, before a certain day here fixed, of the above named provisions of the act of 1874.

45. No statute can abolish a writ given by the constitution, as such writ existed when the constitution was adopted. And the jurisdiction of this court being founded on the writ of injunction, the *writ* itself (and not the *order* provided by the statute as a substitute) will issue in such cases.

INFORMATIONS for Writs of Injunction.

These were informations filed in this court July 8, 1874, by the attorney general of this state, acting for the state, praying for writs of injunction to restrain the two defendant companies from exacting tolls for the carriage of passengers or freight in excess of the maximum rates established by ch. 273,

Laws of 1874. When these proceedings were commenced, there were pending in this court informations in the nature of *quo warranto*, filed by the attorney general June 2, 1874, against the same defendants severally, to have a forfeiture of their charters adjudged for their alleged violations of the same act in exacting tolls higher than were therein authorized.

I. The following acts of the legislature of this state, and the facts stated in connection therewith, touching the corporate existence and powers of the *Chicago & Northwestern Railway Company*, are referred to in the pleadings and arguments herein: 1. An act approved August 19, 1849, incorporated the Madison & Beloit Railroad Company, with power to construct a railroad from Beloit, by way of Janesville, to Madison, and authorized the directors to regulate the amount of tolls to be charged on such road. 2. Ch. 219, Laws of 1850, authorized said company to extend its road from Janesville to Lake Winnebago, by way of Fort Atkinson, Jefferson and Watertown; and provided that after the company should assent to the act, it should be known as the Rock River Valley Union Railroad Company. 3. By an act approved March 19, 1855 (P. & L. Laws of 1855, ch. 137), "the Illinois & Wisconsin Railroad Company in the state of Illinois, and the Rock River Valley Union Railroad Company in this state," were authorized "to consolidate the capital stock of the two companies, and to make the two companies one," and to place their affairs and property under the direction of one board of directors; and the consolidated company was authorized to select for itself any name which the board of directors should see fit, and a certificate of such organization and name was to be deposited with the secretary of state of this state, etc. The act further provided that such consolidated company should "remain subject to the laws of the state of Wisconsin and the state of Illinois respectively, " and should have " in all respects the same privileges as though the consolidation had not taken place ;" with a proviso that the laws of Illinois should have no force

or effect in this state under the provisions of the act. It appears that the Illinois & Wisconsin Railroad Company possessed under its charter a like power of consolidation, and that pursuant to these acts a consolidation of the two companies was effected on the 30th of March, 1855, and the consolidated company adopted the name of the Chicago, St. Paul & Fond du Lac Railroad Company. 4. An act approved October 11, 1856 (Laws of 1856, ch. 137), is entitled "An act to execute the trust created by an act of congress entitled 'an act granting public lands to the state of Wisconsin to aid in the construction of railroads in said state,' approved June 3d, 1856, by incorporating the Wisconsin & Superior Railroad Company, and granting a portion of said lands thereto." This act, among other things, empowers the company so incorporated to build, maintain and operate a railroad from the city of Fond du Lac, by way of the city or town of Oshkosh, northerly to some point on the St. Louis River or some point on the state line within the requirements of the act of congress referred to in the title ; and also empowers it, on the completion of said road or any part of it, "to demand and receive such sum or sums of money for the transportation of persons and of property, and for the storage of property, as it shall from time to time deem reasonable." It appears that under this act the Wisconsin & Superior Railroad Company was duly organized. 5. The provisions of ch. 121, Laws of 1856, preserved in sec. 33, R. S. of 1858, are recited below (II, 11). 6. An act of the legislature of this state approved February 12, 1857 (ch. 17, P. & L. Laws of 1857), authorized the Chicago, St. Paul & Fond du Lac Railroad Company and the Wisconsin & Superior Railroad Company to consolidate their capital stock, "and to make the two companies one, and to place the affairs and property of the two companies under the direction of one board of directors," etc. ; and provided that when there should be deposited with the secretary of state of this state a certain certificate showing the fact of such consolidation, "therefrom and thereafter all the

rights, franchises, privileges, powers, immunities, property and causes of action " of the two companies so consolidated, and of the two former companies previously consolidated as above mentioned (viz., the Illinois & Wisconsin Railroad Company and the Rock River Valley Union Railroad Company), should be transferred to, conferred upon and owned by the consolidated company thus created. It appears that the consolidation here authorized was effected on the 5th of March, 1859, and that the title of the consolidated corporation was the Chicago, St. Paul & Fond du Lac. Railroad Company. 7. An act approved March 14, 1859 (P. & L. Laws of 1859, ch. 108), provides that " in case the railroad of the Chicago, St. Paul & Fond du Lac Railroad Company, or any part of said railroad lying within this state, shall be sold by virtue of any mortgage or mortgages, or deed or deeds of trust, * * * the purchaser or purchasers, * * his or their associates, successors or assigns, if desiring to form a corporation under or by virtue of the laws of this state, or of the states of Illinois or Michigan, or any or all of said states, may file in the office of the secretary of state of this state a certificate," specifying certain facts, and signed by such purchaser or purchasers, etc., and that thereupon the persons who shall have signed such certificate " shall be a body politic and corporate by the name stated in such certificate, and the said corporation shall possess all the privileges, powers, authorities and capacities acquired by said purchaser or purchasers or possessed by the Chicago, St. Paul & Fond du Lac Railroad Company by virtue of any law of this state or of the states of Illinois or Michigan," etc., etc. It appears that an act of a similar character was passed by the legislature of Illinois in reference to the property and franchises of the same company in that state, which act was approved February 19, 1859 ; and that afterwards, on the 2d of June, 1859, the railroad and franchises of said Chicago, St. Paul & Fond du Lac Railroad Company were sold by virtue of certain trust deeds which had been given by said company to secure its indebted-

ness; that the purchasers were Samuel J. Tilden and O. D. Ashley; and that on the 7th of the same month said purchasers became a corporation under the name of the *Chicago & Northwestern Railway Company* in pursuance of the laws of this state and of Illinois above mentioned. On the first of January, 1874, and from thence until the filing of these informations, said company owned and operated about five hundred miles of railroad in this state.

II. The following statutes touching the corporate existence and powers of *The Chicago, Milwaukee & St. Paul Railway Company*, and the facts stated in connection therewith, are referred to in the pleadings and arguments herein: 1. An act of the legislature of the *territory* of Wisconsin, approved February 11, 1847, is entitled "An act to incorporate the Milwaukee & Waukesha Railroad Company." Sec. 1 declares that nine persons, designated by name, "are hereby appointed commissioners, under the direction of a majority of whom subscriptions may be received to the capital stock of the Milwaukee & Waukesha Railroad Company, hereby incorporated; and they may cause books to be opened * * * for the purpose of receiving subscriptions to the capital stock of said company," etc. Sec. 2 declares that "the capital stock of said company shall be one hundred thousand dollars, in shares of one hundred dollars each; and as soon as one thousand shares of stock shall be subscribed, and five dollars on each share actually paid in, and a statement shall be deposited with the treasurer of the county of Milwaukee, authenticated by the oath of the secretary and two or more of said commissioners, that such subscriptions and payments have been in good faith made, the subscribers of such stock, with such other persons as shall associate with them for that purpose, their successors and assigns, shall be, and they are hereby declared and created a body corporate and politic, by the name and style of the Milwaukee & Waukesha Railroad Company, with perpetual succession," etc., etc. Sec. 3 provides that said commissioners, or a majority of them, after

the said one thousand shares of stock shall have been sub-scribed, shall give a certain notice of the time and place by them appointed for the subscribers or stockholders to meet for the purpose of electing nine directors; but there is a provision that previous to such first election, the commissioners named in section one of the act shall perform all the duties and be invested with all the powers of directors. The act empowers the company (sec. 8) to construct a railroad from the city of Milwaukee to the village of Prairieville (now Waukesha), and to transport "property and persons upon the same by the power and force of steam," etc.; and it further provides (sec. 15) that "on the completion of said railroad, or any portion of the track not less than ten miles, it shall * * be lawful for the company to demand and receive such sum or sums of money, for passage and freight of persons and property, as they shall from time to time think reasonable." Sec. 5 also declares that the directors shall have power, among other things, "to regulate tolls." 2. An act of the *territorial* legislature, supplementary to the former, was approved March 11, 1848. Sec. 1 declares that the Milwaukee & Waukesha Railroad Company is thereby empowered to extend, lay out and continue the railroad authorized by the preceding act, from the village of Waukesha "to such point in the village of Madison, in the county of Dane, and thence west to such point on the Mississippi River, in Grant county, as the said company may determine." Sec. 2 reads as follows: "Whenever the said company shall decide to extend said railroad as aforesaid, they may increase their capital stock to three millions of dollars, which shall be sub-scribed in shares of like amount as the original stock of said company, and for that purpose may open anew their books of subscription, or open new books for the subscription of such additional stock, and may appoint such agent or agents to attend to the same as may be necessary for carrying out fully the provisions of this section." Sec. 3 provides that said company "shall have the same powers" in locating and construct-

ing the road from Waukesha to Madison and thence to the
Mississippi River, "that they have upon that portion of the
road from Milwaukee to Waukesha;" and that "all powers,
regulations and restrictions, and all authority granted to and
liabilities of said company shall not in any manner be abridged,
extended or altered by the increase of capital stock and exten-
sion of the road as aforesaid, except such alteration, extension
and increase as is authorized by the provisions of this act."
3. An act of the *state* legislature, approved March 12, 1849
(ch. 92, Laws of 1849), empowers the common council of the
city of Milwaukee "to subscribe, in behalf of that city, to the
capital stock of the Milwaukee & Waukesha Railroad Com-
pany, incorporated February 11, 1847, by the legislature of
Wisconsin territory, or to the capital stock of any other rail-
road company which is now or may hereafter be incorporated
for the purpose of constructing a railroad from the city of Mil-
waukee to the Mississippi River," etc.   4. Ch. 49, Laws of
1850, among other things, changes the name of said company
to the "Milwaukee & Mississippi Railroad Company."   5. By
ch. 64, Laws of 1851, said company last named was empowered
to borrow money, and to "make and execute in their corporate
name, all necessary writings, notes, bonds or other papers, and
make, execute and deliver such securities in amount and kind
as may [might] be deemed expedient by said corporation;"
and "the powers of said corporation for the purposes aforesaid,
and for all purposes necessary to carrying out the object of
said company, namely, the construction of a railroad from Mil-
waukee to the Mississippi River," were by said act "ratified
and confirmed, and the contracts and official acts of said com-
pany declared binding in law and equity upon said corporation,
and upon all other parties to said contracts."   6. Ch. 238,
Laws of 1852 (approved April 7 of that year), incorporated
the Southern Wisconsin Railroad Company, with power to
build a railroad from Milton, in Rock county, by way of Janes-
ville, through Green, La Fayette and Grant counties to the Mis-

-sissippi River, and to carry property and persons thereon; and it provided that the directors of said company should have "full power to regulate tolls," etc. 7. Ch. 255, P. & L. Laws of 1853, empowers the Milwaukee & Mississippi Railroad Company to purchase that portion of the Southern Wisconsin Railroad, then constructed or thereafter to be constructed, lying between Janesville and its intersection with the road of the first named company at Milton, together with the real estate, personal property, *franchises*, etc.; and declares that upon such purchase, and a conveyance made in pursuance thereof, such portion of railroad, with the property and franchises appurtenant thereto, necessary for the full use and enjoyment of the same, shall become incorporated and merged in the property and franchises of the Milwaukee & Mississippi Railroad Company, and said company shall have the right to operate, maintain, complete and reconstruct such portion of road, and to manage and control the same in all respects and to the same extent as if the same had been located and constructed as part of the railroad of said company. 8. Ch. 149, Laws of 1852, incorporated the Madison & Prairie du Chien Railroad Company, with power to build and operate a railroad between the points designated in its name, and authorized the company "to demand and receive such sum or sums of money for passage or freight of persons or property as they shall [should] from time to time think reasonable." The act also conferred upon the directors of the company, among other powers, "full power to regulate tolls." 9. Ch. 320, Laws of 1853, provides for a consolidation of the capital stock of the Madison & Prairie du Chien Railroad Company with that of the Milwaukee & Mississippi Railroad Company, and declares that all the rights, privileges, grants, powers and immunities conferred by the charter of the said Madison & Prairie du Chien Railroad Company are transferred to and conferred upon the Milwaukee & Mississippi Railroad Company. 10. Ch. 61, P. & L. Laws of 1855, empowers the Milwaukee & Mississippi Railroad Company to con-

struct a railroad, from a point on its then existing line in Rock county, through Janesville, Monroe, Shullsburg and Benton, to the Mississippi River.  Pursuant to this authority, the company afterwards built a road from a point in Rock county to the village of Monroe, in Green county.  11.  Ch. 121, Laws of 1856 ("An act concerning railroads"), approved October 10 of that year, empowers all railroad companies of this state to borrow money, etc., and to execute mortgages or trust deeds of their respective roads, constructed or in process of construction, and to make provision in such instruments "for pledging or transferring their railroad track, right of way, depot grounds, *rights, privileges, franchises, immunities,* machine houses, rolling stock," etc., as security for their indebtedness; and it provides that in case of a sale by virtue of such a trust deed, or upon foreclosure of such a mortgage, the parties acquiring title under any such sale, and their associates, successors or assigns, shall acquire thereby, "and shall exercise and enjoy thereafter all and the same rights, privileges, grants, franchises, immunities and advantages in and by said mortgage or trust deed enumerated and conveyed, which belonged to or were enjoyed by the company making such deed or mortgage," as to the portion of road so mortgaged or deeded; and that such purchasers, etc., may organize anew under the same or a different name, etc.  The act further extends its provisions to all mortgages and trust deeds theretofore executed by any railroad company, provided such company should accept the same by resolution duly certified and filed with the secretary of state.  These provisions of the act were preserved in sec. 33, ch. 79 of the Revised Statutes of 1858.  12.  Ch. 308, Laws of 1860, entitled "An act to facilitate and authenticate the formation of a corporation by the purchase of the Milwaukee & Mississippi Railroad Company," provided that in case the railroad of the Milwaukee & Mississippi Railroad Company, or any part thereof, should be sold by virtue of any mortgage or deed of trust, the purchasers, their associates, successors or assigns, if

desiring to form a corporation under the laws of this state, might file in the office of the secretary of state a certificate there described, and thereupon the persons named in the certificate should be a body politic and corporate by the name stated in such certificate ; and that such corporation should " possess all the privileges, powers, authorities and capacities acquired by the said purchasers, or possessed by the Milwaukee & Mississippi Railroad Company, by virtue of the charter of said company and of any law of this state." It appears that the road of the Milwaukee & Mississippi Railroad Company extending from Milwaukee to Prairie du Chien, had been conveyed by trust deeds to Isaac Seymour, to secure bonds of the company which had been sold to raise funds for building said road ; that default was made on said bonds in 1860 ; that a decree of foreclosure was obtained under said trust deeds, and the road with the appurtenant property and franchises of the company sold January 18, 1861 ; and that a new corporation was formed by the purchasers in pursuance of the acts above described, under the name of the Milwaukee & Prairie du Chien Railway Company, the articles of association of which were filed in the office of the secretary of state, January 21, 1861. 13. Ch. 65, P. & L. Laws of 1868, declares that " the purchase by the Milwaukee & St. Paul Railway Company of the railway property, rights and franchises of the Milwaukee & Prairie du Chien Railroad Company, and also the sale and conveyance of the same by the said last mentioned company, are authorized, ratified and confirmed," etc. It appears that the Milwaukee & Prairie du Chien Company conveyed its said road and franchises to the Milwaukee & St. Paul Company, August 1, 1868. 14. Ch. 198, Laws of 1852, provides for incorporating the La Crosse & Milwaukee Railroad Company, with power to build and operate a railroad between the two places designated in its name, and " to demand and receive such sum or sums of money for passage and freight of persons and property, as they shall from time to time think proper." The directors were also empow-

ered " to regulate tolls and charges for the transportation of freight and passengers," and also to make such contracts with any person whatsoever, as the execution and management of the works, and the convenience and interests of the company might require. It appears that the company was duly organized, and the road built; that in December, 1856, to secure payment of its bonds in a large amount sold to raise money for the construction of the road, the company executed a trust deed of so much of its road as lay between Portage City and La Crosse; that, upon default made and decree of foreclosure and sale obtained, that part of the road included in said trust deed was sold to one Pratt and one White, April 25, 1863; and that on the 5th of May following, the purchasers filed articles of association in the office of the secretary of state, and became a corporation under the name of the Milwaukee & St. Paul Railway Company. Ch. 358, P. & L. Laws of 1864 (approved April 2), entitled "An act to amend the articles of association of the Milwaukee & St. Paul Railroad Company," empowers the company to issue preferred and special stock, etc. 15. Ch. 450, Laws of 1852 (approved April 17 of that year), provides for the incorporation of the Milwaukee & Horicon Railroad Company, with power to build a railroad from Milwaukee, by way of Iron Ridge and Horicon, to some point on the Fox river, and "to demand and receive such sum or sums of money for passage and freight of persons and property, as they shall from time to time think reasonable." It appears that the company was duly organized, and the road built; that, upon default in payment of bonds issued to raise money for building the road, the trustees named in a deed of trust given as security for such bonds, obtained a decree of foreclosure and sale; and that the road, and its appurtenant property and franchises, were sold in May, 1863, to Washington Hunt and Russell Sage, by whom they were duly transferred to the Milwaukee & St. Paul Railway Company. 16. Ch. 176, Laws of 1851 (approved March 11 of that year), provided for the incorporation of the Milwau-

kee & Watertown Railroad Company, with power to build and operate a railroad from some point on the line of the Milwaukee & Mississippi Railroad in Waukesha county to Watertown, and "to demand and receive such sum or sums of money for passage and freight of persons and property, as they shall from time to time think reasonable." By act of February 13, 1852, this company was authorized to extend its road from Watertown, by way of Columbus and Portage City, to La Crosse. It appears that the company was duly organized, and built its road to Columbus; that afterwards it was consolidated with the La Crosse & Milwaukee Railroad Company; that in 1857 its said road was transferred to the Madison, Fond du Lac & Lake Michigan Railroad Company, afterwards known as the Milwaukee & Western Railroad Company; and that in June, 1863, said road was conveyed by the last named company to the Milwaukee & St. Paul Railway Company. 17. Ch. 419, Laws of 1865 (approved April 10), ratifies the organization of the Milwaukee & St. Paul Railway Company as provided by the articles of association filed May 5, 1863 (*supra*, 14), and declares the company to be "a corporation with all the rights, powers, privileges and franchises which were of the Milwaukee & Western Railroad Company, Milwaukee & Horicon Railroad Company, and of all that part of the La Crosse & Milwaukee Railroad Company pertaining to its road lying west of Portage City." 18. It also appears that a judgment in favor of one Cleveland, held by one James, against the La Crosse & Milwaukee Railroad Company, was in January, 1867, at the suit of James by creditor's bill, decreed to be a lien on the road of said company between Milwaukee and Portage City; and that such road was sold by order of the court, March 5, 1867, and purchased by the Milwaukee & St. Paul Company. 19. It further appears that, pursuant to authority granted by the general railroad law of 1872 (sec. 50, ch. 119 of the laws of that year), the name of the last mentioned company was changed to the *Chicago, Milwaukee & St. Paul Railway Company*, by reso-

lution of the company passed February 7, 1874, and recorded in the office of the secretary of state on the 11th of the same month, and duly published in the official state paper. On the 1st of January, 1874, and from that time until the filing of these informations, said company owned and operated between six and seven hundred miles of railway in this state.

III. Ch. 273, Laws of 1874, approved March 11th of that year, divides all railroads in this state into three classes designated respectively as A, B and C, and declares that class A shall include all railroads or parts of railroads in this state now owned, operated, managed or leased either by the Milwaukee & St. Paul Railway Company, the Chicago & Northwestern Railway Company, or the Western Union Railway Company. Sec. 2 prescribes for each of said classes the maximum compensation per mile which may be charged for the transportation of any person with ordinary baggage not exceeding one hundred pounds in weight; and such maximum for class A is fixed at three cents for persons over twelve years of age, and half that sum for persons under that age. Sec. 3 declares that "all freights hereafter transported upon any railroad or part of a railroad in this state are hereby divided into four general classes, to be designated as first, second, third and fourth classes, and into seven special classes, to be designated as class D, E, F, G, H, I and J." The kinds of freight included in each of the seven special classes are then described; and it is then declared that "all articles not above enumerated or subsequently set into said classes as hereinafter provided, shall be placed in and belong to the four general classes, to be classified by the railroad commissioners hereinafter provided to be appointed, as said articles were classified by the Milwaukee & St. Paul Railway, which classification went into effect on the 15th day of June, 1872." Sec. 4 prescribes the maximum rates chargeable by the railroads included in classes A and B for carrying the several articles named in the several special classes of freight previously described. The rates so pre-

scribed for articles in class D are as follows: "not exceed-ing six cents per hundred pounds for the first twenty-five miles, and not exceeding four cents per hundred pounds for the second twenty-five miles, and not exceeding two cents per hundred pounds for each additional twenty-five miles or frac-tional part thereof, unless the fraction shall be less than thir-teen miles, in which case the rate shall be one cent for said fractional part, unless the whole distance be over two hundred miles, when no greater rate than one-half cent per hundred pounds shall be received for such [each?] twenty-five miles over said first mentioned distance." The maximum rates pre-scribed for each of the other special classes of freight are graded in a similar manner with reference to the distance of the carriage. Sec. 5, among other things, forbids any railroad in class A or B from receiving a higher rate for carrying any freight included in the four general classes than was charged for carrying such freight on the same road on the first day of June, 1873. Sec. 6 provides that any individual or corpora-tion violating or in any way evading the provisions of the act shall forfeit all right to recover or receive any compensation whatever for the service rendered wherein such violation is attempted; and that every agent of the corporation or person operating such railroad, who shall refuse to receive for trans-portation over the road for which he is agent, in the usual way, any of the articles before mentioned, on account of the compensation prescribed in the act being too low, or who, re-ceiving any such articles of freight, shall charge or attempt to charge for the transportation of the same any greater sum than is fixed in the act, or shall in any manner violate or attempt to violate or evade the provisions of the act, shall be deemed guilty of a misdemeanor, and on conviction thereof shall pay a fine not exceeding two hundred dollars for each offense; and that the injured party shall have a right of action against said agent or against the company or person operating the road, or both, for three times the amount taken or received from him

in excess of the rates prescribed by the act. The act further provides for the appointment of three railroad commissioners, with power, among other things, to "classify all articles · of freight," except those placed by the act in the special classes D, E, G and H, and "to reduce said rates on any of said railroads or parts of railroads, either in general or special classes, when in their judgment, or [that of] a majority of them, it can be done without injury to such railroad." There are numerous other provisions in the act, relating to the powers and duties of the commissioners, etc. ; but these are not important here. Sec. 18 declares that "nothing contained in the act shall be taken as in any manner abridging or controlling the rates for freight charged by any railroad company in this state for carrying freight which comes from beyond the boundaries of the state, and to be carried across or through the state." Sec. 19 declares that the act shall take effect from and after its passage and publication. In accordance with a joint resolution of the two houses, approved March 12, 1874, the publication of this act was delayed until April 28 of that year.

IV.  1. Ch. 296, Laws of 1874, was approved March 12, and published March 26, of that year. Sec. 2 of the act amends sec. 55, ch. 119, Laws of 1872 (the general railroad law), so as to read as follows :  " All existing railroad corporations within this state shall respectively have and possess all the powers and privileges contained in this act and in their respective charters, and they shall be subject to all the duties and liabilities prescribed by this act." 2. Ch. 341, Laws of 1874, was also approved March 12, and was published March 25, of that year. Sec. 9 of this act provides that "if any railroad company organized or doing business within this state, or which may hereafter do business within this state, shall charge, collect, demand or recover *more than a fair and reasonable rate of compensation* upon any line or road within this state, which it has the right, license or permission to use, operate or control, the same shall be deemed guilty of extortion, and upon conviction thereof shall

be fined in any sum not less than five hundred- dollars, nor more than two thousand dollars for each offense, with costs of suit, and reasonable attorney's fees, to be fixed by the court." Sec. 10 declares that all acts or parts of acts contravening or conflicting with the provisions of that act are thereby repealed.

V. 1. Section 5 of article I of the constitution of this state provides that " the right of trial by jury shall remain inviolate, and shall extend to all cases at law, without regard to the amount in controversy." 2. Section 2 of article VII provides that " the judicial power of this state, both as to matters of law and equity, shall be vested in a supreme court, circuit courts, courts of probate, and justices of the peace," etc. Section 3 of the same article reads as follows : " The supreme court, except in cases otherwise provided in this constitution, shall have appellate jurisdiction only, which shall be co-extensive with the state ; but in no case removed to the supreme court shall a trial by jury be allowed. The supreme court shall have a general superintending control over all inferior courts; it shall have power to issue writs of habeas corpus, mandamus, injunction, quo warranto, certiorari and other original and remedial writs, and to hear and determine the same." 3. Section 8 of the same article reads as follows : " The circuit courts shall have original jurisdiction of all matters, civil and criminal, within this state, not excepted in this constitution, and not hereafter prohibited by law, and appellate jurisdiction from all inferior courts and tribunals, and a supervisory control over the same. They shall also have the power to issue writs of habeas corpus, mandamus, injunction, quo warranto, certiorari, and all other writs necessary to carry into effect their orders, judgments and decrees, and give them a general control over inferior courts and jurisdictions." 4. Chapter 148, R. S., is entitled " Of proceedings by and against corporations," and contains the following provisions : " Section 13. Upon a complaint being filed under the direction of the attorney general, in any circuit court, such court shall have power to restrain, by injunction, any cor-

poration from assuming or exercising any franchise, liberty or privilege, or transacting any business, not authorized by the charter of such corporation; and in the same manner to restrain any individuals from exercising any corporate rights, privileges or franchises not granted to them by any law of this state. Section 14. Such injunction may be issued before the answer, upon satisfactory proof that the defendants complained of have usurped, exercised or claimed any franchise, privilege, liberty or corporate right not granted to them; and after the answer, such injunction may be continued until such judgment shall be rendered."

VI. 1. Section 13 of article I of the constitution of this state declares that "the property of no person shall be taken for public use without just compensation therefor." 2. Section 1 of article XI provides as follows: "Corporations without banking powers or privileges may be formed under general laws, but shall not be created by special act, except for municipal purposes, and in cases where, in the judgment of the legislature, the objects of the corporation cannot be attained under general laws. All general laws or special acts enacted under the provisions of this section may be altered or repealed by the legislature at any time after their passage." 3. Sections 31 and 32 of article IV were adopted as amendments to the constitution in 1871. By the former section "the legislature is prohibited from enacting any special or private laws" in nine cases there specified, the seventh of which is "For granting corporate powers or privileges, except to cities." Section 32 reads as follows: "The legislature shall provide general laws for the transaction of any business that may be prohibited by section thirty-one of this article, and all such laws shall be uniform in their operation throughout the state."

VII. The information in this case against the *Chicago & Northwestern Railway Company*, after reciting the acts under which the company was organized, and the material provisions of ch. 273, Laws of 1874, etc., charges that said company, im-

mediately after said last mentioned act took effect, to wit, on the 29th of April, 1874, filed in the office of the governor of this state a communication in writing signed by Albert Keep, president of said company, in which, among other things, it announced its intention to disregard the requirements of said act, so far as the same fixes the rates of compensation for the transportation of freights and passengers within said state, and to operate its railroad to and from and between its various stations within this state regardless of the requirements of said act. It further charges that said defendant, " combining and confederating with divers persons at present to the attorney general unknown, * * * and contriving how to·wrong and injure the plaintiff and all the people of the state of Wisconsin in the premises," has hitherto absolutely refused, and still does refuse, to comply with the requirements of the aforesaid act, " and has adopted and issued a tariff of rates for freights between local stations within the said state, and a tariff of rates for freights and passengers transported over its roads within said state, and a classification of freights, each and all of which are in disregard of the classification and rates fixed by the said last mentioned act, and contrary to the requirements thereof ;" that said defendant has also issued to its officers, agents and servants (all of whom the plaintiff prays may, when their names shall be discovered, be made parties defendant to this action, etc.), instructions to demand and receive of all persons passing over their roads or shipping freights thereon, the·rates therefor specified in said tariff and schedules, * * * which are higher than those authorized by said act, and in excess of the power conferred upon defendant by law ; that said defendant, its agents, etc., have, during all the time since said 28th of April, 1874, demanded and received, and now demand and receive, from persons carried on their railroad, and from persons shipping goods, etc., thereon, between places within this state, rates and compensation therefor higher than those authorized by said act, and higher than said defendant is

authorized by law to demand or receive. It is then further charged that said alleged rates are charged and received by the defendant as aforesaid, for carrying freight and passengers which do not come from beyond the boundaries of the state of Wisconsin to be carried across or through the same, and which do not come from places without the state of Wisconsin, to be carried to or delivered at places or stations within this state, and which are not received for carriage or transportation from stations or places within to places or stations without said state. Prayer, for the writ of injunction directed to said defendant, to restrain it, its officers, etc., from exceeding its powers and from violating the law in the manner above stated; and for judgment that said injunction be made perpetual.

VIII. The answer of the *Chicago & Northwestern Railway Company*[*] contains a plea to the jurisdiction of the court, and also a general denial except as to allegations specially admitted. After admitting the corporate character and name of said defendant under the laws of this state, the answer then sets up the following defenses: 1. That ch. 273, Laws of 1874, has, since March 11, 1874, been wholly repealed. 2. That said act never was a valid law, because in violation of sec. 13, art. I of the constitution of this state (*supra*, VI, 1), because "if this defendant is required to operate its railroads in said state in compliance with the terms of said act, it will be deprived of all beneficial use of said railroads without any compensation; and also for the reason that said act is in contravention of sec. 1 of the XIVth amendment to the constitution of the United States, which declares that "No state shall make or enforce any law

___

[*] Although the answers of the defendant companies were not filed until *after* the motions for a temporary injunction were made and argued, their substance is stated here, because they were read for the information of the court, on the hearing of such motions, and were filed before the motions were determined, and because they present in an authentic form the chief grounds upon which the motions were resisted. — REP.

which shall abridge the privileges or immunities of citizens of the United States, nor shall any state deprive any person of life, liberty or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws." 3. That said act was also in violation of sections 31 and 32, art. IV of the constitution of this state, adopted in 1871 (VI, 3). 4. That said defendant's right to regulate the rates to be charged by it for the transportation of passengers and property over its said railroads was recognized by the several acts of the legislature of this state incorporating said company, and the acts amendatory thereof and supplementary thereto, and laws passed subsequent to the formation of said company; that defendant, in good faith, after making a thorough examination of all the facts bearing upon the question as to what said rates ought to be, established certain rates of fare and freight, with the purpose of establishing just and reasonable rates, and that the same are in fact just and reasonable, and are so low that in operating its railways under them it has not derived and does not derive from all its sources of revenue in this state a sum sufficient to pay the necessary cost of operating and maintaining its railways therein, and to pay the interest upon the bonds given by it for money borrowed by it under authority granted by the laws of this state, which money was actually invested in the construction and equipment of its roads in this state, and to pay the legal rate of interest in this state upon the moneys actually invested by its stockholders in the construction and equipment of said roads; and that the compensation for the transportation of passengers and freight, named in said act, would not yield sufficient revenue to pay the interest accruing upon the defendant's bonds above mentioned, and to maintain its roads in this state, with their equipments and appurtenances, in a proper state of efficiency and repair. 5. That defendant is indebted to the holders of its bonds above mentioned for moneys borrowed by it and expended by it in the construction and equipment of its said roads in this state, in the sum of $17,247,-

770, and that said roads, if operated at the rates specified in the act aforesaid, would be of no value to defendant, and the enforcement of said act would impair the obligation of the contracts entered into between defendant and its bondholders, for that such enforcement would oblige defendant to employ its property, mortgaged to secure said bondholders, in such manner as to deprive said creditors of such security as lawfully belongs to them under such contract and by virtue of the laws of Wisconsin.    6. That the enforcement of said act would deprive defendant of its property in its railroads in this state, and in their equipment, by rendering the same of no value to defendant, and would therefore be a violation of the contract entered into between the state and said defendant.    7. That the Galena & Chicago Union Railroad Company was a corporation of the state of Illinois, incorporated under a certain act of the legislature of that state, of 1836, and was authorized by said act to prescribe the manner in which the railroad specified in the act should be used, and the rates of toll for the transportation of persons and property thereon, and also to borrow any sums of money which it might deem necessary, not exceeding its capital stock, to aid in the construction of its roads; that on the 2d of June, 1864, the *Chicago & Northwestern Railway Company* and said Galena & Chicago Union Railroad Company consolidated their property and franchises into one corporation by the name of the *Chicago & Northwestern Railway Company*, which consolidation was made pursuant to the laws of Wisconsin and Illinois; that this consolidation was approved and ratified by an act of the legislature of Illinois, approved February 5th, 1865, by which act it was provided that said company, as then consolidated, should have all the powers theretofore conferred by the laws of that state upon either of said two companies, or any other company consolidated therewith; that by virtue of this consolidation the defendant became vested with all the rights, powers, privileges and franchises which had been theretofore conferred by the laws of Illinois upon the two companies

above named, or by the laws of Wisconsin upon the Wisconsin & Superior Railroad Company, or upon the Chicago, St. Paul & Fond du Lac Railroad Company, or upon the Chicago & Northwestern Railway Company, among which powers was that to demand and receive such sums of money for the transportation of persons and property, as the said railroad from time to time should deem reasonable; and that the enforcement of the act of 1874, aforesaid, would impair the obligation of the contract between the stockholders of said Galena & Chicago Union Railroad Company and those of the Chicago & Northwestern Railway Company, contained in the consolidation of said companies above set forth, and thereby greatly impair the security of the bondholders. 8. That by an act of the legislature of Wisconsin passed March 12, 1874 (IV, 2), defendant was authorized to charge and receive fair and reasonable rates of compensation for the transportation of persons and property over its roads in this state; and that the rates now charged by defendant are fair and reasonable. 9. That a proper construction of said ch. 273, of 1874, is, that the rates of freight therein prescribed are to be applied to all merchandise shipped from any point without said state to any point within it, or from any point within to any without said state, which is a regulation of inter-state commerce that the legislature of Wisconsin has no power to make, under the constitution of the United States. 10. That at the time of the commencement of this action there was, and ever since has been, and still is, another action pending in this court, brought by the attorney general in the name of the state, in which the plaintiff sets forth as the cause of action the same facts which are set forth in the complaint in this action, and prays the judgment of the court to annul the charter of this defendant because of said alleged violation by defendant of the provisions of said act of March 11, 1874, and for no other cause; and that the injunction prayed herein would, if granted, inevitably render the defendant bankrupt, and destroy its existence as a corporation, and this action

is in effect for the same purpose as the former suit, and is designed to accomplish the same purpose, namely, the annihilation of this defendant, and therefore this action is barred; that on such question, involving the existence of the defendant, it has the right to a trial by jury, by the constitution of this state, and if the statute under which this suit is brought is upheld and enforced in this case, defendant will be deprived of a trial by jury; wherefore said act is unconstitutional and void, and on the facts alleged in the complaint this court has no jurisdiction to grant any relief demanded herein. 11. The answer then sets forth at length, substantially as it is above set forth (I), the history of the acts of the legislature of this state, and those of the legislature of Illinois, under which were organized the several railroad companies to whose property and franchises the defendant has succeeded; and it avers that when the property and franchises of the Chicago, St. Paul and Fond du Lac Railroad Company were sold, on the 2d of June, 1859, to Samuel J. Tilden and O. D. Ashley as above stated (I, 7), there were not separate sales of the portions lying in Illinois and Wisconsin severally, but the entire road, from Chicago, in Illinois, to Fond du Lac, in Wisconsin, was sold as a consolidated road, and deeded to the purchasers as one entire road; and it alleges that by virtue of said acts of the legislature of Wisconsin and Illinois, and by virtue of said sale and deeds, said Tilden and Ashley became seized of all the property of said railroad company, and of the right to operate the road and charge reasonable compensation for the transportation of passengers and freight thereon, as natural persons and not as a corporation, and that they did not lose the right so acquired by subsequently filing their certificate of incorporation.

IX. The information against the *Chicago, Milwaukee & St. Paul Railway Company* alleges the organization of the company, as a corporation under the laws of this state, by the name of the Milwaukee & St. Paul Railway Company, by the filing of articles of association in the office of the secretary of

state, upon the 5th of May, 1863, as above stated (II, 14); the amendment of said articles of association as above mentioned by the act of April 2, 1864; the passage of the act of April 10, 1865, ratifying and confirming said articles of association, etc. (II, 17); and the subsequent change of the name of said company (II, 19). It then recites the passage and publication of ch. 273, Laws of 1874, and avers that said defendant is mentioned and described in said act as the Milwaukee & St. Paul Railway Company, " by which name it was then and theretofore, and still is, commonly known and called, and that there is no corporation in this state by the name of the Milwaukee & St. Paul Railway Company, and has not been since the change of the name above stated, except as the name is applied to the defendant, and whenever the Milwaukee & St. Paul Railway Company is mentioned in said act, the defendant is the company meant, and intended to be spoken of and referred to." Said company is then charged with designed, systematic and continuous violation of the provisions of the act of 1874 prescribing maximum tolls chargeable on its roads, the charges being made in terms precisely similar to those used in the other information, above described; and the same relief is demanded against it.

X. The answer of the *Chicago, Milwaukee & St. Paul Railway Company* admits its existence as a corporation under the laws of this state; its original incorporation under the name of the Milwaukee & St. Paul Railway Company, by filing the articles of association of May 5, 1863; the amendment of these articles by the act of April 2, 1864; their ratification and confirmation by the act of April 10, 1865, and the subsequent change of its name to that under which it is made defendant. It then denies generally the other averments of the information. (2) For a second defense, after reciting the facts stated above as to the La Crosse & Milwaukee Railroad Company, the sale of its road and franchises upon foreclosure of the trust deed, and the filing of articles of association by the purchasers, etc. (II, 14), the answer insists that the right to

operate said railroad, and the right of the owner to regulate the charges for transportation of freight and passengers over it, "inhered in and became a part of said railroad property, and a right belonging to the owner thereof, separate and distinct from the existence of said La Crosse & Milwaukee Railroad Company," and was capable of transfer from said company to any purchaser thereof, and "became a vested right in the owner of said railroad, unalterable and irrepealable and unaffected by section one of article eleven of the constitution of Wisconsin;" that "said purchase of Pratt and White at said foreclosure sale was a purchase of said property with the right to use, manage and operate the same as their individual property, and to make money thereby, free and discharged from all right, claim, control, interest or liability of said La Crosse & Milwaukee Railroad Company; that the transfer thereof by said Pratt and White to the defendant, vested the same in defendant in like manner; and that defendant now holds the same as property, with the right inherent therein to be used, managed and operated as a railroad for the transportation of freight and passengers, independent of any corporate right granted to this defendant; that such right to use the property cannot be affected by any alteration of the charter of the La Crosse & Milwaukee Railroad Company, or of the defendant, but inheres in the property and enures to the benefit of the owner, whoever he may be, wholly independent of the existence of either of said corporations, and unaffected by sec. 1, art. XI of the state constitution." The defendant "therefore expressly denies" that it has charged or received higher rates of fare and freight over its road within this state, "than are fixed and allowed by law;" and denies that ch. 273, Laws of 1874, is constitutional or binding upon defendant in respect to that portion of its road lying between Portage City and La Crosse. 3. The answer then sets up the acts of the territorial legislature of 1847 and 1848, relative to the Milwaukee & Waukesha Railroad Company (II, 1, 2); the change of its

name to the Milwaukee & Mississippi Railroad Company by the act of February 1, 1850 (II, 4); the building of its road from Milwaukee to Prairie du Chien, between the years 1850 and 1856; the sale of said road and its franchises in January, 1861, upon foreclosure of the trust deeds given to Isaac Seymour, and the organization, by the purchasers, of the Milwaukee & Prairie du Chien Railroad Company (II, 12); and the conveyance by said company, of its railway franchises, etc., to the defendant, August 1, 1868 (II, 13). It then insists that defendant has succeeded to all the rights, franchises and property which belonged to the corporation so chartered by the territorial legislature; that such rights and franchises are unalterable by the legislature of the state of Wisconsin; and that ch. 273, Laws of 1874, so far as it attempts to affect the road constructed under said territorial charter, is invalid. 4. The answer then sets up the sale to defendant of that portion of the La Crosse & Milwaukee Railroad between Milwaukee and Portage City, March 5, 1867, under a decree of the court to satisfy a judgment lien (II, 18), and avers that by virtue of such sale defendant became the owner of said road, "and entitled to have, own, manage, control and operate the same as its sole and individual property." It then set out the facts as to the acquisition by defendant of the road of the Milwaukee & Horicon Railroad Company (II, 15), and that of the Milwaukee & Western Railroad Company (II, 16). 5. As a fifth defense the answer then avers, as to the roads constructed by the La Crosse & Milwaukee, the Milwaukee & Horicon, the Milwaukee & Western, and the Milwaukee & Waukesha Companies, under their respective charters, and purchased by defendant as above mentioned, that defendant is now the owner thereof, and has succeeded to the rights of said companies in said roads; and it then claims, in the same language as that used in the second defense, the right to use and operate said roads, and regulate the charges for carrying freight and passengers thereon, as a right inherent in the property, and enuring to the benefit

of any owner thereof, disconnected from the corporate existence of said several companies or of the defendant, and unaffected by any alteration in the charters of those companies or that of the defendant; and therefore denies that it has charged or received for such carriage any higher rates than are allowed by law, and denies that said ch. 273 is valid and binding on defendant.    6. For a sixth defense the answer avers that none of the charters under which defendant's roads in this state were constructed, fixed rates for the transportation of freight or passengers, but each of them authorized the company created by it to fix such rates at its discretion; that all such roads were built and put in operation on the faith and credit of such charters; and that thereby the right to fix such rates became vested in said companies and their successors. 7. For a seventh defense the answer avers that said ch. 273, Laws of 1874, was repealed by chapters 296 and 341 of the laws of the same year (IV, 1, 2).    8. For an eighth defense the answer avers that said ch. 341, Laws of 1874, authorizes railroad companies to charge a reasonable compensation for the transportation of freight and passengers; and that the amounts charged by defendant for such transportation during the year 1874 have not in any instance exceeded such reasonable compensation.    9. For a ninth defense the answer alleges that defendant is entitled, under the laws of this state, to charge a reasonable compensation for the transportation of freight and passengers over its road, reference being had to the services rendered, the risks incurred, and the cost and value of the property of the railroad; that the cost of defendant's road in this state amounts to $27,499,264, and it is of that value; that the compensation charged for such transportation since the 28th of April, 1874 (the day when ch. 273 was published), to the time of filing such answer, after paying the operating expenses of the road, does not amount to five per cent. per annum of the cost or value of said road and its appurtenances; and defendant denies that since said 28th of April it has charged

or received more than a reasonable price for such transportation. It further alleges that the rates named in ch. 273, Laws of 1874, are not reasonable and fair, but are unreasonably low and inadequate; and that if said railroad should be operated in accordance therewith, it would not, after paying operating expenses, pay three per cent. per annum on the cost or value of said road. 10. For a tenth defense the answer alleges that by the terms of said ch. 273 defendant is classified in class C of railroads; and it denies that defendant has charged a higher rate of compensation than is so allowed by said act. 11. For a further defense it is alleged that said ch. 273 was never a valid law, for the reason that it was in violation of sec. 13, art. I of the constitution of this state (VI, 1), and because, if defendant were required to operate its railroad in compliance with the terms of the act, it would be deprived of all beneficial use of its railroad without any compensation. 12. It is further averred that said ch. 273 is a special act, and provides different rates of compensation for each of the railroad companies named therein, and is not uniform in its operation throughout the state, and is therefore in violation of the amendment of article IV of the constitution of this state, adopted in 1871, and especially of section 31 of said article (VI, 3). 13. It is further averred that said ch. 273 is in violation of the contract between this state and the defendant, and is therefore void under subd. 1, sec. 10, art. I of the constitution of the United States. 14. It is further averred that the enforcement of said act will deprive defendant of its property without due process of law, and refuse to defendant the equal protection of the laws, in violation of sec. 1, art. XIV of the amendments to the constitution of the United States. 15. And for a fifteenth defense the answer sets up the pendency of the information in the nature of a *quo warranto*, filed by the attorney general, in this court, against said defendant.

None of the pleadings above described were verified.

XI. The attorney general moved, upon the informations,

for temporary injunctions in both cases.    During the argument
of these motions the following affidavits were read in behalf of
the state:    1.  The affidavit of J. H. Osborn states that he is
one of the railroad commissioners of this state, and since the
28th of April, 1874, has had frequent occasion in his official
capacity to inquire into the manner of operating the railways
of the two defendant companies; that he finds, and has per-
sonal knowledge, that said companies are now and have been
continuously since said 28th of April, demanding and receiv-
ing for the transportation of passengers and freights over their
respective railroads in this state greater and higher rates of
compensation than those prescribed by ch. 273, Laws of 1874.
It further states that on the 11th day of March, 1874, and for
a long time theretofore and since, the *Chicago, Milwaukee &
St. Paul Railway Company* was commonly known as and
called the Milwaukee & St. Paul Railway Company.    2.  The
affidavit of George W. Bird states that he resides at Jefferson,
Jefferson county, in this state; that since the 28th of April,
1874, he has had frequent occasion to ride as a passenger on
the trains of the two defendant companies in this state; that
said companies have each continuously since said 28th of
April, and as often as he has had occasion to ride over their
respective roads, demanded and received from affiant for carry-
ing him as a passenger on their respective roads, higher rates
of compensation than those prescribed by ch. 273, Laws of
1874; and that affiant has frequently been informed by agents
of each of said companies, that said companies were charging
and receiving for transportation of passengers and freights over
their respective roads higher rates of compensation than those
prescribed by said ch. 273, and that both of said companies·
were disregarding said chapter so far as it fixes a tariff of rates
for said companies.

    The following affidavits were read in behalf of the *Chicago &
Northwestern Railway Company:*  1.  An affidavit of Albert
Keep, president of said company, states that on or about the

27th of April, 1874, he, as such president, wrote and addressed to the governor of this state a certain letter in relation to the provisions of the two acts of the legislature of this state approved on the 11th and 12th of March, 1874, a copy of which letter is attached to the affidavit; and that affiant has not written or addressed, or caused to be written or addressed, any other communication to said governor in relation to said acts. The letter referred to states that the directors of said company, having carefully considered the two acts aforesaid, "desire to state the reasons why the roads they represent cannot be operated under the schedule named in the said acts;" and it then sets out those reasons at some length.   2. The affidavit of M. M. Kirkman states that he is the general accountant of said company, and keeps the books thereof showing its receipts and expenses; that, as shown by said books and according to the best knowledge and belief of the affiant, the gross earnings of said company upon its railways in this state during the month ending June 30, 1874, were $383,249.68, and the operating expenses of the same during the same period were $302,050.67, so far as the same can now be determined from the books of the company.   3. A second affidavit of Albert Keep, president of said company, states that he has examined the foregoing affidavit of Mr. Kirkman, and that the same is true according to the best information, knowledge and belief of this affiant; that the consolidated gold bonds of said company applicable to its railways in this state have, since the passage of ch. 273, Laws of 1874, depreciated from $87\frac{1}{4}$ on the 11th of March, 1874, to $78\frac{1}{2}$ on the 30th of July, 1874; that the preferred stock of said company has depreciated during the same time from 72 to 57, and the common stock from 53 to 39, which would be a depreciation of the stock of the company to the amount of $5,319,521; that affiant believes he is well acquainted with the means of doing business and the probable amount of receipts and expenses of said company, and has no doubt its receipts from said railways, operated in accordance

with said act, would be reduced in the neighborhood of twenty-five per cent.; and that the railways of said company could not be operated in this state in accordance with said act and earn sufficient to pay the necessary operating expenses of said company and the interest on its bonds.

In behalf of the *Chicago, Milwaukee & St. Paul Railway Company* the following affidavits were read :    1. The affidavit of John W. Cary states that he is the general solicitor of said company, and has been connected with the company since its organization; that he was engaged in foreclosing all of the mortgages mentioned in the answer of said defendant in this case, except that of the Milwaukee & Horicon Railroad, and is conversant with all the facts stated in said answer in respect to those mortgages, the foreclosure thereof, and the title of said defendant to the property now owned and operated by it; that the matters stated in said answer in respect to said several mortgages, the foreclosure thereof, and said defendant's title to the several roads named in the answer, are substantially true as therein stated; and that the provisions of the several charters as set forth in said answer are substantially correct. 2. The affidavit of Sherburne S. Merrill, general manager of said company, states that he has held that office for nine years last past; that he has been engaged in the operation of railroads for over twenty years, and is well acquainted with the business of railroad transportation in the northwest, and conversant with the affairs of said company; that said company now owns and operates in this state about 665 miles of road, and also owns and operates in connection therewith, as a part of its entire system of roads, about 734 miles situate in the states of Illinois, Iowa and Minnesota, making together 1399 miles of railroad operated by said company, as one system of roads; that the entire cost of said lines of roads is $52,454,604, and in the opinion and judgment of the affiant they could not be built and equipped as they now are, for any less sum; that the portion of said roads situate in this state cost $26,785,899.16,

and in affiant's opinion could not now be built and equipped as it is for any less sum; that said road has been operated thus far during the year 1874, substantially upon the same rates that were charged in 1873; that the gross earnings of said road in 1873 were $9,046,123.57, and the entire net earnings resulting from the operation of the road during that year, after paying operating expenses and the repairs and renewals of the road and track, amounted to the sum of $2,451,563.24; that said net earnings for 1873 amounted to four and sixty-seven hundredths (4.67) per cent. of the actual cost of the entire road; that the amount of annual interest paid on the bonded debt of the company in 1873 amounted to $1,797,554.87, which amount deducted from the net earnings left only $654,008.37 applicable for the purposes of dividends to the stockholders, which was only two and thirty-six one hundredths (2.36) per cent. upon the common and preferred stock; that in affiant's opinion the earnings of said road in 1873 could not have been increased by a reduction of the rates then charged, and any reduction in the present rates would not result in any material increase of business over the road at the present time, but would inevitably decrease the earnings of the company; that the rates charged for the transportation of freight and passengers are reasonable, and as low as the rates on any railroads in the United States, of the same class and similarly situated; that in affiant's opinion the present rates charged by the company, with the most careful and economical management of the property, will not yield the company, the present year, over and above operating expenses and the necessary renewals of track and road, more than five per cent. on the entire cost of the whole road; that the average rate charged for the transportation of passengers in 1873 was three and fifty-eight hundredths (3.58) cents per mile, and the average rate charged for freight, of the entire business of the road, was only two and one half (2.50) cents per ton per mile; that the charge per ton per mile of said company in 1868 was three and forty-nine

hundredths (3.49) cents; that the rate has been gradually reduced by the company of its own accord from 1868 to 1873, as above indicated; that the average passenger rates per mile have during the same period been reduced from three and eighty-four hundredths (3.84) cents to three and fifty-eight hundredths (3.58) cents; that this reduction has been made by the company, not because they were receiving more than a reasonable compensation, but in order to accommodate the business of the country, and with a view to develop its resources, and ultimately increase the business of the road; that in affiant's opinion the present rates of the company cannot be further reduced at this time without great injury to the company and the owners of its stock and bonds; that affiant has examined the rates prescribed by ch. 273, Laws of 1874; that the freight rates therein prescribed are ill-digested and inconvenient of application, and if adopted by the company would prove greatly injurious to its best interests, and to many of its patrons; that their adoption by the company would greatly reduce its revenue, and especially decrease its net income, and would cause serious injury and damage to the company, injure its credit, and in a great measure destroy the market value of its securities; and that in affiant's opinion the present rates are just and reasonable, and those prescribed by said ch. 273 are unreasonably low and unjust to the company. 3. The affidavits of John C. Gault, assistant general manager, and Orrin E. Britt, general freight agent, of said company, are confirmatory of the statements made in Mr. Merrill's affidavit.

By direction of the court the two motions for temporary injunctions were heard together, the argument being commenced on the 4th of August, and terminated on the 11th of that month. The state was represented in the argument by *I. C. Sloan*, Assistant Attorney General, *H. S. Orton* and *L. S. Dixon*;* the *Chicago & Northwestern Railway Company* by *C.*

---

* It is a cause of regret that the points argued and authorities cited by

*B. Lawrence, B. C. Cook,* and *Smith & Lamb;* and the *Chicago, Milwaukee & St. Paul Railway Company* by *John W. Cary* and *P. L. Spooner.*

*H. S. Orton,* for the complainant:

A. *The jurisdiction of the court.*

1. The supreme court has original jurisdiction of a bill in equity for an injunction, in all cases where that is the proper remedy. The constitution vests in this court jurisdiction in equi-ty. Sec. 2, art. VII. It also specifically vests in this court power to issue the writ of injunction in a proper cause in equity. Sec. 3, art. VII. The language "to hear and determine" confers the fullest jurisdiction possible in a cause in which the writ of injunction is sought as the only remedy, and presupposes the filing of an original bill in equity for that purpose. This juris-diction to entertain a bill for an injunction in a proper case is original, and *not ancillary to appeals.* (1) The language used in sec. 8, art. VII of the constitution, in conferring jurisdiction on the circuit courts, is as follows: "They shall *also* have the power to issue writs of habeas corpus, mandamus, injunction, quo warranto, certiorari, and *all other writs necessary to carry into effect their orders, judgments, and decrees, and give them a gen-eral control over inferior courts and jurisdictions."* These qualify-ing clauses are not found in sec. 6 where the supreme court is given jurisdiction over the same writs. Who can doubt that, notwithstanding this qualification, the circuit courts have juris-diction to issue writs of habeas corpus, quo warranto and man-damus in all original cases which have nothing to do with "a general control over inferior courts and jurisdictions?" The words "they shall *also* have power," indicate that this clause was intended to confer jurisdiction upon the circuit courts over these great common law writs, *in addition to* "original jurisdic-tion in all matters civil and criminal," and "appellate jurisdic-

---

*Mr. Dixon* cannot be presented here; no brief of them being upon the files, and the occupations of that gentleman since the trial not permitting him to prepare such a brief for the reporter's use.

tion over all inferior courts and tribunals, and a supervisory control over the same," conferred by the first part of sec. 8. It is submitted that the power to issue these writs, including that of injunction, is *concurrent* in the supreme and circuit courts. (2) This court has decided that it has original jurisdiction in habeas corpus, mandamus and quo warranto, in all proper cases, when such jurisdiction is not *ancillary* to appeals and writs of error; and the practice in such cases is settled. But the language of jurisdiction in respect to injunction is just as broad and unqualified as it is in respect to the three other writs just named. (3) The new constitution of Michigan (adopted in 1850), in respect to the jurisdiction of the supreme and circuit courts, is almost literally copied from ours, except that the writ of injunction is not mentioned in the section relating to the jurisdiction of the supreme court. It has been frequently decided in that state that the supreme court has *original* jurisdiction to issue the writs named in that section, in cases not ancillary to appeals. *People v. Adams,* 3 Mich., 428; *People v. Sackett,* 14 id., 244. Under a similar constitutional provision, the supreme court of Ohio has decided that it has original jurisdiction of the writs named (1 Ohio St., 433), and not over the writ of injunction, which is not named. 8 Ohio St., 393. (4) Of all the state constitutions found in the state library, none give original jurisdiction over the writ of injunction to the supreme court, except our own and those of Alabama and Florida. The constitutions of the two states last named declare that the supreme court shall have original jurisdiction " in habeas corpus, mandamus, quo warranto and injunction, and such other remedial and original writs *as may be necessary to give it a general supervision and control of all other courts.*" The qualification thus added has been held in those states to *restrict* the jurisdiction of the court to cases ancillary to appeals, etc. 13 Fla., 33, 39; 44 Ala., 157. The language of our own constitution is unqualified in respect to all of these writs, including injunction. (5) If the language here relied

upon does not confer jurisdiction upon this court except in cases ancillary to appeals, and over inferior courts, then it is utterly *meaningless.* For the *preceding* clauses, which declare that the court shall have appellate jurisdiction, which shall be coextensive with the state, and that it " shall have a general superintending control over all inferior courts," are amply sufficient to give all the necessary jurisdiction in such cases. (6) The argument that if this court should entertain an original injunction bill and grant the writ, it would greatly increase the business of the court, is as valid against the power to issue habeas corpus, quo warranto or mandamus, and cannot be entertained.

2. This is a proper case for an injunction. (1) By the usual and common jurisdiction of a court of chancery, both in England and in this country, this bill would be entertained and the relief granted. From the nature of railway corporations, whose existence and operations depend upon a sovereign grant of franchises and powers, and on the sole ground of the public use and interest in the commercial highways created by them, the government has a paramount right over them, to secure such public use and the proper administration of such franchises and powers. Where such a corporation violates the public law of its being, abuses its franchises, or usurps powers not granted, the government should not await the tardy, expensive and inadequate litigation of private parties seeking redress in a multiplicity of actions, but should itself take immediate steps to control and correct such conduct. And where one of these corporations boldly proclaims its purpose to usurp a franchise not conferred, or taken away, which usurpation will result in a great public injury, and to violate a law of the state made expressly to regulate and restrain, for the public good, the exercise of its corporate functions, it would seem to be the highest duty of the state, either to dissolve the corporation, by legislative or judicial action, and reclaim its forfeited franchises (an extreme and destructive remedy, though one of

unquestioned right), or to correct the wrong and save the rights both of the public and of the corporation by the remedial and harmless agency of a bill in equity for an injunction. And the jurisdiction of equity for this purpose is sustained by authority. "Parties injured by the conduct of a railway company exceeding the powers conferred upon it by act of parliament, are entitled to the most effectual remedy within the power of a court of chancery." *Spencer v. London & B. R'y Co.*, 1 Railway Cas., 159; 2 Joyce on Inj., 903. Upon a bill filed by the attorney general, an injunction was granted to restrain commissioners from paying out a fund to promote the passage of a bill in parliament, which fund was by act of parliament devoted to the construction of works of a public character. *Attorney Gen'l v. Andrews*, 2 MacN. & G., 225; 1 Joyce on Inj., 740. An injunction will be granted to restrain corporations when they go beyond the line of their authority and violate the rights of others. The attorney general is the proper party to bring such suit, when the *public* right is violated. Kerr on Inj., 542, 544, 570. A bill of injunction to restrain a railway company from closing its road to the public use should be brought by the attorney general, and not by a private person as one of the people; and such a bill will lie. *Thorne v. Taw Vale R'y & Dock Co.*, 13 Beav., 10; *Browne v. Monmouthshire Railway & Canal Co.*, id., 32. An injunction will be granted to restrain railway companies from entering into arrangements with other companies to share profits, in order to avoid competition. 2 Joyce on Inj., 845. The attorney general should bring his bill to restrain a corporation from violating the law, when the act affects the public at large. *Bagshaw v. Eastern Union R'y Co.*, 7 Hare, 114; *Buck Mountain Coal Co. v. Lehigh Coal & Nav. Co.*, 50 Pa. St., 91; 2 Story's Eq. Jur., pp. 760 et seq.; 2 Redf. on R. W., 32 et seq.; *Attorney Gen'l v. Hudson River R. R. Co.*, 1 Stockt., 526. An injunction was granted to restrain a railway company from removing a part of its track to the great inconvenience of the public. *People v.*

*Albany & Vt. R. R. Co.*, 37 Barb., 216. See also *People v. The Mayor, etc.*, 32 Barb., 102; *Osborn v. Bank of U. S.*, 9 Wheat., 738. The case of *Att'y Gen'l v. Utica Ins. Co.*, 2 Johns. Ch., 371, is not authority in this case, because, (a) It was not a proceeding against a banking corporation, to restrain it from violating a law of the state relating to its own franchises and powers. (b) The offense there complained of " did not touch the enjoyment of property," and was one by which "no particular individuals were affected or disturbed in the enjoyment of their private rights." (c) Because other remedies, at law, were adequate in that case; whereas, in this case, *quo warranto* would not lie to oust the railway companies from the particular franchise of regulating and controlling their own rates, but would have to be brought to dissolve the corporation, while individual prosecutions would be infrequent, voluntary, dilatory and expensive, and would never cure the public mischief. (2) Jurisdiction of the subject matter of this bill has been specially conferred upon courts of equity in this state by statute. Sec. 13, ch. 148, R. S.; sec. 5 of the act for the organization of the judiciary, R. S. 1858, appendix; sec. 5, ch. 115, R. S. The supreme court has power to issue writs of injunction in any proper chancery case, by virtue of the provisions of the constitution and the statutes. Whenever it is proper and within the chancery jurisdiction of any court of this state, the supreme court may entertain an injunction bill and issue the writ; and if the statute has extended such equitable relief and jurisdiction to cases in which they did not previously exist, the supreme court may take cognizance of such cases. The object of sec. 13, ch. 148, was not to give the circuit court merely a new jurisdiction, but to bring within chancery jurisdiction a new class of cases, or cases in which the legislature deemed it important to render clear and unquestionable the jurisdiction of equity by injunction.

B. *The validity of ch. 273, Laws of 1874.*

1. The act is still in force, unrepealed. The contemporane-

ous action of the legislature on this subject makes the legislative intent not to repeal this law by implication too clear to admit of any doubt.    2.  The act is not partial or special.    It has all the *uniformity* necessary to a law of taxation, by embracing in its regulations *the whole of the classes named;* and is *general* in its application to all the railways in the state, thus classed.    3.  The contracts and legislative acts by which corporations of Wisconsin and Illinois, in control of continuous lines of road in the two states, have been brought under the same general management, do not affect the question.    No action on the part of the state, and no arrangement or contract with our railway corporations, can suspend, evade or defeat a plain provision of the state constitution reserving the sovereign power to alter or repeal acts of incorporation.    Whatever arrangements or contracts may exist between the railway corporations of this state and similar corporations in other states, all our corporations must necessarily remain domestic, with a well-defined corporate identity, subject to our own laws and constitution.  *Farnum v. Blackstone Canal Corp.*, 1 Sum., 47, 62 ; *Racine & Miss. R. R. Co. v. Farmers' L. & T. Co.*, 49 Ill., 331 ; *McGregor v. Erie R. R. Co.*, 35 N. J., 89.    4.  The provisions of the act regulating the tolls chargeable by the defendant companies, are constitutional and valid.    (1)  These railway corporations are *not mere common carriers*.    An incorporated railway carrier is confined to fixed routes and to current rates or fixed compensation ; must have all the means of carriage necessary for the public business ; cannot suspend or abandon business at pleasure; and must not discriminate in charges and tolls.    Such a carrier is the creation of an act of the law, and cannot exist, cannot construct or operate a railway, own or alienate property, make contracts, or do any act, without legislative permission and a grant of powers and franchises.    The business in which such corporations are engaged is not a private business or enterprise, but public, and for the public use.    The investment of private capital in such business under an act of incor-

poration and for the purpose of private gain, may distinguish such corporations from municipal or purely public ones; and they may for this reason alone be called private corporations; but they are never considered such as to their objects or purposes, and private gain does not form even a part of the consideration that moves the government in creating them. Their true nature and objects are suggested by the use of the common law proceeding in *quo warranto*. This writ was made for the purpose of inquiring into and taking away the franchises of municipal corporations. It was afterwards extended to embrace business and commercial corporations, called private; but the proceeding was in no way changed, and the judgment at common law had the same effect in all cases, which was and is the forfeiture of the franchises and the confiscation of the personal property to the government, and the reversion of the real property of the corporation to the former owners. This proceeding at common law, in England and in this country, entirely disregards the interests of stockholders and creditors, and sets aside, without any consideration, vested rights, private interests and contracts which have grown out of the existence and business of the corporation. This proceeding at common law only contemplates such a corporation as a public one in every respect, and for the public use alone. 1 Ld. Raym., 426; 8 Pet., 281; 18 How. (U. S.), 480; 1 Blackf., 278; 23 Pick., 334. The statutes of our state have indeed changed this proceeding, and undertaken to save the property of shareholders and the rights of creditors, by treating the corporation, after a judgment of forfeiture in *quo warranto*, as still existing for a limited time, for a court of equity to administer upon its estate and pay the debts. But the proceeding is still utterly destructive of the boasted private rights of the stockholders in the business and property of the corporation. A legislative custom has grown up of late years, of incorporating a purely private business, in which the public has no interest at all, or only an incidental one on the ground that it is in the general

interests of trade. Bad as this custom is, the state has never yet granted to any such private corporation the right to use the high government prerogative of *eminent domain*, or to take private property for their use. That right cannot be given for a private use, but only for a public use; and so far as it is given to railway companies, they are treated as public corporations in every respect. *Beekman v. Saratoga & S. R. R. Co.*, 3 Paige, 58, 74, 75; *Miners' Ditch Co. v. Zellerbach*, 37 Cal., 543. It is now claimed, and has been decided by the most respectable judicial authority in this country, that railroads are public highways *sub modo*, and when the corporations are dissolved by either judicial or legislative action, the roads pass into the hands of the state, to be kept and used, through some agency to be provided by the legislature, for the good of the public as *highways*. That the state has the right to so use and control railroads after the dissolution of the corporations, there can be no doubt; but such right has never been exercised, because a different method has been adopted for disposing of the railroad and other property of defunct corporations, through the court of chancery. But this is a mere provision of statute, which may be changed at the pleasure of the legislature. That " a railroad established and existing under an act of incorporation is a *public highway*, but only to be used in a different mode," is the language of the highest authority. Ang. on H. W., § 18; *Beekman v. S. & S. R. R. Co.*, 3 Paige, 74; *Rex v. Severn & W. R. R. Co.*, 2 Barn. & Ald., 646; *Erie & N. E. R. R. Co. v. Casey*, 26 Pa. St., 287; *Olcott v. Supervisors etc.*, 16 Wall., 695; *Thorpe v. R. & B. R. R. Co.*, 27 Vt., 140; *L. C. & C. Railroad Co. v. Chappell*, 1 Rice (S. C.), 383; *West River Bridge Co. v. Dix*, 6 How. (U. S.), 546. (2) Whatever private individuals might or might not be able lawfully to do in building and operating a railroad without a charter from the state, it is sufficient to say that the two defendants are railway corporations, chartered by the state, and that they still use and enjoy its franchises, and have constructed their roads by the use of the

sovereign right of eminent domain; and it is only material to inquire what right the state has reserved to control them, or to repeal or alter their act of incorporation. They are estopped in this proceeding to deny their corporate character. *State ex rel. Waring v. Ga. Med. Society*, 38 Ga., 608; *Alton & U. A. H. R'y & Carrying Co. v. Deitz*, 50 Ill., 210; *Liverpool Ins. Co. v. Massachusetts*, 10 Wall., 566. And it is further to be observed that the right to demand and receive compensation for the carriage of persons and property is *expressly conferred upon both these defendants by their charters*, and has been *accepted* and enjoyed by them as a part of their charters and as *a corporate franchise.* (3) The right of a railway company to collect tolls from the public is of necessity a corporate *franchise*, and must be *granted* by the legislature; and therefore, in this state, under the reserved power of the legislature to alter and amend acts of incorporation, such tolls may be ·regulated and fixed by law, without the consent of the corporation. "A right to claim toll can only exist by grant or prescription." 1 Wilson, 115; Strange, 1238; Coke Eliz., 710; Cooper, 47; 11 East, 476; 4 Taunt., 520; 1 Barn. & Cress., 223, 424; 1 Atkyns, 815; 2 Black. Com., 47; 4 Mod., 320; 2 Rolles' Ab., 171; *Hull Dock Co. v. Browne*, 2 Barn. & Ad., 58; *Barrett v. Stockton R. R. Co.*, 2 Man. & G., 165 (40 E. C. L., 313); *Olcott v. Banfill*, 4 N. H., 545; *Perrine v. Ches. & Del. Canal Co.*, 9 How. (U. S.), 184; A. & A. on Corp., Appendix, 820; Ang. on Highw., § 368, and ·cases there cited; *Hamilton v. Keith*, 5 Bush (Ky.), 458; *Charles River Bridge v. Warren Bridge*, 7 Pick., 495; *Beekman v. S. & S. R. R. Co.*, 3 Paige, 62, 63, 64, etc.; *McGregor v. Erie R. R. Co.*, 35 N. J., 89, 115; *State v. Boston, C. & M. R. R. Co.*, 25 Vt., 433; *Hamilton v. Keith*, 5 Bush, 460; *Whiting v. S. & F. R. R. Co.*, 25 Wis., 167, 196. . Counsel then examined and distinguished the cases of *Allen v. McKeen*, 1 Sum., 278, 302; *Comm. v. Essex Co.*, 13 Gray, 353 (comp. 104 Mass., 447); *Sage v. Dillard*, 15 B. Mon., 347; *Beardsley v. Ontario Bank*, 31 Barb., 625; *Bank of Middlebury v. Edgerton*, 30 Vt., 190; *Coe*

*v. Columbus, P. & Ind. R. R. Co.*, 10 Ohio, 386. (4) The reserved power to repeal, alter or amend acts of incorporation may be exercised in respect to all charters of private corporations; and such alterations or amendments may affect any right, franchise or power conferred by the charters, and to any extent, regardless of any vested rights of property, or the rights of creditors, or the obligation of contracts, growing out of or in any way connected with such charters and the operations of such corporations. *Read v. Frankfort Bank*, 23 Me., 318; 2 Fairfield, 284; 18 Me., 109; *Wilson v. Tesson*, 12 Ind., 286; *City of Roxbury v. B. & P. R. R. Corp.*, 6 Cush., 424; *Miner's Bank v. U. S.*, 1 Greene (Iowa), 563; *Story v. Jersey City etc. R'y Co.*, 10 N. J. Eq., 13; *Proprietors etc. v. Haskell*, 7 Me., 474; *State ex rel. M. & E. R. R. Co. v. Miller*, 31 N. J., 521; *State ex rel. Jersey City & B. R. R. Co. v. Mayor etc.*, id., 575; *State v. Curran*, 7 Eng. (Ark.), 321; *Mass. Gen'l Hospital v. State Mut. Life Ass. Co.*, 4 Gray, 234; *Hugh White v. S. & U. R. R. Co.*, 14 Barb., 559; *Hyatt v. McMahon*, 25 id., 458; 10 id., 282; *The Reciprocity Bank*, 17 How. Pr., 323; *Sherman v. Smith*, 1 Black, 587, 593; *Bailey v. Trustees, etc.*, 6 R. I., 491; *Albany Northern R. R. Co. v. Brownell*, 24 N. Y., 351 (overruling 21 Barb., 513); 1 Kern., 102; 4 id., 336; 21 N. Y., 9.

*C. B. Lawrence* and *B. C. Cook*, for the *Chicago & Northwestern Railway Company:*

I. This proceeding is founded on sec. 13, ch. 148, R. S. (Tay. Stats., 1731). 1. The manifest object of this statute, so far as it relates to corporations, is not to regulate the manner in which a corporation shall exercise a franchise conferred by its charter, but to prevent it from exercising franchises not conferred. Thus a railroad corporation could be enjoined under this statute from issuing bank bills, but could not be required by injunction to keep its fences in order, cause its conductor to wear a particular kind of badge, or regulate the number of its brakemen. If the contrary be true, the whole execution of the law in reference to railways would be remitted to a court of chan-

cery. The general principle of law is settled, that where an act is forbidden, and a penalty provided for any violation of the prohibition, the remedy is by enforcement of the penalty, and equity has no jurisdiction. *Attorney Gen. v. Utica Ins. Co.*, 2 Johns. Ch., 371; *Comm. v. Wellsboro & Tioga Plank Road Co.*, 35 Pa. St., 152; *Putnam v. Sweet*, 1 Chand., 286; *Brown's Appeal*, 66 Pa. St., 155; *Jones v. Little Rock*, 25 Ark., 301; *Morris & E. R. R. Co. v. Prudden*, 20 N. J. Eq., 530; *Smith v. Lockwood*, 13 Barb., 213. 2. This statute confers jurisdiction upon the *circuit* court only. It is said that this court acquires jurisdiction by virtue of sec. 3, art. VII of the state constitution, which gives it power to issue writs of injunction and to hear and determine the same. But when the constitution was adopted, the power to issue a writ of injunction was a certain, well defined and limited power, and did not extend to cases of this kind. The constitution provided that this court, except in cases otherwise provided *in that instrument*, should have "appellate jurisdiction only." If the legislature may confer jurisdiction on this court which it did not possess before the statute was passed, it may confer upon it jurisdiction, in all cases, and the constitutional provision last cited becomes of no effect whatever. It may also, in that case, take away the jurisdiction of this court by repealing all laws authorizing writs of habeas corpus, mandamus, injunction, quo warranto and certiorari, and forbidding the issuing of those writs. Under this mode of construction the constitutional provisions granting and limiting the jurisdiction of the court become of no value. *State Bank v. Cooper*, 2 Yerg., 620; *Attorney Gen'l v. Tudor Ice Co.*, 104 Mass., 239; 1 Abb. Pr. R., N. S., 169. 3. Before the passage of the statute above cited, it is clear that no writ of injunction could have been legally issued in this case; that the remedy against a corporation which exercised any franchise, liberty or privilege, or transacted any business, not authorized by its charter, was by writ of *quo warranto*, and that the only mode of enforcing a statute to regulate the man-

ner of doing business by a railroad company was by a proceeding to enforce the penalties provided by the statute, in either of which cases the defendant would have been entitled to a trial by jury. Sec. 5, art. I of the state constitution, provides that the right of trial by jury shall remain inviolate, and shall extend to all cases at law. Could the legislature, by changing the name of the proceeding from one at common law to one in chancery, thereby deprive a party of his right to a trial by jury? If it can go one step it can go any length, in that direction, and a citizen will hold his right to a jury trial at the pleasure of the legislature. *Tabor v. Cook*, 15 Mich., 326; *Work v. The State*, 2 Ohio St., 296; *Exline v. Smith*, 5 Cal., 112; *Hughes v. Hughes*, 4 Mon., 43; *People v. Phillips*, 1 Edmonds' Select Cas., 386; *Norval v. Rice*, 2 Wis., 22; *Oatman v. Bond*, 15 id., 26; *Truman v. McCollum*, 20 id., 369; *Town of Sheboygan v. S. & F. R. R. Co.*, 21 id., 667; *Callanan v. Judd*, 23 id., 348.

II. Under secs. 31 and 32, art. IV of the state constitution as amended in 1871, it is evident that the legislature can regulate the powers of railroad corporations only by general laws, uniform in their operation throughout the state. Ch. 273 of 1874 is a *special* law. By its classification of railroads, class A includes all roads now owned, operated, managed or leased by three companies specified by name; class B includes all roads owned, operated, managed or leased by three other companies specified by name; and class C includes all other railroads in the state; and different rates of fare and freight are prescribed for the three classes severally. The discrimination is not made to depend upon the character of the roads, their cost, or the amount of their business, but wholly upon the person or company owning or operating the road. It is difficult to conceive of legislation more special than this. If the right to collect freight and fare is a corporate franchise granted by the legislature, then to grant to one company the right to collect one rate of fare and freight, and to another company the

right to collect another rate, is to grant special corporate powers to each. If it be said that the railroads are classified in this act with reference to the gross amount of their receipts, or of their profits, the answer is, that if. it is within the province of the legislature to establish a general rule, founded upon cost of road, amount of business, or amount of receipts, it is not within the province of the legislature to determine what companies come within the rule thus established, but that is a judicial question. The legislature may determine. that every citizen of the state shall pay a tax of $40 on every $1,000 of property he owns in the state; but it cannot determine that A shall pay a tax of $40, B of $60, and C of $80, although as a matter of fact A has $1,000, B $1,500, and C $2,000 of property in the state. *Durkee v. Janesville*, 28 Wis., 464; *Lewis v. Webb*, 3 Greenl., 333; *Budd v. The State*, 3 Humph., 490; *Wally's Heirs v. Kennedy*, 2 Yerg., 555; *State Bank v. Cooper*, id., 606; *Vanzant v. Waddel*, id., 270; *Tate v. Bell*, 4 id., 207; *Officer v. Young*, 5 id., 322. The legislature has neither the constitutional right nor the means of finally determining any fact upon which the rights of any citizen depend. *Jones v. Perry*, 10 Yerg., 80; *Simonds v. Simonds*, 103 Mass., 572; *State v. Tappan*, 29 Wis., 681.

III. Sec. 13, ch. 273, Laws of 1874, attempts to give the railroad commissioners power to classify all articles of freight, and to reduce the rates on any of the railroads, and declares that companies which shall refuse to conform to the rates fixed by the commissioners shall be guilty of a misdemeanor, etc. This is a delegation of legislative power which the legislature had no power to make. By the constitution of this state (art. IV, sec. 1), the legislative power is vested in the senate and assembly. The general principle applicable to every delegated power requiring knowledge, discretion and rectitude in its exercise, is that such power cannot be delegated. *C. W. & Z. R. R. Co. v. Comm's of Clinton County*, 1 Ohio St., 87; *People v. Collins*, 3 Mich., 344; *Rice v. Foster*, 4 Harrington, 487; *Par-*

ker v. The Comm., 6 Barr, 507; Bancroft v. Dumas, 21 Vt., 456.

IV. Said ch. 273 points out the particular manner in which the defendant shall exercise certain franchises; and it provides specific penalties for a violation of its requirements. Whether, admitting the validity of the act, such obedience could be enforced by mandamus is at least extremely doubtful; but it admits of no doubt that the enforcement of the act by a chancery proceeding is in violation of every principle of chancery law, and without the support of a single precedent. Such penalties as the legislature has chosen to affix to a violation of its command, it has declared in the act; and with them the attorney general must be content.

V. The granting or refusing of an injunction, in a case where equity has jurisdiction, is purely a matter of discretion with the court; and it will not interfere unless it is satisfied that the case is one in which the jurisdiction can be properly and beneficially exercised, and ought, in fact, to be exercised. Kerr on Injunctions, 6; Attorney Gen'l v. Bank, 1 Hopk., 596; Pettibone v. R. R. Co., 14 Wis., 443; Attorney Gen'l v. Cleaver, 18 Ves., 218; Frankford v. Lennig, 1 Am. Law Reg., 357.

As to the validity of ch. 273, Laws of 1874, Mr. Lawrence further argued substantially as follows :* . For the purposes of this argument, regarding the company as purely a domestic corporation, it is conceded that the provisions of sec. 1, art. XI of the constitution of Wisconsin, place the franchises of the company, that is, the right to exist and transact its business as a corporation, and to condemn land under the power of eminent

---

*The points and citations here given are taken from a brief used by Mr. Lawrence in arguing an application made to the U. S. Circuit Court for the eastern district of Wisconsin, in behalf of Pick and others, foreign holders of the bonds of the Chicago & Northwestern Railway Company, for an injunction restraining the railway commissioners and attorney general of this state from taking steps to execute ch. 273, Laws of 1874, against that company. This brief was filed by Mr. Lawrence as a part of his argument in the present case.

domain, entirely within the control of the legislature; but they give to that body no power whatever over property lawfully acquired by the corporation while its charter was in force, which the legislature could not exercise over the property of natural persons. If the legislature can require this defendant to carry passengers for three cents per mile, or to transport a hundred pounds of freight twenty-five miles for six cents, it can require passengers to be carried for one mill per mile, and a hundred pounds of freight to be carried twenty-five miles for the same compensation. The power to pass one law involves the power to pass the other. The principle of this act, then, is clearly this: that the legislature of Wisconsin may, under the power reserved by its constitution to "alter or repeal" a charter at any time after it is granted, simply confiscate, for the supposed benefit of the public at large, the property of the stockholders and the debts due the creditors of the company. Although the corporation, as an artificial person, owns the legal title to this road, yet the road belongs in substance to the individual stockholders, subject to the lien of the bondholders. It would perhaps be more strictly accurate to say that the corporation owns this property in trust for the bondholders and stockholders; but they hold their equities, and the corporation its legal title, by as sacred a right as any individual holds his own. A legislature acting under the limitations imposed by all our American constitutions in regard to the sanctity of private rights, cannot take the property of one individual or class, for the benefit of another individual or class. Even when it is taken for the benefit of the state, under the power of eminent domain, these constitutions all provide that due compensation must be made. The constitutional provision reserving to the legislature the power to alter or repeal charters must be construed so as, if possible, to make it consistent with the other provisions of the same instrument, and especially with the familiar and fundamental principle above stated. The legislature can alter a charter only by an act which belongs to the

sphere of legislation. It cannot confiscate property. It can-
not, under pretense of amending a charter, despoil a chartered
company for the public good. Such an act is not legislation;
it is merely a legislative decree divesting private property.
Blackstone says: "A particular act of the legislature to con-
fiscate the goods of Titius, or to attaint him of high treason,
does not enter into the idea of municipal law; for the opera-
tion of this act is spent on Titius only, and has no relation to
the community in general; it is rather a sentence than a law."
The constitution of Wisconsin goes further than most state
constitutions in putting restraints upon governmental power, to
prevent its being exercised to the injury of natural rights. It
even provides in terms that the legislature shall pass no law
impairing the obligation of contracts — a provision not generally
found in state constitutions, as the similar provision in the fed-
eral constitution is sufficient. Is it not reasonable to say that
when the legislature exercises the power of repealing or alter-
ing charters, it must do so in a mode not antagonistic to the
other provisions of the constitution, or to its general spirit, and
therefore without destroying the vested rights of property? It
may control the mode of using the chartered privileges so as to
make their use consistent with public safety, or with the rights
of others, as it may control the enjoyment of individual prop-
erty for the same purpose; but if it seeks, for the supposed
benefit of the public, to alter the charter in a manner which
will destroy the value of the corporate property, it must pro-
vide just compensation therefor. Can the legislature, at its
discretion, under the power to repeal or alter a charter, take
the property of the corporation for the benefit of the public
without making compensation to the owners? And to take
away the *income* of property is, in principle and in fact, to take
the property itself. *Pumpelly v. Green Bay Co.*, 13 Wall., 166.
Moreover the power of the legislature under the clause of the
state constitution above cited, is to be determined by reference
not only to the other provisions of the same instrument, but

also to the federal constitution. The 14th amendment provides that no state shall " deprive any person of life, liberty or property, without due process of law." Under this amendment, every person holding property within the limits of the United States is protected against the arbitrary divestiture of his title by an act of the state legislature. The constitution of Wisconsin was adopted in 1848. At that time there was not a mile of railroad in the state. But it was known that under special charters, privileges were sometimes claimed to which the state could not with propriety submit. Some of these questions had been raised in other states, and litigation had ensued. The right of taxation had been denied, and the control over the operations of chartered companies, which the state must exercise under its police power, was liable to be disputed, because of the difficulty which courts have always found in determining the precise extent to which that power extends. Hence the insertion of this clause in the Wisconsin constitution. Properly construed, it is a wise provision. It enables the legislature to restrain corporations from infringing on the rights of others, and to deal with them as it deals with natural persons. This clause was inserted to remove all difficulty from the exercise by the legislature of a proper and just control over corporations; but it does not authorize the legislature to do with the property of a corporation, or with its income, what it could not do with the property or income of a natural person engaged in the same vocation. The legislature may modify or take away what it gave, but nothing more. The property, which it did not give, it is forbidden to take without compensation. It may require a company to fence its road, although it thus adds to its burdens, because it could require a natural person to perform similar duties for the public safety. It may forbid the company to charge unreasonable rates of freight under penalty of a fine, leaving the decision of the question to the courts, and thus take away the privilege given by the charter to the company of fixing its own freights at discretion; but it

cannot *prescribe* the rates, any more than it could do so to a natural person. It may make any amendments which do not take from the company rights which the legislature could not take away from a natural person. It may repeal, at discretion, the franchise of a purely domestic corporation. The corporation would then be dissolved, but the stockholders would remain, and would still own the property. Even the fee simple of the roadbed is vested in the corporation to the fullest extent by the terms of some of these charters, and of course there could be no question as to the rails, locomotives and cars. The state, having repealed the franchise, can take the property and pay due compensation, or it can permit the stockholders to operate the road as copartners, and can exercise the same control over them as over other natural persons exercising the vocation of a common carrier. But in no mode can it confiscate the property or its income to the public use without making due compensation. *Sage v. Dillard,* 15 B. Mon., 353; *Miller v. N. Y. & Erie R. R. Co.,* 21 Barb., 513; *Comm. v. Essex Co.,* 13 Gray, 253; *Miller v. The State,* 15 Wall., 498; *Holyoke Co. v. Lyman,* id., 522. 2. As to the effect of the reserved power over charters in reference to the rights of *creditors* of the corporations. Under authority of the legislature this defendant has contracted and now owes a debt amounting to many millions of dollars. The state now passes an act taking from the corporation the income of its property for the supposed benefit of the public, and thereby taking away all means of performing its contracts with its creditors. If, before the bonds were issued, the legislature had thought proper to take away from the corporation the power to issue them, its power to do so could not have been denied. But the bonds having been issued, the legislature cannot now impair the contract between the corporation and the bondholders by taking from the corporation all means of payment. Under the power given by the charter, the company has conveyed its property subject to a right of redemption. Can the legislature, under pretense of amending the

charter, annul that conveyance? Can it enact, as in principle it has done, that all the income from the property conveyed, above the expenses of operating the road, shall be paid into the state treasury or devoted to the public uses? Is this, in any just sense, an amendment of the charter? Is it the kind of amendment contemplated by the constitution of Wisconsin? That instrument provides that the legislature may grant charters of incorporation, and shall have the power to alter them, but shall not impair the obligation of contracts. The two provisions, taken together, mean that as between the state and the corporation the charter shall not be regarded as a contract beyond the power of the state to alter, but that the legislature shall not impair contracts which the corporation has made with third persons, under a power given by the charter. *Bronson v. Kinzie*, 1 How. (U. S.), 311 ; *Durfee v. Old Colony & Fall River R. R. Co.*, 5 Allen, 247 ; *Tomlinson v. Jessup*, 15 Wall., 459. 3. Said sec. 1, art. I of the state constitution, provides that the charters of companies incorporated *under that section* may be altered or repealed. This can refer only to companies existing and operating solely under Wisconsin charters, and within the limits of this state. But in the present case, the legislature of Wisconsin, having first chartered a company by virtue of the authority of that section, subsequently, by virtue of its general legislative power and not under any power specifically conferred by that section, authorized such company to consolidate its stock and franchises with a company existing under the laws of Illinois. We submit that a company thus formed is not one existing merely under a charter of the Wisconsin legislature, but one existing under the acts of consolidation passed by the legislatures of both Wisconsin and Illinois, and therefore not subject to the exercise of the power over charters reserved by the Wisconsin constitution in reference to corporations deriving their existence from the legislature of Wisconsin alone. Still less is it applicable to the present company, organized as it was by the purchasers of the consolidated Chicago & Fond du Lac

road, sold as one road, and the purchasers incorporating under the pledge given in advance by the legislatures of both states, that they might thus. incorporate as one company, owning a road extending into each state. We do not pretend that one state can create a railroad corporation to exercise its franchises, except on sufferance, in another state. We concede that so far as the roadbed of this company is situated in Illinois, it is to be regarded as existing under Illinois law, and so far as it is situated in Wisconsin, it is subject to .Wisconsin law. .We concede that there is technically a Chicago & Northwestern Railway Company for Illinois, and another for Wisconsin. But this is only technically true. Practically, the Chicago & Northwestern road in Wisconsin, and the same road in Illinois, are represented by the same stock, which also includes the Galena & Chicago Union Railway Company, whose stockholders surrendered their stock for that of this defendant, representing a road partly lying in one state and partly in another. We insist that this is not a corporation existing by virtue of any act of the Wisconsin legislature alone, and therefore does not fall within the terms of the Wisconsin constitution. That this corporation is legally created, has never been denied; and yet it could not have been created as it now exists without the coöperative legislation of both Wisconsin and Illinois. The Chicago & Northwestern Railway Company of Wisconsin, although existing as a sort of legal fiction, in fact has no road. The same is true of the Chicago & Northwestern Railway Company of Illinois. · But these two companies consolidated into one do own and control a road running into both states. The road, so far as it is situated in each state, is of course subject to the laws of that state; but the legislature of Wisconsin cannot enact a law in reference to this consolidated road, existing under the acts of two states, which it could not, under the federal constitution, have enacted even in regard to its domestic roads but for the provision in its constitution reserving the power to alter or repeal the charters of such domestic roads. 4. The act of

1874, in question, is void because it attempts to regulate inter-state commerce. *State Freight Tax*, 15 Wall., 232.

*Smith & Lamb*, for the same defendant:

1. This court has no jurisdiction to grant the injunction here sought. (1) The purpose of the suit is to enforce by injunction a criminal law of the state. There is no complaint of individual or special injury, but the action is based wholly on the violation of a *public penal statute* by the defendant, and the only relief asked is by an injunction to prevent such violation. By the general principles of equity jurisprudence, chancery has no jurisdiction to grant an injunction for such a purpose. Kerr on Inj., § 1; Hilliard on Inj., § 1; High on Inj., § 23; 1 Joyce's Law of Inj., 716; Chancellor KENT in *Att'y Gen'l v. Utica Ins. Co.*, 2 Johns. Ch., 371; Chancellor SANFORD in *Att'y Gen'l v. Bank of Niagara*, 1 Hopk., 354; *Sparhawk v. Union R'y Co.*, 54 Pa. St., 401; *Att'y Gen'l v. City of Patterson*, 1 Stockt. (N. J.), 624; *Cochran v. McCleary*, 22 Iowa, 75; *Smith v. Lockwood*, 13 Barb., 209; *Att'y Gen'l v. Bank*, Harrington (Mich.), 315; *People v. Miner*, 2 Lans., 396; *Mayor of Hudson v. Thorne*, 7 Paige, 261; *Brandreth v. Lance*, 8 id., 24; *Babcock v. N. J. Stock Yard Co.*, 20 N. J. Eq., 296; *Jones v. Little Rock*, 25 Ark., 301; *State v. Saline Co.*, 11 Am. R., 454; *Att'y Gen'l v. Salem*, 103 Mass., 138; *Att'y Gen'l v. Tudor Ice Co.*, 104 id., 239. The jurisdiction granted to this court by the state constitution, to issue the writ of injunction, relates of course to the chancery writ then issuable by courts of equity in accordance with the clearly defined principles of equity jurisprudence, as existing when the constitution was established. (2) This court takes no power to grant an injunction in such a case from sec. 13, ch. 148, R. S. That statute is first found in this state as part of ch. 114, R. S. of 1849, and seems to have been adopted from New York. It has always been regarded by the profession and held by the courts to be a plain innovation upon the principles by which courts of chancery proceeded, and an anomaly in equity jurisprudence, and as such to be en-

forced according to its strict letter, and to authorize an injunction only when a case was brought clearly within its literal terms. *Verplanck v. Mercantile Ins. Co.*, 2 Paige, 438. But this new jurisdiction or power is expressly given by the statute only to the *circuit* courts. *Expressio unius exclusio alterius.* Any superior or municipal or county court with civil jurisdiction might as properly assume power to enjoin, under this statute, as the supreme court. (3) Has this court, by the constitution, *original* jurisdiction of bills in equity for injunctions? Sec. 3, art. IV of that instrument, declares that " the supreme court shall have a general superintending control over all inferior courts ; it shall have power to issue writs of *habeas corpus, mandamus,* injunction, *quo warranto, certiorari,* and other original and remedial writs, and to hear and determine the same." The power is, first, to *issue* the writs ; second, to *hear* them ; third, to *determine* them. Injunction being in no possible case an *original* writ, it never can be issued except in a case in which the court has first obtained jurisdiction of the parties to be affected by it. In cases of *habeas corpus, mandamus, quo warranto, certiorari,* and other similar writs, such as writs of error and of prohibition, the writ itself, when issued, brings the case into court, to be heard and determined. But the court is asked here to take jurisdiction by an ordinary summons, try and determine an ordinary suit, and then issue a writ of injunction. If the court has original jurisdiction of this case under the power to issue " other original and remedial writs," then it has original jurisdiction of every possible case, either at law or in equity. If the claim for this court of original jurisdiction in equity cases is based upon its power to issue a writ of injunction, then it follows that if on the trial of such a case, a successful defense is made on the merits, the judgment of the court must be that it had no jurisdiction, instead of a judgment in defendant's favor; and such judgment would be no bar to a new suit. In other words, if the defendant is beaten the court has jurisdiction ; if he is successful, the court

has no jurisdiction. The constitution of Alabama (adopted in 1818) contained this provision : " The supreme court, except in cases otherwise directed by this constitution, shall have appellate jurisdiction only, which shall be coextensive with the state. * * * *Provided*, that the supreme court shall have power to issue writs of injunction, *mandamus, quo warranto, habeas corpus*, and such other remedial and original writs as may be necessary to give it a general superintendence and control of inferior jurisdictions." The decisions construing this section are these : *Ex parte Simonton*, 9 Porter, 383 ; *Ex parte Mansony*, 1 Ala., 98 ; *State v. Williams*, id., 342 ; *State v. Porter*, id., 688 ; *Ex parte Tarlton*, 2 id., 35 : *Ex parte Grant*, 6 id., 91 ; *Ex parte Chaney*, 8 id., 424 ; *Ex parte Floyd*, 40 id., 116 : *Ex parte Henderson*, 43 id., 392. The constitution of Missouri, adopted in 1820, contains the following provisions : " The supreme court, except in cases otherwise directed by this constitution, shall have appellate jurisdiction only, which shall be coextensive with the state, under the restrictions and limitations in this constitution provided. The supreme court shall have a general superintending control over all inferior courts of law. It shall have power to issue writs of *habeas corpus, mandamus, quo warranto, certiorari*, and other original remedial writs ; and to hear and determine the same." The decisions upon these provisions, or some of them, are : *Lane v. Charless*, 5 Mo., 285 ; *Foster v. The State*, 41 id., 61 ; *Vail v. Dinning*, 44 id., 210. The case last named was before the court on *quo warranto*, as reported in 53 Mo., 97. The constitution of Arkansas adopted in 1836 provided as follows : " The supreme court, except in cases otherwise directed by this constitution, shall have appellate jurisdiction only, which shall be coextensive with the state. * * * It shall have a general superintending control over all inferior and other courts of law and equity. It shall have power to issue writs of error and *supersedeas, certiorari* and *habeas corpus, mandamus* and *quo warranto*, and other remedial writs, and to hear and determine the same." The decisions

upon these provisions fluctuated until 1851, when they were all revised in 6 Eng., 618. See *Ex parte Anthony*, 5 Ark., 363; *Levy v. Lychinski*, 3 Eng., 113; *Carnall v. Crawford County*, 6 id., 617; *Jones v. Little Rock*, 25 Ark., 284. See also in connection with these cases, *State v. Farwell*, 4 Chand., 100, 106. The cases in 26 Ark., 287, 25 Cal., 26, and 53 Mo., 97, relied on by the attorney general, were cases of *quo warranto*, and not of injunction, and do not overrule the former cases. It may be conceded that the case of *Att'y Gen'l v. Blossom*, 1 Wis., 317, distinctly holds that this court has original jurisdiction of the writ of *quo warranto*, but that is all that was or could be decided as to jurisdiction in that case, for that was all that was before the court. The provisions in the constitution of Arkansas of 1836, above cited, are identical in effect with those of our state constitution on the same subject; for although the writ of injunction is not named in it, "other remedial writs" are authorized, and an injunction is such a writ. The decision in 25 Ark., 284, is therefore entirely in point. The court there say that after years of patient investigation they revise the whole course of decision in that state, overruling some decisions, and determining that the original jurisdiction given by the constitution cannot be invoked when there are inferior courts in existence authorized to hear and determine the case. This we understand is the force and scope of the decisions in 25 Ark., 284, and 6 Eng., 617. So far as injunctions are concerned, we understand that no change has been made by later decisions in that state. Under a new and different constitution a different rule is established in cases of *quo warranto*. Under the rule laid down in 25 Ark., this court will not take jurisdiction of an information like this, because there are inferior courts upon which this jurisdiction is expressly conferred by secs. 13, 14, ch. 138, R. S. Counsel further urged that the chief trust committed by the constitution to this court is that of the *appellate* jurisdiction; that original jurisdiction was intended to be exercised by the court only in exceptional cases;

that in all other cases the court ought sacredly to preserve its character as an appellate court, calmly reviewing the decisions of other courts, undisturbed by the influences which affect a *nisi prius* trial; and that justice to parties requires that wherever it is possible they should have preserved to them the advantage of a review on appeal.   2.  The injunction sought should not be granted because  the information is not verified, and no affidavit has  been served or noticed as the ground on which the application will be made, and none can be used that are not served.   *Corwith v. Bank of Illinois*, 8 Wis., 376;  R. S., ch. 129, sec.  3, and sec.  14, ch.  148;  *Att'y Gen'l v. Bank of Chenango*, Hopk., 596;  *Pidgeon v. Oatman*, 3 Rob. (N. Y.), 706.   3.  The injunction sought should be refused because of the pendency of the information in the nature of *quo warranto* against the same defendant for  the  same cause of  action as set up in the answer.   R. S., ch. 125, sec.  5, subd.  3;  *Groshon v. Lyon*, 16 Barb., 461;  *Ogden v. Bodle*, 2  Duer,  611;  *Ward v. Gore*, 37 How. Pr., 119.   4.  Assuming ch. 273, Laws of 1874, to be a valid act, and  that this court has full jurisdiction to grant the writ, still it ought not to be granted upon the facts appearing in this case.   The act imposes penalties quite sufficient for the protection of any citizen who may feel that he has been injured; and therefore there is no such  public necessity, no such impending danger to the rights and interests of the people of the state, as would justify a court of equity in interfering by injunction; especially if it be true, as set forth in the answer and shown by the affidavits of men of great experience in such matters, that a full compliance with the law would be ruin to the defendant.   The writ of injunction will not ordinarily be granted when the parties, as in this case, are in dispute concerning their legal rights, until the right is established by law.   High on Inj., §8;  *Hart v. Mayor*, 3 Paige, 213;  *Mammoth Vein Consol. Coal Co.'s Appeal*, 54 Pa. St., 183.   "Substantial and positive injury must always be made to appear to the satisfaction of a court of equity, before it will grant an injunction;  and acts which,

though irregular and unauthorized, can have no injurious result, constitute no ground for relief." *Head v. James*, 13 Wis., 641; *Rogers v. Michigan*, 28 Barb., 539; High on Inj., § 9. "The right to an injunction is not a matter of course, but is addressed to the sound discretion of the court, and when it is likely to result in an injury, it will not be granted." High on Inj., § 13; 5 C. E. Green, 530.

*P. L. Spooner*, of counsel, for the *Chicago, Milwaukee & St. Paul Railway Company*:

1. The legislature cannot impose upon a railroad company, by any alteration of its charter, the duty of carrying passengers or freight for anything less than a "just compensation." An extreme case may be put to test a principle. Would an act of the legislature be valid, which should require a railroad company to carry passengers and freight without compensation, and impose penalties for disobedience? Can the state command the services of a person in a matter which relates exclusively to his private calling, and then say that he shall receive no pay for it? This question is answered negatively by this court in *County of Dane v. Smith*, 13 Wis., 588, where an act of the legislature which recognized the duty of a court to appoint counsel to defend an indigent person charged with crime, but enacted that the county should not be liable to pay the attorney, thus appointed, for his services, was held invalid. An act requiring a railroad company to carry freight and passengers free would not only require the services of the corporation but the entire use of its property, without compensation. Such a use of the property for the public benefit would be a taking of it within the meaning of the constitution (*Pumpelly v. Green Bay Co.*, 13 Wall., 166), and for such taking a "just compensation" must be made. The legislature cannot alter the charter of a private corporation so as to take away the right of trial by jury "in all cases at law;" or so as to take away from it "a certain remedy in the laws," for all injuries it may receive in its property; or so as to deny it the benefit of a

writ of error; or so as to subject it to taxation by any other than the constitutional rule of uniformity. 11 Wis., 35 ; 12 id., 47. But if a private corporation is entitled to the benefit of the constitutional provisions just referred to, why is it not also entitled to the benefit of that other constitutional provision that "the property of no person shall be taken for public use without just compensation therefor," and to the benefit of that principle of universal law which declares that no man's particular services shall be required for the public use without compensation? If the acceptance of a charter subject to the power of the legislature to alter or repeal it, is a waiver of any one of the constitutional safeguards, it is a waiver of all. Such a corporation must therefore be held to stand beyond the pale of the constitution, without a single one of the rights secured by that instrument, or it has a right to just compensation whenever its services are demanded or its property is required for the public use. It is no answer to this to say that the legislature has a right to *repeal* the charter of a railroad company at any time, and thereby well nigh destroy the value of its property. After such a repeal, the property of the road would remain, unburthened by a franchise which could not be exercised without loss. To continue a company in the possession of its franchises, and require it under heavy penalties to render public service without any compensation, or without an adequate one, is a very different thing.

2. What is a "just compensation," in any given case, for the services of a corporation or the use of its property, is a *judicial* question. To say that the state may conclusively fix the price for which it shall command the services of a person or the use of his property, would make the constitutional provision nugatory.

3. If these views are correct, it follows that the court will not issue an injunction *requiring the company to carry* passengers or freight *at the rates prescribed in the act.* The only injunction which the court could issue, if any, would be one re-

quiring the company to *desist from carrying* between places within this state, unless it shall carry at the inadequate rates prescribed by the act — an injunction which would not seem to be founded on any equitable principle. Such an injunction may be asked on the ground that the act forbids the charging of higher rates than those prescribed, and that the company *transcends its authority* in making such charges. But the act also provides that if any agent of any railroad company shall refuse to receive freight for transportation on the ground that the rates prescribed are too low, he shall be subject to a fine of not less than $200 for every such offense. If *this latter portion* of the law is invalid, will the former portion of it be enforced? Would the legislature have passed the former portion without the latter? Would it have enacted that the companies should *desist* from carrying except at the rates prescribed, if it had known that it could not compel them to carry at those rates? If it had foreseen that the only alternative was, that the companies would carry at *reasonable* rates, though somewhat higher than those prescribed in the act, or would abstain altogether from carrying from place to place within this state, would the legislature have preferred the latter? Any one who considers the evils that would result from such a cessation of railroad service even for a few months, cannot hesitate in his answer to this question. It appearing, then, that the most vital provision of the act, that which it was supposed would compel railroad service at the reduced rates, is invalid, the other and auxiliary provisions fall with it, just as when parts of a statute which are valid, are so connected with other parts which are void, as to warrant the belief that the valid parts would not have been passed alone, the whole will be held inoperative. *Slauson v. Racine,* 13 Wis., 398 ; *State ex rel. Walsh v. Dousman,* 28 id., 541. Of what use would be an injunction commanding the companies to abstain from carrying unless they will carry at the rates prescribed? What relief would it afford to the public? If the people will not travel or send freight over

the roads except at the rates prescribed in the act, the companies will certainly abstain from .carrying except at those rates, and there is no need of such an injunction. The only practical effect of it would be to restrain people from traveling on the road or sending freight, however much they may wish to do so. But the manifest purpose of the act was to *compel the railroads to perform the service* for the rates prescribed. The penalties denounced against charging greater rates and against refusing to carry at the prescribed rates, were alike designed to accomplish that single purpose. And if the rates prescribed are inadequate, if to compel railroad service at those rates would be to take the services of the corporation and the use of its property for the public without just compensation, then the purpose of the legislature was to do an unconstitutional thing, and the act, in its prescription of inadequate rates and its declaration of fines and penalties, should be regarded as invalid.

4. The counsel further contended at length that ch. 273, Laws of 1874, was repealed by virtue of ch. 341, or by virtue of ch. 292, of the same year.

*John W. Cary*, for the *Chicago, Milwaukee & St. Paul Railway Company* :

A. The injunction asked for should not be granted against this defendant, because it is not included in class A, but in class C, of railroads, by ch. 273, Laws of 1874. The Milwaukee & St. Paul Railway Company is named as one of the companies in class A; but the averments of the information that this-defendant is meant by that name, that it is now known and commonly called by it, and that there is no company in the state of that name, are all denied by the answer, and must be established by proof. The statute itself furnishes no proof of them, and no extrinsic evidence can be allowed. *People v. Oakland Co. Bank*, 1 Doug. (Mich.), 282. The act is one imposing heavy penalties, and is an attempt to exercise extraordinary powers, and should be strictly construed. As to the rule of construction, see *Rex v. Croke*, 1 Cowp., 29; *Nazro v.*

*Merchants' Mut. Ins. Co.*, 14 Wis., 295, 298–9 ; *King v. Inhabitants of Mabe,* 3 Ad. & Ell., 531.

B. Equity has no jurisdiction to restrain a corporation from the exercise of franchises not granted to it or engaging in business not authorized by law. All questions relating to the extent of franchises granted to corporations, their abuse and forfeiture, and the control of their exercise, belong exclusively to a court of law. On all such questions the defendant is entitled to trial by jury, and the writ of injunction is not the proper remedy. (1) The recognized remedy against corporations for exercising franchises not granted, or for abusing or exceeding those granted, is by *quo warranto.* This is an ample and complete remedy at law, and there is consequently no necessity for a resort to equity. *Att'y Gen'l v. Utica Ins. Co.*, 2 Johns. Ch., 371 ; *Att'y Gen'l v. Bank of Niagara,* Hopkins, 354 ; *Smith v. Lockwood,* 13 Barb., 209 ; *Mayor etc. v. Thorne,* 7 Paige, 261 ; *Att'y Gen'l v. Tudor Ice Co.,* 104 Mass., 239 ; *Att'y Gen'l v. City of Salem,* 103 id., 138. (2) The statute alleged to be violated provides *penalties* for its infringement, and this is the exclusive remedy. It is a settled rule that where a statute gives a new right, or the means of acquiring it, and an adequate remedy for its invasion, parties injured are confined to the statutory redress. Sedgw. Con. & Stat. Law, 93 ; *City of Boston v. Shaw,* 1 Met., 138–9 ; *Crosby v. Bennett,* 7 id., 17 ; *Dudley v. Mayhew,* 3 N. Y., 15, 16, note and cases cited ; 13 Barb., 217.

C. This action cannot be maintained under secs. 13, 14, ch. 148, R. S. The proceeding there authorized is a special one, not in accordance with the course of the common law ; and the authority given must be in all respects strictly construed. (1) That proceeding is authorized to be taken in the circuit court only, and not in this court. The power granted to this court by the constitution to issue the writ of injunction must be construed merely to authorize this court to issue such writ in cases where it would be a proper remedy by the general principles of equity jurisprudence. (2) The power given by

the statute is to restrain a corporation "from assuming or exercising any franchise, liberty or privilege, or transacting any business, not authorized by the charter of such corporation." But the complaint in this case does not allege that defendant has exercised any franchise not granted to it, or carried on any business not permitted. The statute does not authorize an injunction to restrain a corporation from a mere *abuse* of a franchise. See 103 Mass., 139, 140.

D. No case is made in the complaint showing an emergency or necessity requiring the issue of an injunction. That writ does not issue as a matter of course in a mere technical case; but there must be an emergency or necessity requiring it to issue in order that some great and irreparable injury or mischief may be prevented. No such injury will result if no injunction issues in this case; while it is manifest that great injury and inconvenience will be occasioned by its issue. The business of the companies and of the people is proceeding in its usual and uniform course. The act here sought to be enforced attempts to introduce an entirely new and extraordinary principle in regard to railroad property; a principle heretofore existing only in the minds of communists and internationals, and one which, if successfully established, will create an entire revolution in that species of property, and shake to their foundations all investments in railroad securities. There is now pending in this court a writ of *quo warranto* against this company designed to try the validity of this act, and that suit is at issue. There is also a case standing for argument at this term, on appeal, involving the validity of the act. And it is well known to this court that the same question has already gone to the supreme court of the United States from the circuit court of the United States for the western district of Wisconsin. Under these circumstances there would seem to be no necessity to disturb, by preliminary injunction, the business of transportation of this state and the vast interests connected therewith, before the final judgment of this court is pronounced upon the validity

of the law. *Potter v. Schenck*, 3 Fish., 182 ; 3 Fish., 315; *Smith v. Lockwood*, 13 Barb., 219 ; *Mayor, etc., v. Thorne*, 7 Paige, 264; *Stroebe v. Fehl*, 22 Wis., 347.

E. The act here sought to be enforced (ch. 273, Laws of 1874), so far as it attempts to fix the rates of compensation to be charged by the defendant company for the transportation of freight and passengers, is *void*, because it interferes with defendant's *rights of property*, in contravention of sec. 13, art I of the constitution of this state, and of article 5 of the amendments to the federal constitution. The right to control one's property and fix the price for its use, is an attribute of ownership, and the right to determine the compensation for which one will render his personal services and incur risks in transacting the business of another, is a personal right necessary to freedom. A pretended law which ignores these rights is unconstitutional and void. 1. The shareholders of this company are the *absolute owners* of the railroad and of all the property of the company. More than ninety-nine hundredths of all the grounds of the company, of every description, are acquired by negotiation and purchase, and the title in fee simple conveyed to the company by warranty deed. The remaining hundredth part is generally acquired by purchase after proceedings to condemn have been instituted, the commissioners only naming the amount which the company must pay; and the company taking the title in fee simple by deed. Hardly any of these grounds are held by judgment entered in proceedings for acquiring land by the exercise of the right of eminent domain. All lands, however acquired, are paid for wholly by the company. The road is constructed by the company, and at its sole expense. All the other property, of every description, used in operating the road, is purchased and paid for by the company. It would seem to need no argument or authority to show that the ownership of the road and property is in the company or its shareholders, and not in the state. A. & A., §§ 40, 31; *Whiting v. S. & F. R. R. Co.*, 25 Wis., 167; *People v. Salem,*

20 Mich., 477, 478; *People v. Batchellor*, 53 N. Y., 140; *Don-naher v. The State*, 8 Sm. & M., 649, 661; *Trustees v. A. & R. R. R.*, 3 Hill, 570; *Ohio etc. R. R. v. Ridge*, 5 Blackf., 78; *Bonaparte v. Camden & Amboy R. R.*, 1 Bald. C. C., 205, 222; *Dearborn v. B. C. & M. R. R.*, 4 Fost., 179; *Tinsman v. B. & D. R. R. Co.*, 2 Dutch., 148; 1 Redf. on R. W., 52. 2. This act takes our property by depriving us of its beneficial use and enjoyment. Before the passage of the act we were entitled, *as owners*, to fix the compensation to be paid us for the transportation of freight and passengers over our road. " *That right is an attribute of ownership.*" *State Freight Tax*, 15 Wall., 232. The only value of a railroad to its owners is the right to operate it so as to make what is commonly known as net earnings. By operating this road in accordance with the scale of prices fixed by the company itself in 1873, the total net revenue applicable to interest and dividends is less than thirty per cent. of the gross earnings. This act fixes the rates nearly thirty per cent. below those rates, so that, if it is complied with, the same amount of business done by the company during the past year will yield no net income. And as the net income or revenue constitutes the sole profit and measure of value of the road, it is plain that if the act is sustained, and retained as the permanent policy of the state, the value of the road is entirely destroyed and lost both to the bond and stockholder. It is plain, therefore, that the law not only takes but confiscates the property of the company. *Pumpelly v. Green Bay Co.*, 13 Wall., 166. 3. The legislative right to regulate the charges of railroad companies cannot be sustained on the ground that the state has empowered the companies to exercise its right of *eminent domain*. That right may be conferred upon an individual as well as upon a corporation. This has been done in England, and in many of the states — as in Pennsylvania to enable the owner of mineral lands to reach them across the lands of another. By the exercise of this power, A. appropriates the land of B., and is thereby enabled to bring his coals to market, and derives an income from his

otherwise dormant capital. But does this grant to A. give the state the right to fix the price of the product? A private corporation may be empowered to exercise the right of eminent domain to obtain a way along which to lay pipe for the transportation of oil to a railroad or navigable water. *West Va. Trans. Co. v. Volcanic Oil & Coal Co.*, 5 West Va., 382. But could the state fix the price of the oil? Counsel criticised the opinion in *R. R. Co. v. Chappell*, 1 Rice (S. C.), 383; a remark of Chancellor WALWORTH in *Beekman v. S. & S. R. R. Co.*, 3 Paige, 74; a dictum of Justice WOODBURY in *West River Bridge Co. v. Dix*, 6 How. (U. S.), 546; and a remark of DIXON, C. J., in 25 Wis., 196; and he contended that the power of eminent domain may be exercised whenever, in the judgment of the legislature, the public interest will be in any way promoted by the taking of private property, whether the improvement intended to be secured thereby is to be made by the state or by private parties. 2 Kent, 260; 3 Paige, 73; Cooley's Con. Lim., 530–536. He likewise distinguished as to the right of the state to fix the tolls of a ferry or a bridge, which rests upon the fact that the stream over which the bridge is built, or across which the ferry is maintained, is the property of the state, of which, unless prohibited by its contract, the state may make such disposition as it pleases. 4. The right of the legislature to prescribe the charges for carriage on railroads cannot be maintained on the ground that such roads are *public highways*. That a railroad is a highway *in a certain sense*, is not disputed; that it is not a highway in the *ordinary sense* of that word, is equally certain. It is a great thoroughfare over which great numbers of persons and great quantities of property are transported in cars by the railroad company. But it is not open to the public, owned by the state, or in any manner controlled, managed or used as common highways are. Its ownership is exclusively by the company; and they have a right to operate and control it in their own way, subject to such police and other regulations as the state may lawfully make in re-

spect to any other property owned by any citizen of the state. The legislature of this state treats railroads as property, not as common highways. They have always been subject to *taxation;* and the same legislature which passed the act here in question, raised the tax on railroads, so that the amount to be paid this year is nearly half a million dollars. The absurdity of attempting to treat railroads as highways of the common character is illustrated by sec. 31, ch. 119, Laws of 1872, "in relation to railroads," which forbids any person, under a penalty, to ride, drive or walk on such roads. See the subject discussed in 53 N. Y., 140. 5. Sec. 1, art. XI of the state constitution, empowering the legislature to alter or repeal all general laws or special acts enacted under the provisions of that section, does not authorize the enactment of a law establishing rates to be charged for transportation of freight and passengers. (1) What are corporate franchises or privileges? A corporation is an artificial being, created by the legislature, and clothed by it with certain franchises or privileges; among which are indefinite existence, perpetual succession, the franchise to transact business in its corporate name, and the franchise to transact the particular business for which it was created. "Many individuals desire to associate together in a work requiring a large amount of capital, and they prefer to act and conduct such business in an artificial name, to purchase and hold property by that name, and to issue certificates of stock to the owners of such property, according to the amount of capital each individual has invested in the enterprise. The sole object of those who invest their capital in such business is private gain or emolument. The state grants this privilege, and this is the franchise of the corporation. It is simply a grant of authority from the state to its citizens to conduct certain specified business by an artificial or corporate name." These are franchises, which the state may alter or repeal; and when they are repealed, the parties who form the corporation will own the corporate property as before

the repeal, and may manage, operate and enjoy it as tenants in common. *Bacon v. Robertson*, 18 How. (U. S.), 480. (2) What was the object to be gained by inserting this provision in the constitution? The law had been settled, that a charter of a private corporation was a contract with the state, irrepealable and unalterable by subsequent legislation. This constitutional provision was designed to bring such a charter under the control of the legislature, the same as all other acts of the legislature. It was not intended to give the legislature any control over the *property* of individuals or corporations, not otherwise possessed, but simply to enable it to deal with such charters as it could with any other law passed by a prior legislature. Without this reservation of power, laws that might have been passed affecting individuals carrying on a particular business, could not have been passed in respect to a corporation. Under this reservation the legislature has the same power over corporations and their business that it has over individuals, and nothing more. (3) While corporate franchises may be said to be a species of property, and are of value, they are entirely distinct from what is ordinarily understood by the property of the corporation or of the shareholders. No modification or repeal of the corporate franchises under which corporators have purchased and hold property, can impair any estate or vested right of the corporators in such property. The state cannot recall any more rights or privileges than it has granted. Whatever other rights the corporation has acquired are as inviolate as those of natural citizens. Counsel further argued, at length, that the building and operating of a railroad, and the receiving of pay for the carriage of persons and property thereon, are acts which may be performed by any natural person of sufficient means and ability, and do not require any grant of authority from the legislature (*Bank v. Edgerton*, 30 Vt., 182; opinion of ALLEN, J., in *Beardley v. Ontario Bank*, 31 Barb., 625; *Coe v. C. P. & I. R. R. Co.*, 10 Ohio St., 372; 2 Redf. on R. W., 517, 570); that an individual might purchase, own and operate all the

railroads now built, and charge for the transportation of freight and passengers, without interference or control of the government, except that his charges must be reasonable; and that the constitutional reservation here in question gives the legislature no power to interfere with such property, or to prescribe the compensation to be made for its use. (4) This reserved power only gives the legislature power to alter such things as are contained in the charter, and there is nothing to alter in defendant's charter, as to rates. The power to amend is not reserved, but only the power to alter; and an alteration must be of something already in the charter. The charters of railroad companies in this state expressly confer on the boards of directors the power to regulate tolls, and to charge such sums as they may from time to time think reasonable. There is nothing in them fixing or prescribing the rates; and therefore ch. 273, fixing rates, is not an alteration of anything in the charter. (5) If this reserved power gives the right to fix a tariff of rates for railroads, it reaches to all other corporations of the state: to fire, marine and life insurance companies, to gas, lumber and brewing companies, to newspaper and hotel companies, and to manufacturing and mercantile companies of every kind; and it empowers the legislature to fix the price at which their services must be rendered, and their products disposed of. (6) It is well settled that this power of alteration, whether reserved in the charter itself, or by a general law, or by the constitution, is not an arbitrary and unlimited power. As showing the existence and nature of the limitations to which this power is subject, counsel cited *Comm. v. Essex Co.*, 13 Gray, 253; *Comm'rs v. Holyoke Co.*, 104 Mass., 451; *Allen v. McKeen*, 1 Sum., 276; *Miller v. The State*, 15 Wall., 478, 498; 21 Grat., 593; *Miller v. N. Y. & E. R. R.*, 21 Barb., 513; *Comm. v. Canal Co.*, 66 Pa. St., 41; Cooley's Con. Lim., 577–8; *Zabriskie v. R. R. Co.*, 3 C. E. Green, 180; *O. & L. R. R. v. Veazie*, 39 Me., 581; *City of Erie v. Erie Canal Co.*, 59 Pa. St., 174.

F.   Ch. 273, Laws of 1874, is void, because it is in violation

of that principle of constitutional law which prohibits unequal and partial legislation upon general subjects. It restricts certain corporations by name to a certain fixed price, certain others by name to another specified price, and allows others to charge another price, for performing the same services. The pretended classification is entirely arbitrary, and rests upon no principle or recognized basis. *Non constat* but that the roads allowed to charge the highest price are receiving the greatest income per mile. This is mere class legislation, contrary to the fundamental principles of our government, and is invalid. Cooley's Con. Lim., 389–394; *Wally's Heirs v. Kennedy*, 2 Yerg., 554; *Durham v. Lewiston*, 4 Greenl., 140; *Holden v. James*, 11 Mass., 396; *Piquet, Appellant*, 5 Pick., 65; *Budd v. The State*, 3 Humph., 483; *Durkee v. City of Janesville*, 28 Wis., 464; *Bull v. Conroe*, 13 id., 238–244.

G. The act in question is also in violation of the seventh subdivision of the amendment to the state constitution, which prohibits special legislation " for granting corporate powers or privileges, except to cities."

H. Said ch. 273 was repealed by the " act in relation to railroads " (ch. 341), passed and approved on the next day, the provisions of the latter act in respect to railroad charges being inconsistent with those of the former.

*I. C. Sloan*, Assistant Attorney General, for the state, argued substantially as follows:

A. *As to the question of jurisdiction.*

1. The supreme court of this state has *original jurisdiction in equity*, to the extent of issuing writs of injunction to restrain the commission of unlawful and injurious acts, under sec. 3, art. VII of the constitution. *Att'y Gen'l v. Blossom*, 1 Wis., 317; *In re Booth*, 3 id., 1, 50, 70; *Ex parte Booth*, id., 148; *In re Booth & Rycraft*, id., 157, 176, 177, 208; *Bagnall v. Ableman*, 4 id., 163; *Att'y Gen'l v. Barstow*, id., 567; *Att'y Gen'l v. Messmore*, 14 id., 115; *May v. Keep*, 1 Chand., 285. (Counsel also quoted from the constitutions of Alabama,

Arkansas, California, Florida and Missouri, the clauses referring to the jurisdiction of the supreme courts of those states, and cited the following decisions relating thereto: *Davis v. T. C. & R. R. R. Co.*, 4 Stew. & Port., 421 ; *Ex parte Simonton*, 9 Port., 383 ; 1 Ala., 98 ; *Murray v. Ayers*, 1 Ala., 323 ; *State v. Porter*, 1 Ala. (N. S.), 19 id., 561 ; 24 id., 91 ; 40 id., 118 ; *State v. Johnson*, 26 Ark., 281 ; *Ex parte Ellis*, 11 Cal., 222 ; *Tyler v. Houghton*, 25 id., 26 ; *State v. Johnson*, 13 Fla., 33 ; *State v. Board of State Canvassers*, id., 55 : *Rector v. Price*, 1 Mo., 198 ; *State v. Merry*, 3 id., 278 ; *State ex rel. Att'y Gen'l v. Vail*, 53 id., 97, 107).

2. Courts of equity, both in England and in this country, have jurisdiction to restrain by injunction a corporation from exceeding its corporate powers. If the exercise of the usurped power causes *special* injury to the property or rights of an *individual*, he can maintain a suit in equity to enjoin the exercise of such power. A corporation constructing works beyond what is necessary for the purposes of the incorporation and contemplated by the charter, will be restrained by injunction. *Newark Pl. R. & Ferry Co. v. Elmer*, 1 Stockt., 754. Chancery will interfere to prevent a disposition of the property of a corporation for other than corporate purposes, upon a proper case made out. *Kean v. Johnson*, 1 Stockt., 401. So a corporation can be restrained from issuing shares for the purpose of creating votes to influence a coming election (*Fraser v. Whalley*, 2 Hem. & Mil., 10), or from paying the expenses of an application to parliament for an act authorizing an extension of the line. *Vance v. E. L. R. Co.*, 3 K. & J., 50. Where an agreement made between two railway companies contains clauses which are beyond the powers of the directors of one of the companies, and clauses for referring to arbitration all disputes arising under such agreement, equity will restrain both companies from proceeding to arbitration, at the suit of a shareholder in the company which has no power to make such agreement. *Maunsell v. Midland G. W. R. R. Co. of Ireland*, 1 Hem. & Mil., 130 ; Joyce on Inj.,

798. A single shareholder of a railway company may obtain an injunction to restrain it from performing an act beyond its legal power. *Charlton v. Newcastle etc. R. R. Co.*, 5 Jur. (N. S.), 1096; Joyce on Inj., 789. A company will be restrained from entering into an agreement contrary to the policy of its charter, at the suit of any shareholder. *Simpson v. Denison*, 10 Hare, 51. See also *Coleman v. Eastern Counties R'y Co.*, 10 Beav., 1; *Carlisle v. S. E. R'y Co.*, 1 MacN. & G., 689; 1 H. & T., 366. Cases almost without number may be found showing that the jurisdiction of courts of equity is almost constantly exercised in restraining corporations, and especially railway companies, from exceeding the powers conferred by their charters, and from committing unauthorized acts, to the injury of the property or rights of individuals or of other corporations. See the cases in 2 Redf. on R. W., 307–359.

It may be claimed that where the unlawful act affects the public generally, without working special injury to individuals, courts of equity will not entertain jurisdiction, but will leave the public to its remedy at law by information to forfeit the charter. Such a claim is not well founded. According to Chancellor KENT, corporations are created because they are supposed to be beneficial to the public. If they subserve public interests when acting within the scope of the powers granted to them, and work a public injury only when acting beyond that scope, it is obvious that while a forfeiture of the granted powers might possibly operate to remedy the injuries resulting from usurped powers, it would also work a public injury to the full extent that a proper exercise of the granted powers would be beneficial. It would be necessary to totally destroy the business of a corporation in the proper conduct of which the public is beneficially interested, in order to prevent a usurpation of powers not conferred on it by law. To forfeit the charters of the railway companies at bar, and to stay the operation of the railways they represent, would work a greater injury to the public than any which it suffers from the exac-

tions prohibited by the act here sought to be enforced. Surely it will not be insisted that the remedy at law is adequate. And there is no reason why the unlawful acts of a corporation which are so general in their effect as to reach and injure the whole people of a state, should not be stayed by injunction, as well as those which affect only one or a limited number of persons. Nor do the provisions of ch. 273, Laws of 1874, by which suits may be brought to recover penalties, furnish any adequate remedy. They lead to a multiplicity of small suits, which, while expensive and harassing, do not accomplish salutary results. And this brings the case within a well recognized rule of equity jurisprudence. Jurisdiction has always been entertained in equity, where it was apprehended that a multitude of suits would be brought, all depending upon a similar state of facts and the settlement of one principle of law.

The case of *The Att'y Gen'l v. Utica Ins. Co.*, 2 Johns. Ch., 371, is relied upon by defendants. In that case a very narrow and limited view of the jurisdiction of courts of equity was taken. The chancellor says : " It is an extremely rare case, and may be considered, if it ever happens, an anomaly, for a court of equity to interfere at all, and much less preliminarily, by injunction to put down a public nuisance which did not violate the rights of property but only contravened the general policy." And, reasoning by analogy, he inferred that if a court of equity would not entertain jurisdiction to enjoin the creation of a nuisance which injuriously affected the public right, *but which was not a purpresture*, it should not restrain corporations from violating their charters when such violations affected the public *only*. Such may have been the rule as to nuisances in 1817, when that case was decided; but it is now well settled that a public nuisance is ground for the interference of a court of equity at the suit of the attorney general in behalf of the public, when individual rights of property are not affected, or their violation not complained of.

*Att'y Gen'l v. Metropolitan Board of Works*, 1 Hem. & Mil., 298; *Att'y Gen'l v. Conservators, etc.*, id., 1; Kerr on Inj., 334–6. And the jurisdiction in such cases does not in any way depend upon the nuisance being also a purpresture. A purpresture might not be a nuisance, but it could be restrained by injunction because it was an encroachment on the soil of the king; and a nuisance, whether a purpresture or not, could be enjoined at the suit of the attorney general, if it injuriously affected a public right. *People v. Vanderbilt*, 26 N. Y., 287, 293; High on Inj., 519–21; Hilliard on Inj., 273 et seq. The rule as to enjoining public nuisances being the reverse of what Chancellor KENT assumed it to be, the conclusion, by analogy, as to restraining corporations from violating their charters to the public injury, must also be the reverse of that which he reached. It was also remarked by the chancellor, that there were "no particular individuals affected or disturbed in the enjoyment of their private rights" by the unauthorized acts of the defendant bank in that case. But in the case at bar the individual rights of all who use the railroads of the state are injuriously affected.

The general grounds upon which courts of equity will interfere by injunction in the case of railway companies to keep them within their charter powers, is fully stated by Lord COT-TENHAM, Chancellor, in *River Dun Nav. Co. v. North Midland R'y Co.*, 1 Eng. R'y Cas., 135. He there concurred with Lord ELDON (*Agar v. The Regent's Canal Co.*, Cooper, 77), in holding that the jurisdiction of chancery is to be exercised "for the purpose of keeping these companies within the powers which the acts gave them;" and he asserted that this was "a most wholesome exercise of the jurisdiction, because, great as the powers necessarily are to enable the companies to carry into effect works of this magnitude, it would be most prejudicial to the interests of all persons with whose property they interfere, if there was not a jurisdiction continually open and ready to exercise its power for the purpose of keeping them within that

limit which the legislature has thought proper to prescribe.". This was said in a case where a railway company attempted to take the *land* of the complainants; but the reason for the jurisdiction is quite as strong where the money of all persons who use the railways of the state is unlawfully taken from them. "The rule laid down by Lord Chancellor COTTENHAM and repeated in several cases, that it is the duty of a court of equity. to 'adapt its practice and course of proceeding, as far as possible, to the existing state of society, and to apply its jurisdiction to all those new cases which, from the progress daily making in the affairs of men, must continually arise, and not, from too strict an adherence to the forms and rules established under very different circumstances, decline to administer justice, and to enforce rights for which there is no other remedy,' is certainly worthy of the ablest, the wisest and best judges who ever administered the law of England or America." 2 Redf. on R. W., 310.

The argument that there is a remedy at law is answered in several English cases, as follows: The information in the nature of *quo warranto* to forfeit the charter of a corporation is in the nature of *punishment,* and the proceeding was formerly regarded as strictly criminal, and is still *quasi* criminal. But the remedy by injunction is for the *prevention of injury,* and not for punishment. As argued by Sir Samuel Rumley in *Att'y Gen'l v. Cleaver,* 18 Ves., 214, "the ground of the application it not that the act is a crime, but that it occasions irreparable injury to several persons. The defendants, in order to succeed, must establish the principle that *because* the act is a crime it is entitled to favor and protection in a court of equity."

The following cases are cited in support of the propositions here advanced: *Att'y Gen'l v. Forbes,* 2 Myl. & Cr., 123; *Box v. Allen,* 1 Dick., 49; *Kerrison v. Sparrow,* Cooper, 305; *Att'y Gen'l v. Johnson,* 2 Wilson C. C., 87; *Att'y Gen'l v. Nichol,* 16 Ves., 338; *Att'y Gen'l v. Eastern Cos. R'y Co.,* 3 Eng. R'y Cas., 337; *Att'y Gen'l v. Cambridge Consumers' Gas Co.,* 4 Ch. App.

. Cas., 71; *Mayor etc. of Liverpool v. Chorley Water Works Co.*, 2 DeG., MacN. & G., 860; *Att'y Gen'l v. Railway Co.*, 3 Ch. App. Cas., 100; *Att'y Gen'l v. Royal College of Physicians*, 1 J. & H., 561; *Att'y Gen'l v. Luton Local Board*, 2 Jur. (N. S.), 180; *Att'y Gen'l v. Guardians of the Poor*, 13 Jur., 669; *People v. New York*, 32 Barb., 102; *Davis v. The Mayor*, 2 Duer, 663; *Att'y Gen'l v. Salem*, 103 Mass., 138; *Att'y Gen'l v. Tudor Ice Co.*, 104 id., 240; *Doolittle v. Sup'rs*, 18 N. Y., 155; *Buck Mountain Coal Co. v. Lehigh Coal & Nav. Co.*, 50 Pa. St., 91. It is to be collected from all these cases, that where the exercise of powers and privileges not granted by law to a corporation works a public injury, equity, at the suit of the attorney general, will restrain the repetition of such acts, but will not interfere at the suit of the attorney general where only private interests or property are affected; and that in these latter cases the writ is denied, not because the court has no jurisdiction, but because no proper case is made out for its exercise.

Public corporations, more than private ones, are held to be under the supervision and control of the court. That railroads are public works, and railway companies *quasi* public companies, in the sense that they are created to promote great public interests, and are hence under the control and supervision of the state, is abundantly established by authority. *Bonaparte v. C. & A. R. R. Co.*, 1 Baldw., 223; *Jarden v. P. W. & B. R'y Co.*, 3 Whart., 506–7; *Whiting v. S. & F. R. R. Co.*, 25 Wis., 181–2; *Olcott v. The Supervisors*, 16 Wall., 694. But if such companies are to be regarded as strictly private, still, by the later authorities, the doctrine is well established that courts of equity may keep them within their powers by injunction. And, as in arresting the creation or continuance of nuisances, if private rights alone are infringed, the action is brought by the individuals injured; if the public rights are infringed, the action is by the attorney general in behalf of the whole people. *Att'y Gen'l v. Great N. R'y Co.*, 1 Drewry & Smale, 154; *Hart v. London & N. W. R. R. Co.*, 2 Johns. & H., 109; *Stockport*

The Attorney General vs. Railroad Companies.

*Water Works v. Mayor of Manchester*, 9 Jur. (N. S.), 266 ; Kerr on Inj., 543, note 1 ; *Ware v. Regent's Canal Co.*, 3 De Gex & J., 228. In the last case it is held that, to support an information, no substantial damage or definite injury to the public need be shown. It is enough that the company has not strictly followed, or is about to transgress, the powers vested ·in it by the legislature.

If there could be any doubt, upon these authorities, whether this is a proper case for the exercise of chancery powers, that doubt is removed by sec. 13, ch. 148, R. S., which expressly authorizes an injunction at the suit of the attorney general in such cases. It is claimed, however, that the injunction authorized by this statute can be granted only by the circuit court, because only that court is named. This is the precise question which has so often arisen in the federal courts with reference to enforcing state laws. The state constitution grants to this court power to issue the writ of injunction ; and the grant is without limit. It is as broad as the existence of chancery power for that purpose. In respect to the possession of this power the supreme court of this state and the federal courts are on precisely the same footing. It is held that a state law extending the equity jurisdiction of the state courts over a particular subject, and making no reference to the federal courts, operates to extend in like manner the jurisdiction of the federal courts within that state (*Bayerque v. Cohen*, 1 McAl., 113), and that a state law which confers *exclusive* jurisdiction of a particular subject on the state courts cannot prevent the United States courts sitting within the state from taking the same jurisdiction. *Parsons v Lyman*, 32 Con., 566 ; *Lorman v. Clark*, 2 McLean, 568. The reasoning in the latter case is strictly applicable to the case at bar. And it would not be competent for the legislature, if such had been its intention, to confer power in the matter of injunctions upon any court *exclusive* of the supreme court, because this court, by the constitution, has jurisdiction of that remedy *concurrent* with the circuit courts.

*Clark v. Smith*, 13 Peters, 195 ; *Ex parte Biddle*, 2 Mass., 472 ; *Paine v. Wright*, 6 McLean, 395 ; *Grant v. Hamilton*, 3 id., 100 ; *Bennett v. Boggs*, 1 Baldw., 60 ; *Livingston v. Moore*, id., 424 ; *Parsons v. Lyman*, 32 Conn., 566 ; 5 Abb. Nat. Dig., 65, 66

B. *As to the validity of ch.* 273, *Laws of* 1874.

The power reserved to the legislature by sec. 1, art. XI of the constitution of this state, to alter or repeal, at any time after their passage, all general laws and special acts enacted under the provisions of that section, is, by its terms, an unlimited power.

The existence, powers and capacities of a corporation, and its mode of exercising them, must depend upon the law of its creation. The exercise of the corporate franchise, being restrictive of individual rights, cannot be extended beyond the letter and spirit of the act of incorporation. *Beaty v. Lessee of Knowler*, 4 Pet., 168 ; *Comm'rs of Inland Fisheries v. Holyoke W. P. Co.*, 104 Mass., 449 ; *Charles River Bridge v. Warren Bridge*, 11 Pet., 420, 544, 548 ; *Perrine v. C. & D. Canal Co.*, 9 How. (U. S.), 172, 192 ; *Richmond, F. & P. R. R. Co. v. Louisa R. R. Co.*, 13 id., 71 ; *Cleaveland v. Norton*, 6 Cush., 383 ; *Boston v. Richardson*, 13 Allen, 146. Corporations have no right to charge toll on freight, except as that right is granted by their charters. *Beaty v. Trustee of Knowler*, 4 Pet., 168 ; *Perrine v. C. & D. Canal Co.*, 9 How. (U. S.), 172 ; *Thorpe v. R. & B. R. R. Co.*, 27 Vt., 146 ; *Boston & L. R. R. Corp. v. Salem & L. R. R. Co.*, 2 Gray, 27 ; *Comm'rs, etc., v. Holyoke W. P. Co.*, 104 Mass., 457 ; *Erie & N. E. R. R. Co. v. Casey*, 26 Pa. St., 307.

There is no limitation on the power of the legislature to alter the charter of a corporation, where that power is reserved without any words of limitation. The legislative discretion in that respect cannot be controlled by the courts. *Pratt v. Brown*, 3 Wis., 611 ; *Nazro v. Merchants' Mut. Ins. Co.*, 14 id., 295 ; *Chapin v. Crusen*, 31 id., 209 ; *McLaren v. Pennington*, 1 Paige, 102 ; *Perrin v. Oliver*, 1 Minn., 202 ; *Penn. College Cases*,

13 Wall., 190 ; *Oliver Lee's Bank,* 21 N. Y., 9 ; *Sherman v. Smith,* 1 Black, 592 ; *Tomlinson v. Jessup,* 15 Wall., 454 ; *Miller v. The State,* id., 478 ; *Holyoke Co. v. Lyman,* id., 516 ; *Olcott v. The Supervisors,* 16 id., 678.

The limitation of charges in no way interferes with interstate commerce. *State Freight Tax,* 15 Wall., 277 ; *State Tax on Railway Gross Receipts,* id., 284.

Bondholders and creditors have no greater rights than the corporation itself. *Bronson v. Kinzie,* 1 How. (U. S.), 311 ; *McCracken v. Hayward,* 2 id.. 608 ; *Curran v. Arkansas,* 15 id., 305 ; *Hawthorne v. Calef,* 2 Wall., 10 ; *Tomlinson v. Jessup,* 15 id., 458 ; *Mumma v. Potomac Co.,* 8 Pet., 281 ; *Root v. Godard,* 3 McLean, 103 ; *Root v. Wallace,* 4 McLean, 8 ; *Read v. Frankfort Bank,* 23 Me., 318 ; *Albany Northern R. R. Co. v. Brownell,* 24 N. Y., 345 ; *S. & S. R. R. Co. v. Thatcher,* 11 N. Y., 102 ; *Buff. & N. Y. City R. R. Co. v. Dudley,* 14 id., 336. The reserved *power* of the legislature is not affected by the fact that its exercise may incidentally impair, or even destroy, the value of the securities held by the creditors of the corporation. Thus, where the state has not granted any *exclusive* right to one corporation, it impairs no contract by incorporating a second one which injures or destroys the first. *Charles River Bridge v. Warren Bridge,* 11 Pet., 420 ; *Turnpike Co. v. State,* 3 Wall., 210 ; *Richmond, F. & P. R. R. Co. v. Louisa R. R. Co.,* 13 How. (U. S.), 71 ; *Boston & L. R. R. Co. v. Salem & L. R. R. Co.,* 2 Gray, 1, 35 ; *Springfield v. Conn. River R. R. Co.,* 4 Cush., 63 ; *Central Bridge Corp. v. Lowell,* 4 Gray, 474.

RYAN, C. J. These causes, although before the court now on motion only, are of high importance, for both the interests and the principles which they involve. Most of the questions to be passed upon were elaborately argued with much learning and ability at the bar, and all have been patiently and laboriously considered by us, in view of the gravity and delicacy of the decision which we have to make.

I. The first question to be settled, and the one which has given us the greatest difficulty to settle, is the jurisdiction of this court to entertain the informations in these causes.

Since the case of *Attorney General v. Blossom*, 1 Wis., 317, the original jurisdiction of this court under the third clause of sec. 3, art. VII of the constitution of this state, has never been doubted in this court, has been recognized and asserted in many cases, and is no longer an open question. This original jurisdiction is conferred and limited by the power "to issue writs of *habeas corpus, mandamus, injunction, quo warranto, certiorari,* and other original and remedial writs, and to hear and determine the same." The court has many times exercised original jurisdiction in cases of *habeas corpus, mandamus, quo warranto* and *certiorari*. This is the first time it has been called upon to assert original jurisdiction of injunction. In the case of *Cooper v. Mineral Point*, 34 Wis., 181, application was made to this court to issue a writ of injunction in a cause pending in the circuit court. The court disclaimed jurisdiction to grant the writ in a cause not in this court, under either its appellate or original jurisdiction; but took occasion to assert its jurisdiction to issue the writ in a proper case commenced in this court, as an exercise of its original jurisdiction. But in neither of these cases, nor — so far as we are aware — in any other case, has it been considered what are the nature and limits of the original jurisdiction conferred on this court in cases of injunction, or how that jurisdiction is to be exercised. And indeed the distinction between the writ of injunction and the other writs granted, seems to have been overlooked in discussions which had relation chiefly to the nature and functions of those other writs.

In *Attorney General v. Blossom*, SMITH, J., speaking of the group of writs given to the court, says that "this class of writs, it would seem, appertain to and are peculiarly the instruments of the sovereign power, acting through its appropriate department, prerogatives of sovereignty," etc. He calls them indiscriminately original and prerogative writs; and says that they

"differ essentially, in their character and objects, from ordinary writs issued by the courts in the regular and usual administration of the law between parties. They go to accomplish peculiar and specific objects, carrying with them the special mandate of the sovereign power, etc. They bear no resemblance to the usual processes of courts by which controversies between private parties are settled by the judicial tribunals of every grade." He speaks particularly of the writs of *certiorari* and injunction as "remedial writs of a high judicial character, and essential to the complete exercise of the function of sovereignty in the administration of justice."

Substantially correct of all the other writs named, this language does not appear to be accurately used of the writ of injunction. At common law, all the other writs given were prerogative writs, issuing on behalf of the state only; and though sometimes used for private remedy, were so used on special leave given, and in the name of the state, and were not ordinary writs applicable to private controversies or issuable of course. All the other writs must or might be original; as given to this court they must be original writs, in the modern and practical sense of the term original writs. The writ of injunction was not original. They are, as given, essentially jurisdictional writs, implying the jurisdiction granted, in each case, *ex vi termini*. The writ of injunction was not an original writ, and by itself, as given, implies no specific jurisdiction. It was a judicial writ, going only upon some judgment, interlocutory or final, of the court issuing it, in some case of which the court had jurisdiction otherwise; never jurisdictional, but always remedial in aid of jurisdiction already attached, within the vast range of equitable cognizance. And the difficulty arises wholly from placing this nonjurisdictional writ in a group of jurisdictional writs; this judicial writ amongst original writs; this equitable writ of vague and varied application amongst common law writs of sharp and terse significance; this confusion of equitable and legal jurisdiction. In *Attorney General*

*v. Blossom*, the jurisdiction in question was *quo warranto*. And elaborately as the question was discussed by the able judge who wrote the opinion, he seems to have followed the framers of the constitution in a want of perception that the writ of injunction appeared to be illy grouped with *habeas corpus, man damus, quo warranto* and *certiorari*, and that the court might be troubled some day, as it has been now, how to take jurisdiction of a writ not before jurisdictional; how to hear and determine a writ not before original.

The common law, which gave the original writs adopted by the constitution, gave the forms of procedure. The jurisdic tion of them, once ascertained, involved nothing difficult, noth ing new; and when they were under consideration, the original jurisdiction of the court was easily asserted and discussed. It was natural that the court should overlook, it was fitting that the court should postpone, the difficulty arising on original jurisdiction of injunction, until the writ itself should be applied for, and a proceeding taken to put its original jurisdiction of the writ in motion. And the questions are now here, for the first time, for settlement, What is that jurisdiction? What are its import and limits? How and at whose instance is it to be asserted? The writ does not of itself, like the rest of the group of writs given, furnish an answer to these questions.

From the beginning of the discussion of these motions, this difficulty stared us in the face, and we called on the bar for a solution of it. On the one side, we were first told that the writ gives this court general equitable jurisdiction, in all cases, be tween all parties, where injunction is prayed; thus substantially making this court one of general equitable jurisdiction, concur rent with all the circuit courts of the state. Later in the dis cussion an attempt was made to limit this interpretation to cases in which perpetual injunction is the sole relief sought. The latter construction is hardly consistent with the indisposi tion of a court of equity to be the handmaid of other courts,

or the general maxim that a court of equity, having once obtained jurisdiction for one purpose, will retain it for all purposes; or if consistent, not very available as a limitation. And an original equitable jurisdiction, however restricted, of purely private causes, concerning private interests, between private persons, would be wholly inconsistent with the manifest policy of the constitution to limit this court to appellate jurisdiction, superintending control over inferior courts, and original jurisdiction in certain causes *publici juris*, as is held in *Attorney General v. Blossom*. It would be a gross blemish upon the symmetry and economy of the constitutional distribution of jurisdiction, a solecism against the judicial order observed in it, to attribute to the supreme court of the state original jurisdiction in one class of causes of private right, which is carefully excluded in all other causes, for no inherent distinction; for no assignable reason, except that it seems to follow from words used for a different purpose; a purely accidental and incongruous jurisdiction, which was surely not designed. (See the cases in Missouri cited *infra*.) We could not accept so vicious and mischievous a construction, resting really upon an imputation of an inaccurate use of terms in the constitution; and which after all does not fully meet the difficulty of jurisdiction given of a nonjurisdictional writ.

On the other side it was suggested that the writ of injunction does not go at all to the original jurisdiction of the court; and that it is inserted where it is, in aid of the appellate or superintending jurisdiction of the court. This construction is properly rejected in *Attorney General v. Blossom*. The framers of the constitution appear to have well understood that, with appellate jurisdiction, the court took all common law writs applicable to it; and with superintending control, all common law writs applicable to that; and that, failing adequate common law writs, the court might well devise new ones, as Lord Coke tells us as "a secret in law." Hence the constitu-

tion names no writ for the exercise of the appellate or superin tending jurisdiction of the court.[*] But the original jurisdiction depends on the writs given, and hence the group of specific writs. The injunction given, mean what it may, appertains therefore to the original jurisdiction of the court.

Again we were told that the writ of injunction was inserted in the class of original writs *ex abundanti cautela*, where it does not fit, where it performs no office, where it stands mere surplusage, signifying nothing, *nudum verbum*. We might sympathize with this way out of the difficulty, but we cannot accept it. We cannot so deal with the charter of this court. We cannot so dispose of a jurisdictional word. Even in ordinary phrases, in an ordinary statute, dealing with an ordinary subject, *verba aliquid operari debent, cum effectu sunt accipienda*. And surely we cannot, in the constitution which creates the court, reject as superabundant and unmeaning an independent, jurisdictional word, manifestly inserted for the purpose of imposing a distinct duty on the court, only because we find it difficult to apply it. We must hold that the grant of the writ had a definite purpose. This is proved by the independent use of the word, rarely appearing in such a grant of jurisdiction. We may say that we have found it difficult to define the purpose; but if we should find it impossible to interpret the organic law of the court, we might not unjustly be held to confess our unfitness for this place.

Receiving from the bar no solution of the difficulty which we could accept, we have patiently considered it, seeking light from the constitutional grant of jurisdiction itself, from the previous discussions of this court and from the discussions of other courts on kindred subjects; steadfast to accept or reject jurisdiction of these causes, as our duty might be; and as far as we should be able, and as far as might be necessary to our decision, to ascertain and define the jurisdiction in question for the

---

[*] See sec. 5, ch. 115, R. S.

future guidance of the court and the profession, until our construction should be modified or changed by our successors.

All the other writs of the group are common law writs. The writ of injunction, when the constitution was adopted, was exclusively an equitable writ, used only by courts of chancery. As such it was given to this court, implying and carrying with it equitable jurisdiction to employ it. It is therefore plain that the original jurisdiction of this court is both legal and equitable, within certain limits; legal for the use of the common law writs; equitable for the use of the chancery writ. The use of the former must be according to the course of common law courts. The use of the latter, according to the course of courts of equity; in each case, subject to statutory modifications of the practice, which do not impair the jurisdiction granted. The common law writs, as already observed, imply and define the jurisdiction appurtenant to them, as jurisdictional writs. It is otherwise with the writ of injunction. Equity has no jurisdictional writs. By the course of courts of equity, the jurisdiction must precede the writ. And though the writ is the end of the equitable jurisdiction implied, the scope of the jurisdiction must be sought mainly outside of the writ itself. It can issue only after bill or information filed. And the question still remains, what is the original equitable jurisdiction conferred on the court, of bills or informations, dependent on the use of the writ.

The grant of original jurisdiction is one entire thing, given in one general policy, for one general purpose, though it may have many objects and many modes of execution. So it is of the appellate power. So it is of the superintending control. There are three independent and distinct grants of jurisdiction, each compact and congruous in itself; each a uniform group of analogous remedies, though to be exercised in several ways, by several writs, in legal and equitable proceedings, on many objects, in great variety of detail. The constitution wisely, almost necessarily, stopped with the general grants of jurisdiction,

carefully distinguished, and left details to practice and experience.

The grant is to the supreme court of the state, in the full significance of that term given in *Attorney General v. Blossom*; designed to have a general judicial oversight of the state in all its interests, public and private. To this court, as such, are given general appellate jurisdiction and superintending control over all other courts throughout the state, because these are essential to the judicial supremacy of the court in all ordinary litigation; and original jurisdiction of certain writs, " because they are designed for the very purpose of protecting the sovereignty and its ordained offices from invasion or intrusion, and also to nerve its arm to protect its citizens in their liberties, and to guard its prerogatives and franchises against usurpation." This is the language of the court in *Attorney General v. Blossom*, which we adopt and approve as applicable to the question before us. And it tends to show, as the whole opinion in that case shows, that the three grants of jurisdiction proceed on one policy : appellate jurisdiction to decide finally all ordinary litigation; superintending jurisdiction over all other courts to control the course of ordinary litigation in them; and, outside of these, original jurisdiction of certain proceedings at law and in equity, to protect the general interests and welfare of the state and its people, which it would not do (to quote SMITH, J., again) to dissipate and scatter among many inferior courts. Here are three jurisdictions, but one policy : to make this court indeed a supreme judicial tribunal over the whole state; a court of last resort on all judicial questions under the constitution and laws of the state; a court of first resort on all judicial questions affecting the sovereignty of the state, its franchises or prerogatives, or the liberties of its people. *Attorney General v. Blossom.*

The other courts may, indeed, adjudicate public as well as private questions; and the appellate and superintending jurisdiction of this court may therefore reach public as well as pri-

vate interests. But the framers of the constitution, for greater security, added to these original jurisdiction over great public interests, for reasons already assigned. In a government like ours, public rights of the state and private rights of citizens often meet, and may well be involved in a single litigation. So it may be in the exercise of the original jurisdiction of the court. But it is safe to say that the constitution is content to intrust purely private rights to the appellate and superintending jurisdictions given, and to have granted the original jurisdiction of this court for the better and prompter and more authoritative protection of public interests. This is its primary and controlling object and character.

This is very plainly implied by the grant of the writs of *habeas corpus, mandamus, quo warranto* and *certiorari*, as is well reasoned in *Attorney General v. Blossom.* And, plainly recognizing the intention of the constitution to vest in this court one jurisdiction, by several writs, to be put to several uses, for one consistent, congruous, harmonious purpose, we must look at the writ of injunction in the light of that purpose, and seek its use in the kindred uses of the other writs associated with it. *Noscitur a sociis* is an old and safe rule of construction, said to have originated with as great a lawyer and judge as Lord Hale, peculiarly applicable to this consideration. Lord Bacon gives the same rule in a more detailed form, more emphatic here. *Copulatio verborum indicat acceptationem in eodem sensu.* Here are several writs of defined and certain application classed with one of vague import. We are to be guided in the application of the uncertain, by its certain associates. The joinder of the doubtful writ with the defined writs operates to interpret and restrict its use, so as to be accepted in the sense of its associates; so that it and they may harmonize in their use, for the common purpose for which it is manifest that they were all given. And thus, in this use and for this purpose, the constitution puts the writ of injunction to prerogative uses and makes it a *quasi* prerogative writ.

There is the less difficulty in reaching this construction, and giving definite meaning to the jurisdiction of injunction, because of the very contrast between this writ and *mandamus*. The latter commands. The former forbids. Where there is nonfeasance, *mandamus* compels duty. Where there is malfeasance, injunction restrains wrong. And so near are the objects of the two writs, that there is sometimes doubt which is the proper one; *injunction* is frequently mandatory, and *mandamus* sometimes operates restraint. In these very motions it was argued on one side that the remedy of the state is by *mandamus*, on the other that it is by injunction. And it is very safe to assume that the constitution gives *injunction* to restrain excess, in the same class of cases as it gives *mandamus* to supply defect; the use of the one writ or the other in each case turning solely on the accident of over-action or shortcoming of the defendant. And it may be that where defect and excess meet in a single case, the court might meet both, in its discretion, by one of the writs, without being driven to send out both, tied together with red tape, for a single purpose.

This view excludes jurisdiction of injunction in private suits, between private parties, proceeding on private right or wrong. In excluding them, we feel quite assured that we are only giving effect to the very purpose and limit of the constitution in the grant of jurisdiction. And we were aided in arriving at this conclusion, by decisions of the supreme court of Missouri, in somewhat analogous cases, excluding original jurisdiction of causes of merely private interest. *State v. Stewart*, 32 Mo., 379; *State v. Lawrence*, 38 id., 535; *Foster v. State*, 41 id., 61; *Vail v. Dinning*, 44 id., 210; *State v. Vail*, 53 id., 97. In our view, the jurisdiction of the writ is of a *quasi* prerogative writ. The prerogative writs proper can issue only at the suit of the state or the attorney general in the right of the state; and so it must be with the writ of injunction, in its use as a *quasi* prerogative writ. All may go on the relation of a private person, and may involve private right. It is the duty

of the court to confine the exercise of its original jurisdiction to questions *publici juris*. And hereafter the court will require all classes of cases, as it has hitherto done some, in which it is sought to put its original jurisdiction in motion, to proceed upon leave first obtained, upon a *prima facie* showing that the case is one of which it is proper for the court to take cognizance.

Although the writ of injunction was at no time properly a jurisdictional writ, and it has long been held to be a judicial writ only, used to give effect to the general jurisdiction of courts of equity, yet in the early history of the English Chancery, the use of the writ rested on a jurisdiction of its own, borrowed from the Roman law by the churchmen who first sat in that court. 1 Spence, 668. And this early use of the writ as a *quasi* jurisdictional writ has aided us in giving to it the construction and use in the constitution, which we adopt.

We ought, perhaps, earlier in the discussion, to have indicated another section of article VII of the constitution, which has aided our conclusion. Section 8 gives jurisdiction to the circuit courts, original in all matters, civil and criminal, within the state, not excepted in the constitution or thereafter prohibited by law, and appellate from all inferior courts and tribunals, and supervising control over the same, and also power to issue writs of *habeas corpus, mandamus, injunction, quo warranto, certiorari* and all other writs necessary to carry into effect their judgments, etc., and a general control over inferior courts and jurisdictions. A great jurisdiction, comprehending, as C. J. Stow remarked, in *Putnam v. Sweet,* the united powers of the English courts of the King's Bench, Common Pleas, Exchequer and Chancery. The same writs are granted to those courts as to this. It is impossible for a lawyer to suppose that they are granted in the same sense and with the same measure of jurisdiction, to this court as to those courts. Such a proposition would shock the legal sense of any professional man. And the distinction is to be looked for, and is readily

found, in the general constitution and functions of those courts and of this. The writs are given to the circuit courts as an appurtenance to their general original jurisdiction; to this court, for jurisdiction. Those courts take the writs with unlimited original jurisdiction of them, because they have otherwise general original jurisdiction. Other original jurisdiction is prohibited to this court, and the jurisdiction given by the writs is essentially a limited one. Those courts take the prerogative writs as part of their general jurisdiction, with power to put them to all proper uses. This court takes the prerogative writs for prerogative jurisdiction, with power to put them only to prerogative uses proper. The circuit courts take the writ of injunction with all the powers and uses of the English Court of Chancery. This court takes it as an integral element of its jurisdiction of prerogative writs. And it would be a rude and criminal emasculation of the judicial charter of the state, to disfranchise this court of all jurisdiction or use of injunction, as it would be a wild and reckless delusion, undiscerning the symmetrical distribution of judicial powers in the constitution, to attribute to this court the same jurisdiction and uses of the writ which the circuit courts have.

And so the difficulty which seemed so great, becomes so little, and is overcome, as difficulties often are, by being directly met and carefully examined. And thus we find that SMITH, J., was more apparently than really inaccurate in *Attorney General v. Blossom*, when he classed injunction with the other writs given, and called the whole group prerogative and original writs. For, in our view of its use, the injunction given to this court seems to become a *quasi* prerogative writ, and founds jurisdiction as if it were an original writ. It is certainly competent for the constitution to give new writs, or to put old writs to new uses; to make any writ, by the use to which it puts it, prerogative or original; and to found jurisdiction on any writ, as in case of a prerogative or original writ. And this it appears

to have done, in effect, with the injunction which it gives to this court.

We therefore hold that this court has original jurisdiction of an information on behalf of the state in the nature of an injunction bill in chancery, in all cases coming within the scope of the original jurisdiction conferred on this court by the third clause of section 3, article VII of the constitution, in which injunction is the appropriate remedial writ.

The original jurisdiction of the court by way of injunction being thus settled, no question was made on the argument, and it is not perceived how any could well be, of our jurisdiction to entertain the informations in these causes, if they make a case for equitable cognizance.

II.   But equitable jurisdiction of such informations was denied.   It was argued that courts of equity have no jurisdiction, at the suit of the attorney general, to enjoin usurpation, excess or abuse of corporate franchises.

This question was argued very ably and at large, and has been carefully considered, although we have had no difficulty in coming to the conclusion that courts of equity have such jurisdiction, and that it is a very beneficial jurisdiction, almost essential to public order and welfare.

It was hardly denied that the English court of chancery entertains jurisdiction in such cases; and indeed the English books leave little room for such a denial.

But it was said that, in England, the attorney general has a right to elect his forum, legal or equitable.   And it is so said in some of the cases.   *Attorney Gen'l v. Mayor of Galway*, 1 Molloy, 103.   But it appears to us that this logically follows, everywhere, upon equitable jurisdiction to restrain corporate violations of charters or other public law.   In such cases there is always a remedy at law.   The attorney general may proceed at law by *quo warranto* to forfeit the charter of the offending corporation; and, if there be a penalty, as often happens, he

may sue for it at law. And the concurrent remedy by injunction inevitably gives the election imputed to the attorney general. And we see no reason why the attorney general here has not the same election. To deny him such an election is only another way of denying the jurisdiction.

The equitable jurisdiction precludes the objection that there is an adequate remedy at law. It admits the remedy at law, but administers its own remedy in preference, when the state seeks it in preference. It seems to proceed on the presumption that it may better serve the public interest to restrain a corporation, than to punish it by penal remedies or to forfeit its charter; and that, in that view, the proper officers of the state should have an election of remedies. And we may as well say in this connection, that the jurisdiction to entertain these informations is wholly independent of an adequate remedy at law; and that, were that otherwise, we could not consider the informations in the nature of a *quo warranto*, pending in this court against these defendants, as an adequate remedy at law, which could be a substitute for or bar to the injunctions asked. Judgments of ouster on those informations might not only be of far more grave consequence to the defendants, but might be far less beneficial to the state, and less accordant with its policy, and altogether less equitable and proper, than the injunctions sought to restrain the defendants from doing what is alleged to work a forfeiture of their charters. Doubtless the court has power, in granting injunctions, to prescribe conditions controlling the action of the attorney general in the *quo warranto* cases. But if this court can enjoin, it can do so without regard to any remedy at law; and the attorney general has a right of election to resort to the more lenient remedy of injunction, in preference to the harsher and more dangerous experiment of forfeiture.

It was further urged for the defendants, against the authority of the English cases, that the jurisdiction of the English chancery in such cases, rests largely on recent acts of parliament.

And we were referred, in support of that position, to the Railway and Canal Traffic Act of 1854, and to the Common Law Procedure Act of the same year (17 and 18 Vict., ch. 31 and ch. 125). We have carefully examined these statutes, and Mr. Joyce's comments upon them. We find that the former of them enlarged the powers of some of the common law courts, and gave them jurisdiction of certain summary proceedings, and the equitable writ of injunction for certain purposes, against railway and canal companies. The second of these acts gives some equitable powers, and the writ of injunction, in certain cases, to courts of common law. But we fail to discover that either of these statutes adds anything to the jurisdiction of courts of equity: In this connection we were led also to examine the Railway Act of 1840 (3 and 4 Vict., ch. 97), and the Railway Act of 1844 (7 and 8 Vict., ch. 85). Section 11 of the former of these two latter acts, and section 17 of the latter of them, the second of these sections being a substitute for the first, give certain authority to the Board of Trade to require the attorney general to proceed against railway companies for violation of legal duty; and, upon such requisition, make it obligatory on the attorney general to take such proceedings. While the latter of these sections was in force, the attorney general filed an information in the court of chancery against a railway company for an injunction against acts within the letter and spirit of the section, without any requisition of the Board of Trade. On application for injunction, the vice chancellor says :

" It is, however, contended that as the act of 7 and 8 Vict., ch. 85, sections 16, 17, prescribes a particular remedy in such a case, the attorney general cannot take proceedings otherwise than in accordance with that provision.

"This objection in truth involves the contention that this court has no jurisdiction to entertain the suit by the attorney general, unless it is instituted under the circumstances mentioned in those sections.

" The effect of those sections is not to take away the right of the attorney general to file such an information at his discretion, although there is no certificate of the board of trade, or the jurisdiction of the court to entertain such a suit. The only effect is, that if the board of trade has certified to the attorney general, he is *bound* to act, and compel the railway company to abstain from doing what is in violation of the law. In that particular case he can exercise no discretion; he must sue."

The information was sustained and the injunction issued. *Attorney General v. Great W. Railway Co.*, 1 Drewry & S., 154.

We have been unable to find any English statute enlarging the jurisdiction of the court of chancery in such cases; and we find all the English cases proceeding without reference to statutory jurisdiction. We find no room for doubt that this jurisdiction of English courts of equity is independent of all authority by statute, and has long been as well recognized as any ground of equitable jurisdiction whatever. And these views are fully sustained by the case just quoted.

We cannot state the rule better than by taking it from the excellent work of Mr. Brice, so recently given to the profession.

" Under many circumstances, the court of chancery has, on public grounds, jurisdiction to prevent corporations acting in various ways, or contrary to the intent for which they have been created. The public, however, must be represented in all applications relating to such matters, and this is done by the intervention of the attorney general. No single person, whether a member of the corporation in question or not, is able on his own account, and of his own motion, to call upon the court to interfere for his special protection. The wrong he complains of is not confined to himself; no right or privilege peculiar to himself is violated; the wrongs inflicted and the rights invaded affect the public, and the public, consequently, must be a party to the proceedings. The occasions upon which the court will exercise jurisdiction to restrain the doing of acts of this kind, seem to fall into the three following:

heads:" The author then proceeds to give the three heads of jurisdiction at large, which are thus classed in his own words: "1st. When a corporation is abusing powers given for public purposes; 2d, or is committing a breach of trust; 3d, or is acting adversely to public policy." We copy this last in full:

"When any corporation is doing acts detrimental to the public welfare, or hostile to public policy. The right of the attorney general to interfere on these grounds was fully established in *Attorney General v. Great North. Railway Company*, where the defendants had engaged in an illegal trade in coals. It was objected that it was not competent for him to file an information. But KINDERSLEY, V. C., said: 'On this point I entertain no doubt whatever. Whenever the interests of the public are damnified by a company established for any particular purpose by act of parliament, acting illegally and in contravention of the powers conferred upon it, I conceive it is the function of the attorney general to protect the interests of the public by an information; and that, when in the case of an injury to private interests, it would be competent for an individual to apply for an injunction to restrain a company from using its powers for purposes not warranted by the act creating it, it is competent for the attorney general, in cases of injury to public interests from such a cause, to file an information for an injunction.' "

The writer then proceeds: " The above being the grounds of the jurisdiction of the court of chancery in this behalf, the next point is, when can the attorney general direct proceedings on behalf of the public? He may do so whenever public interests have been damnified, or will manifestly be damnified, in the result, by transactions which are now taking place. And it would seem from the judgment in *Ware v. Regent's Canal Company* (3 De Gex & J., 212, 228), that he may do so when a corporation is going beyond its special powers, even though no definite injury has been done or is likely to be done to the public. Where there has been an excess of the

powers given by an act of parliament, but no injury has been occasioned to any individual, or is imminent and of irreparable consequences, I apprehend that no one but the attorney general, on behalf of the public, has a right to apply to this court to check the exorbitance of the party in the exercise of the powers confided to him by the legislature." Brice's *Ultra Vires*, 506–9.

The custom of courts of equity to interfere in such cases, at the suit of private parties, for private injuries, is quite old. It seems to have grown up out of the ancient jurisdiction to restrain waste and nuisance. We shall not attempt to trace it. It is recognized as an established jurisdiction by Lord HARDWICKE in 1752 (*Fishmonger's Co. v. East India Co.*, 1 Dickens, 163) ; and particularly as applied to corporations exceeding or abusing their franchises, by Lord ELDON in 1815. *Agar v. Regent's Canal Co.*, Cooper, 77. In more recent times, as corporations have grown in number and power, cases applying this jurisdiction to them are very numerous. We cite a few at random : *River Dun N. Co. v. North Mid. Railway Company*, 1 English Railway Cases, 135 ; *Blackburne v. Glamorgan Canal Navigation*, 1 Mylne & K., 154 ; *Coats v. Clarence Railway Company*, 1 Russell & M., 181 ; *Dawson v. Paver*, 5 Hare, 415 ; *Broadbent v. Imperial Gas Company*, 7 De Gex, M. & G., 437 ; *Ware v. Regent's Canal Company*, 3 De Gex & J., 212 ; *London & Brighton Railway Company v. Cooper*, 2 English Railway Cases, 312.

The general grounds of jurisdiction, in favor of private persons as well as the public, are stated by Lord ELDON in *Blackmore v. Glamorgan Canal Navigation*. "When I look upon these acts of parliament, I regard them all in the light of contracts made by the legislature, on behalf of every person interested in anything to be done under them ; and I have no hesitation in asserting that, unless that principle is applied in construing statutes of this description, they become instruments of greater oppression than anything in the whole system of ad-

ministration under our constitution. Such acts of parliament have now become extremely numerous; and, from their number and operation, they affect so many individuals, that I apprehend those who come for them to parliament, do, in effect, undertake that they shall do and submit to whatever the legislature empowers and compels them to do; °and that they shall do nothing else; that they shall do and forbear all that they are required to do and forbear, as well with reference to the interests of the public, as with reference to the interests of individuals. It is upon this ground that applications are frequently made," etc.

And the jurisdiction is now clearly defined as having two branches: one on behalf of the state, for public wrong, and the other on behalf of private persons, for private wrong, arising from an excess or abuse of corporate franchise. Relief against public wrong is confined to informations by the attorney general. *Ware v. Regent's Canal Company*, 3 De Gex & J., 212; *Brown v. Monmouth Railway and Canal Company*, 13 Beavan, 32. And it has been held, on the other hand, that the attorney general cannot maintain information on the ground of mere private wrong. *Attorney General v. Birmingham & O. Railway Company*, 4 De Gex & S., 190, and 3 MacNaghten & G., 453. Though doubt is thrown upon this point by the later case of *Ware v. Regent's Canal Company*, 3 De Gex & J., 212.

Be that as it may, the authority of the English chancery to restrain corporate violations injuring or tending to injure public welfare, or to defeat public policy, at the suit of the attorney general, as stated by Mr. Brice, is now beyond controversy. *Attorney General v. Johnson*, 2 Wilson, 87; *Attorney General v. Forbes*, 2 Mylne & C., 123; *Attorney General v. Eastern Counties Railway Company*, 3 English Railway Cases, 337; *Attorney General v. Great Nor. Railway Company*, 4 De Gex & S., 75; *Attorney General v. Sheffield Gas Company*, 3 De Gex, M. & G., 304; *Attorney General v. Great North. Railway Company*, 1 Drewry & S., 154; *Attorney General v. Mid. Kent Rail-*

*way Co.*, 3 Chancery Appeal Cases, 100; *Attorney General v. Cambridge Gas Co.*, 4 Chancery Appeal Cases, 71.

The grounds on which this jurisdiction rests are ancient; but the extent of its application has grown rapidly of late years, until a comparatively obscure and insignificant jurisdiction has become one of great magnitude and public import. The modern exercise of this jurisdiction has kept pace with the multiplication of great corporations in England. The cause may be found in the language of Lord ELDON already quoted, and the motive, in the language of Lord COTTENHAM three times repeated : " I have before taken occasion to observe that I thought it the duty of this court to adapt its practice and course of proceedings, as far as possible, to the existing state of society, and to apply its jurisdiction to all those new cases which, from the progress daily making in the affairs of men, must continually arise ; and not, from too strict adherence to forms and rules established under very different circumstances, decline to administer justice and enforce rights for which there is no other remedy." 1 Mylne & C., 559 ; 4 id., 141, 635.

In our day the common law has encountered in England, as in this country, a new power, unknown to its founders, practically too strong for its ordinary private remedies. The growth of great corporations, centers of vast wealth and power, new and potent elements of social influence, overrunning the country with their works and their traffic throughout all England, has been marvelous during the last half century. It is very certain that the country has gained largely by them in commerce and development. But such aggregations of capital and power, outside of public control, are dangerous to public and private right; and are practically above many public restraints of the common law, and all ordinary remedies of the common law for private wrongs. Their influence is so large, their capacity of resistance so formidable, their powers of oppression so various, that few private persons could litigate with them ; still fewer private persons would litigate with them, for the little

rights or the little wrongs which go so far to make up the measure of average prosperity of life. It would have been a mockery of justice to have left corporations, counting their capital by millions — their lines of railroad by hundreds, and even, sometimes, by thousands of miles — their servants by multitudes — their customers by the active members of society — subject only to the common law liabilities and remedies which were adequate protection against turnpike and bridge and ferry companies, in one view of their relations to the public; and, in another view, to the same liabilities and remedies which were found sufficient for common carriers who carried passengers by a daily line of stages, and goods by a weekly wagon, or both by a few coasting or inland craft; with capital and influence often less than those of a prosperous village shop keeper. The common law remedies, sufficient against these, were, in a great degree, impotent against the great railway companies — always too powerful for private right, often too powerful for their own good. It was in these circumstances that the English courts of equity applied their restraining jurisdiction at public or private suit, and laid on these great companies the strong hand of equitable control. And all England had occasion to bless the courage and integrity of her great judges, who used so ably and so freely and so beneficially the equity writ, and held great corporations to strict regard to public and private right. Every person suffering or about to suffer their oppression, by a disregard of corporate duty, may have his injunction. When their oppression becomes public, it is the duty of the attorney general to apply for the writ on behalf of the public. And in this country, where the judicial tone is less certain, it is refreshing to read the bold and true words of which English equity judges do not spare the utterance. One of these corporations having violated an injunction, V. C. SHAD-WELL says: " Considering then their conduct to be at once contumacious and otherwise illegal, to be wrongful against the plaintiff individually, wrongful against the Queen's subjects at

large, and of, I had almost said, scandalous example; whatever amount of inconvenience may be the consequence of acting against the defendants on this occasion, I think it right to deal with them according to their merits. The consequence may possibly be to stop the railway. I answer again that it ought to be stopped, for it passes where it does by wrong. The directors of the company and their agents cannot, on this motion, at present, be committed to prison; but what can be, shall be done, to repress a daring invasion of public and private rights, maintained in open defiance of law, authority and order. Let a sequestration issue." *Att'y Gen. v. Great North. Railway Co.*, 4 De Gex & S., 93. A great example, of authority, in proper cases, for all American judges.

And it is not unimportant to observe that this broad English jurisdiction was well established and publicly recognized at the time of the adoption of our state constitution.

It was, however, strenuously denied that it had been adopted in this country or could be upheld by the current of American authorities.

We have not found this jurisdiction as directly and succinctly stated in American treatises as in English, although it is fully recognized by the best of our elementary writers. Judge RED-FIELD says that "injunctions in courts of equity, to restrain railways from exceeding the powers of their charters, or committing irreparable injury to other persons, natural or artificial, have been common, for a long time, in England and this country." 2 Redfield on Railways, 307. Nearly all the chapter of his work (ch. 39) from which we quote, is full of instruction on the question, and directly recognizes, especially in the valuable notes, the same jurisdiction of courts of equity in this country, both at the suit of private persons for private wrongs and of the attorney general for public wrongs, as that exercised by the English chancery. Later in the chapter he says that the equitable jurisdiction by injunction goes upon the ground of nuisance. As, indeed, any intrusion upon public right is in the

nature of pourpresture. The ancient jurisdiction to restrain nuisance, is perhaps the most direct ground of the modern jurisdiction under consideration. And the former is fully asserted as an American jurisdiction, as to remedies both by private persons and by the attorney general for the public. 2 Story's Eq., §§. 920–923.

The remedy by injunction, at the suit of private parties, for private wrong, is recognized and enforced in a great number of American cases. *Gardner v. Newburgh*, 2 Johns. Ch., 162; *Belknap v. Belknap*, 2 Johns. Ch., 463; *Couch v. Turnpike Co.*, 4 Johns. Ch., 26; *Jerome v. Ross*, 7 Johns. Ch., 315; *Osborn v. United States Bank*, 7 Wheat., 738; *Bonaparte v. Camden & A. R. R. Co.*, Baldwin, 205; *McArthur v. Canal Co.*, 5 Ohio, 139; *Ross v. Page*, 6 Ohio, 166; *Mohawk Bridge Co. v. Utica & S. R. R. Co.*, 6 Paige, 554; *Delaware & Md. R. R. Co. v. Stemp*, 8 Gill & J., 479; *Rowe v. Granite Bridge Co.*, 21 Pick., 344; *Browning v. Camden & W. R. R. Co.*, 3 Green, 47; *Jordan v. Phil., W. & B. R. R. Co.*, 3 Wharton, 502; *Newburyport T. Co. v. Eastern R. R. Co.*, 23 Pick., 326; *Bigelow v. Hartford Bridge Co.*, 14 Conn., 565; *O'Brien v. Norwich & Wor. R. R. Co.*, 17 Conn., 372; *Moorhead v. Little Miami R. R. Co.*, 17 Ohio, 340; *Kean v Central R. R. Co.*, 1 Stockton, 401; *Newhall v. Galena & C. U. R. R. Co.*, 14 Ill., 273; *Boston & L. R. R. Co. v. Salem & L. R. R. Co.*, 2 Gray, 1; *Sanford v. R. R. Co.*, 24 Pa. St., 378; *Bell v. Ohio & P. R. R. Co.*, 25 Pa. St., 161; *Water Comm. v. Hudson*, 2 Beasly, 420.

There are more cases to the same effect; an unbroken line of decisions, of the most respectable authority, covering some half a century; most of them going on excess or abuse of corporate franchise, and all fully sustaining equitable jurisdiction in case of private wrong. They seem to establish the jurisdiction of courts of equity in this country, as conclusively as it is established in England, of private suits to restrain private wrong arising from excess or abuse of power by corporations.

In such cases, public wrong may be considered only as an

aggregation of private wrongs. And, the jurisdiction once established to enjoin private wrong, in each case, at the suit of the person wronged, it is almost a logical necessity to admit the other branch of the jurisdiction, to enjoin, at the suit of the state, such a general wrong, common to the whole public, as interests the state, and could be remedied by private persons by a vast multitude of suits only, burthensome to each and impracticable for very number; more conveniently, effectively and properly represented by the attorney general as *parens patriæ*. But jurisdiction of informations of this nature has sometimes been denied here, courts of equity in this country, singularly enough, being sometimes more timid to control corporate power, and less willing to protect the public against corporate abuse, than the English chancery. In both branches of the jurisdiction, it proceeds as for *quasi* nuisance; and it is difficult to understand why the jurisdiction should be asserted as to private nuisance and denied as to public nuisance; why, for the same cause, individuals should have a remedy denied to the aggregate of individuals, called the public. But, as we remarked before, in this regard the judicial voice in America is less certain in tone than in England. We should be willing to follow the English rule, in this state, unless there were a preponderance of American authority against it. But fortunately we find this wholesome jurisdiction sustained here by the great weight of authority, and, with modern experience, we deem it only a question of time when it must be universally asserted and exercised." ' '

In *Bigelow v. Hartford Bridge Co., supra,* STORRS, J., takes occasion to say: "Indeed it is upon the ground of particular injury to the plaintiff, distinct from what he suffers in common with the rest of the public, that all applications for injunctions against what is a public nuisance are sustained. And there is no good reason why, apart from such special injury, relief should be granted in this mode at the instance of a particular individual. Courts of equity, in this respect, proceed on the

principle which prevails in courts of law, that an action will not lie in respect of a public nuisance, unless the plaintiff has sustained a particular damage from it, and one not common to the public generally. To preserve and enforce the rights of persons as individuals, and not as members of the community at large, is the very object of all suits, both at law and in equity. The remedies which the law provides in cases where the rights of the public are affected, are ample and appropriate ; and to them recourse should be had when such rights are violated. The courts of equity in England will indeed sustain informations, not by individuals, but at the suit of the attorney general or the proper crown officer, for the purpose of abating public nuisances and what are termed pourprestures. That mode of proceeding has been, however, hitherto unknown here, and whether it would be tolerated in any case it is unnecessary to consider." 14 Conn., 578.

This is not a very accurate statement of the jurisdiction, which does not go to abate, but to restrain, which is the very ground of it, as distinct from legal remedies. The court holds the jurisdiction in cases of private nuisance and of public nuisance inflicting particular injury, at the suit of an individual, and questions it at the suit of the state. It is not easy to comprehend why the remedy should avail against the less evil, and not against the greater ; why equity should interpose to restrain what affects one person only, and refuse its protection against what affects all persons ; in the case of a public nuisance, restrain it at the suit of one whom it especially aggrieves, and refuse to do so for the public whom it equally aggrieves. The reason assigned signally fails; for remedies at law reach private as well as public nuisances.

If, in saying that the remedy by information in behalf of the state was hitherto unknown there, the court meant in Connecticut, it was probably correct ; if in the United States, it was certainly mistaken.

*Bigelow v. The Hartford Bridge Co.* was decided in 1842. As

early as 1834, the jurisdiction was entertained and asserted by the court of chancery of New Jersey, in *Attorney General v. New Jersey R. R. Co.*, 2 Green, 136. The chancellor says: "It would seem, at first, incongruous and improper for this court to interfere in cases of public nuisance. The very fact that nuisances of that character are offenses against the community, and necessarily savor of criminality in a greater or less degree, would seem to distinguish them as matters not proper to be dealt with by this court. But the jurisdiction of chancery, to a certain extent, in cases of public nuisance, appears to be admitted, although it has been very rarely exercised. It is asserted by Lord HARDWICK in *Baines v. Baker*, Ambler, 159; 3 Atkyns, 750; and is considered as existing by Lord ELDON, in the case of the *Atttorney General v. Cleaver*, 18 Vesey, 211. He speaks with caution on the subject, as though it were new but not disputed ground. Chancellor KENT, in *Attorney General v. Utica Ins. Co.*, 2 Johns. Ch., 371, appears rather to question the jurisdiction; considering that the cases of pourpresture which have often occurred in the Court of Exchequer on the equity side, differ in some important particulars from a strict case of public nuisance. He seems to think that the case of *Baines v. Baker*, before Lord HARDWICK, has been misunderstood. It was a bill filed by one individual against another, to stay building an hospital for people infected with the small-pox, very near the homes of several tenants of the plaintiff. The court said, if it were a nuisance at all, it was a public nuisance; that bills of that sort were founded on nuisances at common law, and if a public nuisance it should be an information in the name of the attorney general; and then it would be for his consideration whether he would file such information or not. Chancellor KENT throws out a doubt whether it was not meant that the attorney general might file an information in the King's Bench. Such has not been held to be the meaning by English lawyers or courts, and it appears to me their construction is the right one."

This is feeble language compared with the English cases cited. It is certainly not true in our day, that the English courts rarely exercise the jurisdiction; and the caution which the chancellor attributes to Lord ELDON has long since passed out of the court. 'It may be safely assumed that the chancellor of New Jersey who asserted the jurisdiction then, would be less timid in doing so now. ' But in that day he adds: " The very fact, however, that there may be a doubt on the subject by intelligent jurists, should be sufficient to induce caution on the part of this court. In cases of public nuisance there is an undisputed jurisdiction in the common law courts by indictment, and a court of equity ought not to interfere in a case of misdemeanor, when the object sought can be as well attained in the ordinary tribunals." And so, asserting the jurisdiction, he denied the motion.

In 1836, notwithstanding the cases presently noticed in 2 Johns Ch. and Hopkins, Chancellor WALWORTH asserted and enforced the jurisdiction in New York. The attorney general filed an information to restrain the defendant corporation, claiming a right so to do, from tapping a canal. The chancellor sustained the jurisdiction and the injunction, saying: " This court has jurisdiction to restrain any pourpresture, or unauthorized appropriation of public property to private use, which may amount to a public nuisance, or may injuriously affect or endanger the public interest. And when the officers entrusted with the protection of such public interests, acting under the sanction of their official oaths, believe the intended encroachment will prove injurious to the navigation of the canals, private persons should not be permitted to interfere with the waters or embankments of the canals, contrary to law, upon a mere opinion, although under the sanction of an oath, that the intended trespass upon the public rights would not be an injury to the public." *Attorney General v. The Cohoes Co.*, 6 Paige, 133. In emergency, the New York chancery overlooked Chancellor KENT's coy doubts and nice subtleties, and assumed the

jurisdiction which he had involved in such learned obscurity.

In *Georgetown v. Alexandria Canal Co.*, 12 Peters, 91, which was a bill to restrain the defendants from erecting a nuisance under their charter, decided in 1838, the supreme court of the United States thus state the jurisdiction:

" Were it even admitted that the canal company had exceeded the authority under which they are acting, nevertheless, as the Potomac River is a navigable stream, a part of the *jus publicum*, any obstruction to its navigation would, upon the most established principles, be what is declared by law to be a *public nuisance*. A public nuisance being the subject of criminal jurisdiction, the ordinary and regular proceeding at law is by indictment or information, by which the nuisance may be abated, and the person who caused it may be punished. If any particular individual may have sustained special damage from the erection of it, he may maintain a private action for such special damage, because to that extent he has suffered beyond his portion of injury in common with the community at large. Besides this remedy at law, it is now settled that a court of equity may take jurisdiction in cases of public nuisance, by an information filed by the attorney general. This jurisdiction seems to have been acted on with great caution and hesitancy. Thus, it is said by the chancellor in 18 Vesey, 217, that the instances of the interposition of the court were confined and rare. He referred, as to the principal authority on the subject, to what had been done in the court of exchequer, upon the discussion of the right of the attorney general, by some species of information, to seek, on the equitable side of the court, relief as to nuisances and preventive relief. Chancellor KENT, in 2 Johns. Ch., 382, remarks that the equity jurisdiction in cases of public nuisance, in the only cases in which it had been exercised, that is, in cases of encroachment on the king's soil, had lain dormant for a century and a half; that is, from Charles I. down to the year 1795. Yet the jurisdiction has been finally sustained, upon the principle that equity can

give more adequate and complete relief than can be obtained at law. Whilst, therefore, it is admitted by all, that it is one of delicacy, and accordingly the instances of its exercise are rare, yet it may be exercised in those cases in which there is imminent danger of irreparable mischief before the tardiness of the law could reach it."

These views were adopted by the United States circuit court of Michigan, in the same year, on a bill for injunction against a nuisance. The court asserts both branches of the jurisdiction in equity, and says: "No individual has a right to prosecute for a public nuisance, in his own name or at his own instance, in this form of action, unless the nuisance be irreparably injurious to himself. The United States, through their law officer, might well ask to have this nuisance, if it shall be one, abated; but the special and private injury to an individual is the only ground on which he can ask relief against it." *Spooner v. McConnell*, 1 McLean, 337.

And the same views were again recognized and affirmed by the supreme court of the United States, in 1851, in *Pennsylvania v. Wheeling Bridge Co.*, 13 Howard, 518.

The same question came before the supreme court of Pennsylvania in 1854, at the suit of the attorney general against a railroad company to restrain them from filling up a canal in the construction of their road, under their franchise. The court says:

"The boldness of this act seems almost like a studied test of the vigilance of the canal commissioners, and of the efficiency of the remedies which the state has provided for the prevention of injuries. It is hoped that the equity remedy, being somewhat unusual and peremptory in its character, will not be applied to an act which does so little injury. But writs of capias, replevin, foreign and domestic attachment, estrepement, prohibition and *habeas corpus*, are quite as efficient and peremptory in their power, and most of them much more easily obtained, and yet they are common law writs. And estrepe-

ment applies to many of the same cases as injunction, and may issue without bail. And so it was once with the prohibition. In most of the cases, moreover, in which we hear this objection to the injunction, the common law allows more speedy remedy, for it permits the injured party to redress himself by driving off the wrongdoer.

"The argument that there is no irreparable damage would not be so often used by wrongdoers, if they would take the trouble to observe that the word 'irreparable' is a very unhappily chosen one, used in expressing the rule that an injunction may issue to prevent wrongs of a repeated and continuing character, or which occasion damages which are estimable only by conjecture and not by any accurate standard. 3 Railway Cases, 106, 345; 4 id., 186; 1 Sim. & Stuart, 607; 3 Atkyns, 21; 3 Johns. Ch., 501; 16 Pick., 525; 3 Wharton, 513. As this argument is generally presented, it seems to be supposed that injunctions can apply only to very great injuries; and it would follow that he who has not much property to be injured, cannot have this protection for the little he has.

"Besides this, where the right invaded is secured by statute or by contract, there is generally no question of the amount of damage, but simply of the right. He who grants a right cannot take it away, even on giving a better, without a new agreement for the purpose. 19 Eng. L. & E., 287; 16 Pick., 525; 4 Simons, 13; 8 Wend., 99; 8 Paige, 351; 2 Swanston, 253. And such was our decision in the late case of the *Western Saving Fund Co. v. Philadelphia.*

"And so it is where the public rights are invaded. In the case of the *Attorney General v. The Cohoes Co.*, 6 Paige, 133, there was an offer to tap the state canal for a mill purpose, and it was stopped by injunction, without any regard to evidence tending to disprove damage. And in *Downing v. McFadden*, 18 State R., 334, we justified the keepers of the public works in abating a house that encroached upon the embankment of a railroad, though a jury had found that it did no injury.

" And when railroad companies or individuals exceed their statutory powers in dealing with other people's property, no question of damage is raised when an injunction is applied for, but simply one of the invasion of a right. 1 Railway Cases, 135; 4 Mylne & C., 254. And railway companies will not be allowed to exercise their discretion capriciously (1 Railway Cases, 288), but the court will supervise their discretion, as in seeing that they shall not take more land than is needed, nor take any land merely in order to get earth for embankments (1 id., 576; 4 Mylne & C., 116) ; and that they do not unnecessarily affect a mill-race by too small an arch over it. 1 Russell & M., 181; 2 Railway Cases, 280.

" Railway companies must stand upon a strict construction of their chartered privileges. 21 State R., 22; 9 Beavan, 391; 2 Mann. & Granger, 134; 7 id., 253 ; 1 Railway Cases, 576; 3 id., 563 ; 21 Eng. L. & E., 620. With the immense powers that are freely and loosely given to them, this much restraint is essential to the protection of private rights. 1 Railway Cases, 154, 504, 636 ; 4 Mylne & C., 120.

" If they step one inch beyond their chartered privileges to the prejudice of others or of the stockholders, or offer to do any act without the prescribed preliminary steps, they are liable to be enjoined, irrespective of the amount of damage." *Commonwealth v. Railway Co.*, 24 Pa. St., 159.

There is no doubt or hesitation here. Time and experience had done their work ; as the court says, referring to the English cases : " Such at least is the practice elsewhere, and it may be well for us to learn from the experience of others." And the same doctrine is reaffirmed by the court, in 1867, in *Sparhawk v. U. P. Railway Co.*, 54 Pa. St., 401.

The question came again before the New Jersey chancery and court of errors in 1853, upon information and bill to restrain a corporation from exercising their franchise by the erection of a public nuisance. The chancellor refused a preliminary injunction, but briefly and clearly asserted the juris-

diction. He says: "I have no doubt of the power of the court to interpose in this case by injunction; nor of the propriety of its exercising that peculiar jurisdiction, if, as alleged, the defendants, under and by virture of the power of the legislature, conferred upon the Patterson and Hudson River Railroad Company, to bridge the river Passaic, are obstructing the navigation of that river, in violation of the provisions of the act from which they derive their authority."

The court of errors reversed the order of the chancellor and granted the injunction, stating the doctrine in the language of Story's Equity. "'In regard to public nuisances,' says Justice Story, 'the jurisdiction of courts of equity seems to be of very ancient date, and has been distinctly traced back to the reign of Queen Elizabeth. The jurisdiction is applicable not only to public nuisances strictly so called, but also to pourprestures upon public rights and property, as public rivers, etc.'" *Att'y Gen. v. Hudson River R. R. Co.*, 1 Stockton, 526.

And again in 1855, upon an information and bill to restrain abuse of corporate franchise, Chancellor HALSTED had allowed a preliminary injunction, in an opinion in which, after his few authoritative words in the case last cited, he tacitly assumes the jurisdiction. A motion for attachment for violation of the injunction was heard before GREEN, C. J., sitting for Chancellor WILLIAMSON, who had succeeded Chancellor HALSTED and had been of counsel in the cause. Chief Justice GREEN reviews the merits of the case at great length, without a word said of jurisdiction, and sustains the information on the merits. He gives a second opinion on the merits, upon exceptions taken, with the same significant silence. ELMER, J., delivers the judgment of the court of errors on appeal, at some length, affirming the orders of the chancery, with the same tacit recognition of the jurisdiction, as one not to be doubted. An eloquent silence, following twenty-one years after the faltering opinion in *Att'y Gen. v. N. J. R. R. Co.*, *supra*.

We can see nothing in conflict with these cases in the inter-

mediate case of *Att'y Gen. v. Paterson*, 1 Stockton, 624, cited for the defendants, which is indeed a confirmation of the jurisdiction.

In 1865, in Pennsylvania, one corporation filed a bill against another to enforce the charter obligations of the defendant. The court holds that, suffering no special injury, the plaintiff could not maintain the bill; and thus, after much similar discussion, assigns the reason of the judgment; "It is plain, therefore, that a private individual may not, in the absence of a special right or special authority, vindicate the public for breach of duties owing to her alone. Nobody will doubt that he may enforce against public corporations, contracts and duties which they ought to perform towards himself; and, in doing this, sometimes the public interests are subserved, and this is all right. But it is his special interest that gives him the right to act. This might be enough for this case; but it may not be out of place to add that we have no doubt but the remedy by a bill for an injunction, sued out on the part of the commonwealth, by the attorney general, would lie against a company to compel them to observe their charter obligations. It would in this case be a substitute for a *mandamus*, and come within the power given to courts of equity to control corporations other than municipal." *Buck Mountain C. Co. v. Lehigh Coal & N. Co.*, 50 Pa. St., 91.

The same question came before the supreme court of Missouri, in 1873, upon an information in equity against a municipal corporation. SHEPLEY, S. J., in delivering the opinion of the court, reviews the cases at great length, and sustains the jurisdiction. This is his general conclusion: " It seems to me that, both on principle and authority, this proceeding is maintainable; and that, while in case of private corporations, the courts of this country will sustain the conclusions arrived at in 2 Johns. Ch., 371, in 103 Mass., 138, and 104 Mass., 239, that the writ of *quo warranto* affords ample and efficient remedy for violation of its charter or misuse or abuse of its powers,

and that therefore this form of proceeding will not lie, the powers of the state, through its proper legal officers, to restrain public corporations from a violation of the law will be sustained." *State v. Saline Co.*, 51 Mo., 350.

There is a strong presumption that the term private corporations, as here used, is intended to designate private trading corporations; and the term, public corporations, to include all *quasi* public corporations, whose relations with the public involve public interests and public questions. This is indicated by the cases in Massachusetts on which the distinction is rested, and the language of the court in those cases; and seems to follow from many other cases cited and commented on, which certainly do not confine the remedy to private corporations, in the sense in which these defendants are such. And, indeed, it is not easy to see how a private trading corporation could cause public injury by a mere abuse or excess of franchise, or otherwise than as a natural person might. This construction of Judge SHEPLEY's language is confirmed by the additional opinion of Judge BLISS, who discusses the question at some length, and recognizes no such qualification of the jurisdiction. He says:

"How much more adequate the remedy that prevents the doing of any legal wrong, than those that are merely punitive, or that compel every tax payer to prosecute." "I am aware that the jurisdiction of a court of equity, by injunction, even to restrict a public nuisance, has been denied in Massachusetts under their statute (*Hale v. Cushman*, 6 Metc., 425), but it is established in England, and generally admitted in the United States; and the rule as to the proper plaintiff is, I believe, universal."

And this is further confirmed by the dissenting opinion of WAGNER, J. He objects to the jurisdiction assumed, as injuriously affecting the rights of stockholders, which must mean those of *quasi* public corporations. And we feel safe in assum-

ing that, so far as it is necessary here, this decision is in accord with the others cited on this point.

In our investigations of this question, we have carefully examined all the authorities cited at the bar and many others. It is probable that there may be others, which have escaped our attention. But we think that we have sufficiently shown that the jurisdiction has long been asserted and is very generally recognized in the United States. And, before leaving this review of the authorities sustaining the jurisdiction, we wish to quote the terse and comprehensive statement of its scope, given by the supreme court of Pennsylvania: "This remedy extends to all acts that are contrary to law, and prejudicial to the interests of the community, and for which there is no adequate remedy at law." *Kerr v. Trego*, 47 Pa. St., 292.

Two cases in Massachusetts were cited for the defendants, as denying the jurisdiction. They do not seem to us to do so.

. *The Attorney General v. Salem*, 103 Mass., 138, was an information in the nature of *quo warranto* against a municipal corporation for failure of duty. The court holds that the remedy does not lie in the case, for reasons not pertinent here. It was, perhaps, a case for *mandamus*. Having so decided the case, MORTON, J., adds:

" But the plaintiffs urge that this proceeding may be treated as a proceeding for general relief on the equity side of the court. If the necessary amendments were made to change it into an information or a bill in equity, we are of opinion that it still could not be sustained. Whether, in this state, in the absence of any express grant of jurisdiction, the attorney general can bring a bill in equity to redress any public wrong or grievance, need not be decided. It is clear that such a bill cannot be sustained for a private wrong. In this case, the grievance complained of is not a public wrong, in which every subject of the state is interested; and therefore cannot be redressed by a public prosecution or proceeding."

This was only a refusal to pass upon the question, because the question was not before the court. The refusal certainly implies a doubt, very much such as that suggested by the supreme court of Connecticut. But the doubts even of such respectable tribunals cannot weigh against so much solid authority.

*The Attorney General v. Tudor Ice Co.*, 104 Mass., 239, was an information on the relation of a private person, to restrain the defendant from trading outside of its franchise. The court says: "The Tudor Ice Co. is a private trading corporation. It is not in any sense a trustee for public purposes.. The acts complained of are not shown to have injured or endangered any rights of the public, or of any individual or other corporation, and cannot, under any legal construction, be held to constitute a nuisance." "No case is therefore made, upon which, according to the principle of equity jurisprudence and the practice of this court, an injunction should be issued upon an information in chancery."

This disposes of the case. But the court proceeds to quote, with implied approbation, *Att'y Gen. v. Utica Ins. Co., infra,* and *Att'y Gen. v. Reynolds,* 1 Eq. C. Abr., 131; and to make this comment on later English cases: "The modern English cases, cited in support of the information, were of suits against public bodies or officers exceeding the powers conferred upon them by law, or against corporations vested with the power of eminent domain, and doing acts which were deemed inconsistent with the rights of the public."

Without stopping to consider the accuracy of this comment, we content ourselves with the remark that no doubt is implied of the jurisdiction of such informations as those now before this court.

After some particular comments on certain English cases, the court proceeds to state the position of Massachusetts on this question, thus: "However that may be, by our statutes the general equity jurisdiction of this court is limited to cases where

there is no plain, adequate and complete remedy at law, as well in suits by the commonwealth as those brought by private persons. Gen. Stat., ch. 113, sec. 2."

This shows that the court seems to think their jurisdiction, in such cases, crippled by statute. And yet that court has, not only in the cases above cited, sustained private suits within the jurisdiction in question, but appears to have acted on the public branch of that jurisdiction in several cases. It is true that they are cases of nuisance, but they seem to us to be within the broad principles laid down in England and this country. *Att'y Gen. v. Boston Wharf Co.*, 12 Gray, 553; *Dist. Att'y v. Lynn & B. R. R. Co.*, 16 Gray, 242; *Commonwealth v. Smith*, 10 Allen, 448. The case in 16 Gray appears to us fully to support the jurisdiction of equity to restrain corporations from excess or abuse of franchise.

Other cases outside of New York were cited against the jurisdiction; but on examination we cannot consider any of them as having bearing and weight upon the question. But the cases in New York require consideration.

In that state the authorities are conflicting, and do not appear to us to rest on distinct and settled principle. We have already cited several cases decided by Chancellor KENT and other judges, sustaining the private remedy in equity against nuisance, and one case sustaining the public remedy. And the last case which we have seen in the court of appeals sustains the public remedy in equity. *People v. Vanderbilt*, 26 N. Y., 287.

The jurisdiction, as applied to abuse or excess of corporate franchise, is denied in the last case we have seen in that court on the precise question. *People v. Albany & Vt. R. R. Co.*, 24 N. Y., 261.

We have been referred to several cases, in other courts of that state, for and against the jurisdiction. For it are *Davis v. Mayor, etc.*, 2 Duer, 663; *People v. Mayor, etc.*, 32 Barb., 102; *People v. Albany & Vt. R. R. Co.*, 37 Barb., 216, reversed in 24

N. Y., 261. Against it are *dicta* of Vice Chancellor McCoun in *Verplanck v. Mercantile Ins. Co.*, 1 Edwards, 88, and of Strong, J., in *Smith v. Lockwood*, 13 Barb., 219; *People v. Miner*, 2 Lansing, 407, and *People v. Albany & Vt. R. R. Co.*, *supra*.

We must accept this last case as authoritative on the precise point, for the present, in New York; though in view of all the authorities, it is difficult, at this day, to reconcile it in principle with the later case of *People v. Vanderbilt*. The latter case goes on the ground of pourpresture, which is a special kind of public nuisance. The common law defines a nuisance as anything unlawful, which works hurt, inconvenience or damage; and a pourpresture, formerly an intrusion on the King's soil, is now defined as an encroachment upon public rights or property. It is easy to understand how the courts have, of late, applied both terms to unlawful excess or abuse of corporate franchise, as an encroachment upon and a hurt to public rights. But it is difficult to appreciate how the courts of New York continue to adhere to the physical meaning of pourpresture, in the light of all the modern authorities, and to relieve the public and individuals against material nuisance, and refuse to relieve the state against the most serious form of pourpresture, only because it is immaterial.

And we must be permitted to remark that the opinion of the court in 24 New York is destitute of authority cited to uphold it; rests on the unsupported *dictum* of the court; and, however respectable in itself, and for the authority of the court which utters it, does not compare favorably with the able and learned opinions of Duer, J., in *Davis v. Mayor, etc.*, and of Hogeboom, J., in *People v. Mayor, etc.* In face of all the authorities, and apparently ignoring them, it disposes of the question of jurisdiction in this brief and bare sentence: "Any remedy which the public may have for a breach or neglect of duty imposed by the Railroad Act, must be by *mandamus, quo warranto* or indictment; and the performance of such duty cannot be specifi-

cally enforced in equity at the suit of the attorney general."
Outside of New York, this opinion can weigh little against the
current of authority.

We are led to believe that the singular and erratic course of
the New York courts on this subject is somewhat attributable
to the case of *Attorney General v. Utica Ins. Co.*, 2 Johns. Ch.,
371, in 1817, followed in 1825 by *Attorney General v. Bank of
Niagara*, Hopkins, 354.

Whatever degree of deference might be due, in this day, to
the decision of so illustrious an equity judge as Chancellor
KENT, made at so early a day, we are unable to regard *Attor-
ney General v. Utica Ins. Co.* as authority against the jurisdic-
tion under consideration. It was an *information in equity*
by the attorney general for an injunction against the corpora-
tion to restrain it from usurping banking powers. The court
held that no injury to the public or private persons was averred
or apparent; which, in that day, if not now, would be adequate
ground for dismissing the information. But the court goes on
to discuss the equitable jurisdiction of nuisance and kindred
cases, and incidentally denies the authority of equity to enjoin
excess of corporate franchise; though the chancellor leaves room
for an inference that he might have held otherwise, had a pub-
lic evil been averred or apparent. It must be borne in mind
that this was long before the era of great corporations in this
country, and that the modern practice of courts of equity in
England and this country, of applying the equitable remedy
against nuisance to abuse of corporate franchise, was nearly or
quite unknown. And the chancellor, passing from the single
point of his decision, brings all his great learning to bear on all
collateral questions, in such variety and at such length, that it
is not altogether easy to discover what his precise views were
on many subjects discussed. We adopt the view of Chancellor
VROOM, *supra*, that Chancellor KENT only "appears rather to
question the jurisdiction." Be that as it may, it doubtless mis-
led many, as V. C. McCOUN, in *Verplanck v. Mercantile Ins. Co.*,

to think that the decision was against the jurisdiction under any circumstances. And with all our admiration of his learning and deference for his authority and veneration for his judicial qualities, we cannot help feeling that, as in the case of the exercise of the right of eminent domain, the great chancellor misled the courts of New York into error on this question also. In the one case, it took them some quarter of a century to return to sound principles. In the other, they have not yet done so. So mischievous is the sanction of a great name to error.

It is hardly necessary to add that we sustain the jurisdiction to enjoin a corporation from abuse or excess of franchise, or other violation of public law to public detriment, on information in equity, filed *ex officio* by the attorney general.

It will be perceived that we do not found our jurisdiction on ch. 148, secs. 13 and 14, R. S. We quite agree with the counsel for the defendants, that these sections confer no jurisdiction on this court. Whether they operate to limit the jurisdiction of the circuit courts, or are only declaratory of the jurisdiction which we hold to exist outside of them, we need not consider here. It is certain that they do not limit the jurisdiction of this court, if it be competent for the legislature to limit it.

The jurisdiction which we claim for this court puts the writ of injunction to a prerogative use. And we are strongly inclined to think that our views of our jurisdiction of these informations, follow almost logically from our views of our jurisdiction of the writ as a *quasi* prerogative writ. And we have illy expressed ourselves, and illy applied the authorities quoted, if we have not already made it apparent that we consider this jurisdiction, in this court, a necessary and most salutary one for the preservation of public right and public authority.

It was objected to the exercise of the jurisdiction in these cases, that it would deprive the defendants of the right of trial by jury, secured by sec. 5, art. I of the state constitution, extending to all cases at law.

It has been held by this court that this constitutional guaranty does not extend to cases in equity, including such cases of legal right as, by the practice of courts of equity, had become of equitable cognizance at the time of the adoption of the constitution. *Stilwell v. Kellogg*, 14 Wis., 461, affirmed in several late cases cited in Vilas & Bryant's notes.

The constitution was adopted in 1848. And the English cases prior to that time are authority to show this equitable jurisdiction. For it was fourteen years later that the court of chancery was authorized by act of parliament to determine all questions of law and fact, with one qualified exception. 25 and 26 Vict., ch. 42, sec. 1. And the English and American cases cited show that this jurisdiction was an established equitable jurisdiction at the time the constitution was adopted.

But were this otherwise, we cannot perceive of what trial by jury, of what legal right, these informations can deprive the defendants. Their whole defense rests in questions of law. There is no fact for them to traverse, except their violation of the law. And their denial of this, if indeed they are to be taken as denying it, is manifestly formal only. And, if it were a *bona fide* denial, these proceedings would not deprive them of any legal right triable by jury. If the law be valid, they are bound to obey it. If they are obeying it, the injunction cannot harm them or deprive them of any trial. If they are not obeying it, there is nothing involved here to be tried. The objection is specious, but is only specious.

The question is not here, and we shall not consider it, whether, under our practice, we could take equitable jurisdiction of a case in which a legal right is involved triable by jury, and provide for a trial of that right by a jury, so as to satisfy the provisions of the constitution.

It was also urgently pressed upon us that, all other questions apart, no equitable proceeding would lie to enforce chapter 273 of 1874, because it furnishes its own remedies by providing penalties against the corporations violating it. We do not

consider the rule on which the defendants rely, applicable to cases of this character, and should probably hold so in these cases, if the fact were as stated. But we shall not discuss the question, because it is not here. These informations go to enforce the rates fixed by the statute itself, not rates fixed by the commissioners. It does not appear that the commissioners have fixed any rates or classified any articles of freight. And for violations of the rates fixed by the act itself, no penalties are provided against the corporations; certain civil remedies are given, but no penalty. There are penalties against agents; but the remedy against the corporations is a distinct thing from the liability of their servants, as individuals, for violation of public law, mandatory upon them as private citizens.

This is, perhaps, as appropriate a place as we may find to notice an objection taken to the informations. It is said that they aver no specific injury to the public. Such an injury, in such a case, is a conclusion of fact, rather than a fact. The injury is a logical sequence of the facts. The acts of the defendants charged give the jurisdiction; and it is for the court to judge of the consequent evil. Many of the cases cited import, and some of them express, the rule governing such cases. It is not the averment of the pleader, but the nature of the acts pleaded, which is material on the question of public injury. The conscience of the court must be satisfied; and it may be satisfied or not, with or without averment. If an information should aver public mischief, where the court could see that there was none, the averment would go for nothing. So, without averment, it suffices that the court can see the public injury. It was hardly questioned that, in these cases, a public injury is apparent in the acts charged against these defendants. Directly or indirectly, this injury reaches every inhabitant of the state, and affects the whole state in its corporate capacity. It was, indeed, confidently foretold by the counsel for the defendants, that obedience to the law would work a still greater public injury. Upon that it is not for us to speculate. And

if we could, we cannot sit here to offset a speculative injury arising from obedience of law, against a positive injury arising from disobedience of law. In these days of self-judging insubordination, it would ill become this court to set so bad an example of compromise between right and wrong. We cannot look to the consequences of legislation. Let the legislature see to that. We have no discretion. We, at least, must obey the law. We can only see the direct public injury. And the acts charged satisfy the conscience of the court of the public injury. If the acts be illegal, that is sufficient.

Whether an information of this character would lie, as suggested by Mr. Brice, even though no definite injury had been done, or was likely to be done, to the public, we are not called upon to decide in these cases.

III. These questions of jurisdiction settled, still leave some preliminary matters to be considered, before we can reach the provisions of chapter 273, of 1874, which the informations charge that the defendants disregard and violate.

The act has many provisions not material in these causes. And this is a convenient place to state briefly the provisions which are material to any consideration involved here. The act classifies all the railroads of the state; fixes different *maximum* rates for passengers for each class of roads; classifies certain specified articles of freight; fixes *maximum* rates for each of the classes of freight, differently affecting different classes of roads; provides civil remedies against the companies, and penalties against their servants, for taking greater rates than those fixed by the act; provides for railroad commissioners, and gives them authority to classify articles of freight not classified by the act, and to reduce rates of freight; and provides civil remedies and penalties against the companies for taking greater rates than those fixed by the commissioners.

It does not appear that the commissioners have acted in any way under the act; and the question of the validity of their powers is, therefore, not here.

The act was approved by the governor, March 11. It was contended for the defendants that it was repealed by chapters 292 and 341 of the same session; both approved by the governor March 12. We have informed ourselves that the three acts passed the legislature in the same order in which they were approved.

This is a question of constructive repeal. In *Attorney General v. Brown*, 1 Wis., 513, this court adopted the uniform rule governing such cases. If there be two affirmative statutes upon the same subject, one does not repeal the other, if both may consist together; and we ought to seek for such a construction as will reconcile them together.

Section 2 of chapter 292, in which the repeal by that act is claimed, amends sec. 55 of the general railroad act of 1872. The section amended provides that existing companies shall have all the powers and be subject to all the duties prescribed by that act. The amendment provides that they shall have all the powers of the general railroad act and of their charters. It seems to us that the intention of the amendment is very manifest; and it is a question of legislative intention. The amendment was probably adopted *ex abundanti cautela*, to remove any possible doubt that the franchises of the general act had superseded the franchises of existing charters. And the amendment is not a grant of powers, but a mere confirmation of powers previously granted. It left the companies where it found them. And if chapter 273 be a valid alteration of railroad charters previously existing, it is no more repealed by sec. 2 of chapter 292, than any other previous amendment of such charters. The powers of railroad companies confirmed by this section, are those powers of their charters, controlled by all amendments of them and other public acts validly affecting them, as they existed when the section was passed. It is not difficult to make chapters 273 and 292 stand together.

Chapter 341 is an act in relation to railroads, with many provisions for their general government, perhaps all resting in the

police power of the state. Amongst the rest, sec. 9, under which the repeal is claimed, provides a penalty against any railroad company taking more than a reasonable rate of compensation. It was claimed that this provision licenses a reasonable rate of compensation in all cases, and therefore repeals the *maximum* rates specifically fixed by chapter 273. There are three answers to this:

First. Chapter 273 limits the companies to the *maximum* rates provided, but does not expressly license them to exact those full rates. And it might well happen, and the legislature may have so considered, that rates then reasonable might, in change of circumstances, become unreasonable; and that these companies continuing to charge the full *maximum* rates might be charging unreasonable rates.

Secondly. The act provides no fixed, statutory rates of freight for class C of roads. This class is forbidden to charge more than in June, 1873, which might be an unreasonable rate. And it includes all railroads not included in classes A and B, and might therefore well include roads not operated in June, 1873, which would have no limit of rates of freight under the act. Here is ample scope for sec. 9 of ch. 341, without disturbing the fixed rates of ch. 273.

Thirdly. Chapter 273 does not assume to fix rates for all traffic on railroads. The commissioners might not fix the remaining rates, or might delay in doing so, or might naturally, by inadvertences, omit articles of freight in their classification. Here again is subject for sec. 9 of ch. 341 to act upon, applying the rule of reasonable compensation.

It must be admitted that this looks like careless and slovenly legislation. But either of these views is one which we are bound to seek, and which, seeking, we readily find, to reconcile the two acts and make them consist together.

The question of constructive repeal is one of legislative intent. The three acts were passed within two successive days, and must have been pending together. And it is not possible

to believe that the legislature intended to defeat the operation of ch. 273 by the other acts, going through the forms of legislation contemporaneously with it.   And this question of intent seems to us to be absolutely determined by the passage of joint resolution No. 11, delaying the publication of ch. 273, so that it could not become a law until after chapters 292 and 341 had taken effect as laws; so that the constructive repeal should precede, not follow, the act repealed.   The resolution, and the consequent order of publication of the three acts, seem to us not only to demonstrate that the legislature intended no repeal, but might possibly have had the effect, if there must be a repeal, of making chapter 273, as the later act, repeal sec. 2 of ch. 292, and sec. 9 of ch. 341.

It was contended by the *Chicago, Milwaukee & St. Paul Company*, that it is not in class A of railroads, because the corporation in that class is called the Milwaukee & St. Paul Company; whereas the defendant had just one month before added the prefix, Chicago, to its name, under a statute authorizing such change of name.   This was merely assuming an *alias dictus*, not changing the body nor wholly changing its name. It had been called by one name and chose to be called by another, very similar; differing only by the addition of one word, as a sort of *prænomen*.   These facts are pleaded on both sides.   The information avers that there had· been no other corporation of the name used in the chapter, and the answer cannot be held to deny it, though there is a qualified general denial.   *Sexton v. Rhames*, 13 Wis., 99; *Allis v. Sabine*, 17 Wis., 626.   Indeed we think that there is a presumption that there is no other corporation of the name.   We have therefore little difficulty in holding that the corporation named in the act is the defendant.   It is said that we cannot resort to evidence *aliunde* to ascertain the corporation intended by the act. Probably not, but we do not need any.   We can, however, look into the laws of the state to solve the question.   In an-

other case of misnomer of a corporation, this court held, "that the objections to the act are too technical and evasive. Legislative enactments are not to be defeated on account of mistakes, errors or omissions, any more than other writings, provided the intention of the legislature can be ascertained from the whole act." The court might well have added, but that it was not there necessary, that it could equally look into other acts *in pari materia,* as the rule is. *Nazro v. Merchants' M. Ins. Co.,* 14 Wis., 295. This act, by the name it uses, intended some corporation : there is no other but this, and this had lately been designated by the name used. And we find for years before, acts granting powers to the Milwaukee & St. Paul Railway Company claimed here in its answer by this defendant. We find a grant of power to it, passed at the same session and approved by the same governor, March 10, the day before chapter 273. We find no trace in the statutes of any other corporation by either of the *alias dicti* of this defendant. We should assuredly hold it entitled to the grant of March 10. And we will hold it subject to the act of March 11. We should be ashamed to sit here and suffer the law to fail, where the design of the legislature is so apparent, through so mere a verbal quibble on so mere a verbal accident.

*Rex v. Croke,* 1 Cowper, 29, cited by the defendant, goes upon a confusion of things, not of names ; one designating, as Lord MANSFIELD says, the corporation at large ; the other, a select body. And in *People v. Oakland Co. Bank,* 1 Douglass, 282, also cited, the names of the corporation chartered and of the corporation repealed were so essentially different, that the court could not gather the legislative intention. The court says : " It is not intended to assert that there should be an ex act correspondence between the act creating and the one repealing a corporate charter, so far as the name of the corporation is concerned. All that is required is, that the repealing act should indicate with sufficient clearness the name of the

corporation intended. There should be such a correspondence as to leave no doubt of the intention of the legislature." There is surely such a correspondence here.

We imply no censure on any of the distinguished counsel who argued these motions with so much professional ability. We allude to the defendants when we say, that we are constrained to regard some of these points last considered, as unworthy of these causes. And, while we are not disposed to censure them for litigating the main questions involved, these petty points could not fail to remind us of the pungent criticism of Lord LANGDALE, in *Brown v. Monmouth R. & C. Co.*, on such technical points introduced by other great corporations into other great litigations.

IV. A question was made on the argument, of the effect of the constitutional amendment of 1871 upon sec. 1, art. XI of the constitution.

The provision of the constitution, as first framed, was, that corporations might be formed under general laws, but not by special acts, except in cases where the legislature should judge that the objects could not be attained by general laws; and that such general laws or special acts might be altered or repealed at any time.

Of the first clause of this section it was said : " It seems very obvious, on the face of the provision, that it aimed at the evils of special legislation. The provision is against creating corporations by special acts." " It is doubtful also whether this clause can, at best, be regarded as anything more than directory to the legislature, as it leaves the whole matter, after all, to its judgment." *Clark v. Janesville*, 10 Wis., 119.

And, as a directory provision, it proved to be largely unavailing, as our statute books abundantly show. Therefore came the amendment of 1871, prohibiting special legislation in this and other cases. This amendment prohibits the legislature from passing special laws, amongst other purposes, for granting corporate powers or privileges, except to cities; and directs that

the legislature shall provide general laws for purposes for which special acts are so prohibited, which shall be uniform throughout the state.

It was contended that this amendment, prohibiting the grant of corporate powers by special act, operates as a repeal of the reserved power of altering existing special charters by special acts; that the prohibition to grant corporate powers includes, not only the creation of new corporations, but also the grant of new powers to existing corporations, and by inference the limitation or regulation of existing corporate powers, by special acts; and so confines the reserved power to alter special charters, to general laws.

The difficulty of altering special charters by general laws, which shall be uniform throughout the state, is very apparent. And if this were the true construction of the amendment, it would almost follow that special charters could no longer be repealed by special acts, and that the whole reserved power was relegated to general laws. It was even said by counsel that the charter of a corporation, organized under general law, could be repealed only by repeal of the general law; so that one corporation of one kind could not be subjected to repeal without repealing the charters of all corporations of the same kind under the same general law. This is almost an argument *ad absurdum*. And it is all a very inconvenient and, we may say, dangerous construction, which we should be very unwilling to adopt.

.We shall not stop to dwell here on the importance of the reserved power. We may do that later, in a more appropriate connection. We shall only assume here that it is a power of great significance and gravity; of such moment, that it is impossible to believe that the legislature and the people intended to surrender or impair it; very hard to believe that they suffered themselves to surrender or impair it, by implication, in an amendment designed for quite a different purpose, quite consistent with the reserved power.

But the purpose of the amendment, so far as it affects sec. 1, art. XI, appears to. us very manifest. It was designed to act on the first clause only of the section, taking away the legislative discretion and changing the directory provision into a prohibitory one; and not to touch the second clause of the section at all, leaving the reserved power where it found it, to be exercised thereafter as theretofore, upon special charters, by special acts. The amendment is prospective only, not retrospective. It prohibits an old way and provides a new way of creating corporations, but was not designed to affect existing corporations in any way. If it could operate to take away legislative control over existing charters, it might well be argued — as it was in Indiana — that it operates to repeal them altogether.

We can see nothing in the letter or spirit of the amendment to warrant us in giving it a construction to impair the reserved power. Under the rule of constructive repeal, we are bound to give such construction to these constitutional provisions, as will leave both to stand together. It is not for us to wrest so great a power from the legislature, by construction, unless the legislature and the people have made such construction inevitable. And we feel bound to hold, and find no difficulty in holding, the phrase in the amendment, to grant corporate powers or privileges, to mean *in principio donationis*, and equivalent to the phrase, to grant corporate charters. This is implied not only by the word grant, but also by the word corporate. A franchise is not essentially corporate; and it is not the grant of franchise which is prohibited, but of corporate franchise; that is, as we understand it, franchise by act of incorporation.

There are cases in Iowa with some bearing on this question, which were not cited, but which we have carefully considered.

The constitution of that state, of 1857, art. III, sec. 30, prohibits local or special laws in certain cases; among these, for the incorporation of cities or towns; and provides that, in the cases enumerated, all laws shall be general and uniform throughout the state.

In *Ex parte Pritz*, 9 Iowa, 30, *Davis v. Woolnough*, 9 Iowa, 104, and *McGregor v. Baylies*, 19 Iowa, 44, the supreme court held that, under the clause of their constitution mentioned, the legislature had not power by special act to amend city or town charters, existing by special act at the time of the adoption of the constitution. With great respect for that court, we should hesitate long before concurring in the reasoning or adopting the rule of those cases. And the more so, because in *Von Phul v. Hammer*, 29 Iowa, 222, that court also held that, although the legislature could not amend existing charters, yet every corporation of the kind might amend its own charter, under a power in the general law. But we need not consider the reasoning of the Iowa cases, because we cannot consider them applicable here. There is no equivalent in their constitution for the reserved power in ours, to enter into or control the construction of the clause in question.

The constitution of Indiana, of 1851, art. IV, sec. 22, has a similar prohibitory clause of special legislation in specified cases, including laws for the punishment of crime and misdemeanors; and a similar provision for general laws uniform throughout the state. And the question came before the supreme court, whether a law punishing certain misdemeanors, local in its application and not uniform throughout the state, and therefore in conflict with the constitutional provision adopted, but which was in force at the time of the adoption of the constitution, was not repealed by the constitution. But the court held, without difficulty, that the constitutional requirement was prospective, and did not apply to laws passed before its adoption. *State v. Barbee*, 3 Porter, 358. This is an aid to our construction.

We hold the amendment of 1871 to relate to future corporations, and to leave existing corporations under the original provision of the constitution; and that, as to the existing corporations, the reserved power to alter or repeal remains unimpaired.

V. The *maximum* rates of chapter 273, of 1874, expressly

apply to the railroads of the defendants. The defendants plead various antecedent charters, with express power to take toll, without express limitation. The exact language differs in different charters ; but the substance is, we believe, alike in all : power to exact tolls in the discretion of the company, not essentially different from the power in the general railroad act of 1872.

And the defendants thereupon insist that the limitation of those powers in their charters, by the fixed rates of chapter 273, impairs the obligation of the contract of their charters, and is, therefore, in violation of the provision of the constitution of the United States, art. I, sec. 10, subd. 1, which provides that no state shall pass any bill of attainder, *ex post facto* law, or law impairing the obligation of contracts.

The construction and application of this clause by the supreme court of the United States are certain and defined, and are, of course, beyond the reconsideration of this court. But a brief review of the clause and its construction is not irrelevant to the questions before us.

Mr. Madison, Federalist, No. 43, thus explains the policy and objects of this provision : " Bills of attainder, *ex post facto* laws, and laws impairing the obligation of contracts, are contrary to the first principles of the social compact, and to every principle of sound legislation. The two former are expressly prohibited by declarations prefixed to some of the state constitutions, and all of them are prohibited by the spirit and scope of those fundamental charters. Our own experience has taught us, nevertheless, that additional fences against these dangers ought not to be omitted. Very properly, therefore, have the convention added this constitutional bulwark in favor of personal security and private rights; and I am much deceived if they have not, in so doing, as faithfully consulted the genuine sentiments as the undoubted interests of their constituents. The sober people of America are weary of the fluctuating policy which has directed the public councils. They have seen, with regret and

indignation, that sudden changes and legislative interferences in cases affecting private rights, become jobs in the hands of enterprising and influential speculators, and snares to the more industrious and less informed part of the community. They have seen, too, that one legislative interference is but the first link of a long chain of repetitions; every subsequent interference being naturally produced by the effects of the preceding. They very rightly infer, therefore, that some thorough reform is wanting, which will banish speculations in public measures, and inspire a general prudence and industry, and give a regular course to the business of society."

If this be, as may be safely inferred, the sense in which the prohibition was adopted, it is very certain that its framers did not foresee or intend the uses to which it has been put. So, indeed, Chief Justice MARSHALL himself admits, in his opinion, in the leading case. 4 Wheaton, 644.

As early as 1810, the supreme court of the United States held that an act of a state legislature might be a contract within the meaning of the prohibition, and therefore beyond subsequent legislative control. *Fletcher v. Peck*, 6 Cranch, 87.

In 1819, the same great tribunal held that the charter of any corporation, not municipal, was a contract within the prohibition, which the legislature could not impair, by subsequent amendment against the will of the corporation. *Dartmouth College v. Woodward*, 4 Wheaton, 518. And that remains the law of the land to this day.

It is easy to criticise the decision; to say that the very point was not in the case; to impeach the reasoning of the opinions. Many able jurists and statesmen have done so and are doing so. It is easy to foretell that the case will be opened. Many do so. Here is one of the latest and most thoughtful of such speculations:

"Some of those who think it would have been better had the case been decided the other way, may reasonably condemn any attempt to unsettle a branch of the law so long established.

But the murmuring at the whole doctrine, which is beginning to be heard throughout the country; the restless, fitful desire to get rid of it, not yet fully understood by themselves, which large classes of people begin to feel, indicates that the whole subject must, at no distant day, be carefully re-examined. Any decision in an ordinary case ought, as a rule, to stand; and when a decision has stood for fifty years, even to question it lightly and without sufficient consideration, is injurious and censurable, as tending to unsettle an entire system of jurisprudence. But constitutional decisions which take from the political department of government powers and prerogatives usually belonging to it, and which legislation cannot remedy, stand on a different footing from ordinary precedents involving questions of private rights. Fifty years is a short period in the history of a nation living under a constitution intended to be perpetual. The consequences of the Dartmouth College case are now beginning to press heavily on great communities, and the pressure, we believe, will increase rather than diminish. It involves questions of political power, political necessity, it may yet be of political safety, and the case will not be let alone, however wise it might be to do so." 8 American Law Review, 191.

The court was not unanimous in the Dartmouth College case, and has not always been unanimous in subsequent cases applying the rule. Indeed it is a constant tradition of the profession, that the bench has never since been unanimous on the full extent of the doctrine of that case.

The spirit of the decision, and the grounds on which it goes, are best found in the opinions of the judges who made it.

Chief Justice MARSHALL says: "It has been argued that the word 'contract,' in its broadest sense, would comprehend the political relations between the government and its citizens, would extend to offices held within a state for state purposes, and to many of those laws concerning civil institutions, which must change with circumstances, and be modified by ordinary

legislation, which deeply concern the public, and which, to preserve good government, the public judgment must control. That the clause in the constitution, if construed in its greatest latitude, would prohibit these laws. Taken in its broad, unlimited sense, the clause would be an unprofitable and vexatious interference with the internal concerns of a state, would unnecessarily and unwisely embarrass its legislation, and render immutable those civil institutions which are established for the purpose of internal government, and which, to subserve those purposes, ought to vary with varying circumstances. That, as the framers of the constitution could never have intended to insert in that instrument a provision so unnecessary, so mischievous, and so repugnant to its general spirit, the term 'contract' must be understood in a more limited sense. That it must be understood as intended to guard against a power of at least doubtful utility, the abuse of which had been extensively felt, and to restrain the legislature in future from violating the right to property. That anterior to the formation of the constitution, a course of legislation had prevailed in many, if not all, of the states, which weakened the confidence of man in man, and embarrassed all transactions between individuals, by dispensing with the faithful performance of engagements. To correct this mischief by restraining the power which produced it, the state legislatures were forbidden 'to pass any law impairing the obligation of contracts,' that is, of contracts respecting property, under which some individual could claim a right to something beneficial to himself; and that, since the clause in the constitution must, in construction, receive some limitation, it may be confined, and ought to be confined, to cases of this description; to cases within the mischief it was intended to remedy.

" The general correctness of these observations cannot be controverted. That the framers of the constitution did not intend to restrain the states in the regulation of their civil institutions, adopted for internal government, and that the instru-

ment they have given us is not to be so construed, may be admitted. The provision of the constitution has never been understood to embrace other contracts than those which respect property, or some object of value, and confer rights which may be asserted in a court of justice."

If property, as the great chief justice indicates, be the test, it might well be said that aggregations of persons in municipal corporations may have rights of property as clearly as aggregations of persons in private corporations, and come as well within the prohibition. So the court afterward found in *East Hartford v. Hartford Bridge Co.*, 10 Howard, 511, and other cases, in which the court disregards the property test, and rests the application of the rule on the distinction between public and private corporations. See *Charles River Bridge v. Warren Bridge*, 11 Peters, 420. And so of offices, it might well be suggested that the emoluments of public office, conferring rights which may be asserted in a court of justice, might logically come within the property test.

Mr. Justice STORY, another great name which has reflected its lustre on this decision, says : "Another division of corporations is into public and private. Public corporations are generally esteemed such as exist for public purposes only, such as towns, cities, parishes and counties; and in many respects they are so, although they involve some private interests; but strictly speaking, public corporations are such only as are founded by by the government for public purposes, where the whole interests belong to the government. If, therefore, the foundation be private, though under the charter of the government, the corporation is private, however extensive the uses may be to which it is devoted, either by the bounty of the founder, or the nature and objects of the institution. For instance, a bank created by the government for its own uses, whose stock is owned exclusively by the government, is, in the strictest sense, a public corporation. So an hospital created and endowed by the government for general charity. But a bank whose stock is owned by

private persons, is a private corporation, although it is erected by the government, and its objects and operations partake of a public nature. The same doctrine may be affirmed of Insurance, Canal, Bridge and Turnpike Companies. In all these cases, the uses may, in a certain sense, be called public, but the corporations are private ; as much so as if the franchises were vested in a single person."

It is difficult, at this day, to recognize the sound policy of this strict distinction between municipal and all classes of *quasi* private corporations, or to appreciate the wisdom which admits the necessity of legislative control over all municipal corporations of every grade and nature, and denies it to all other corporations of every grade and nature. It is quite safe to say that in this state of Wisconsin, each of these defendants, a private corporation for the purposes of this rule and placed by it above legislative control of its franchises, directly exercises, to say nothing of its indirect influence, more power over the public interests of the state, over the public welfare and prosperity of the state, over the commonwealth, than the largest municipality in the state with its 90,000 or 100,000 souls. The state entrusts it with the exercise of the sovereign right of eminent domain, with the construction and operation for public purposes of hundreds of miles of public thoroughfare of the most dangerous character to public safety, with a virtual monopoly within its district of the carrying trade, with almost a control of all commerce within its reach, and a power almost of life and death over its people — and yet it is a private corporation, whose charter the legislature cannot control ; while the most insignificant town in the state, with no extra-territorial influence and hardly any extra-territorial recognition, is invested with the dignity of a public corporation, over which it is unsafe to deny legislative control.

It is not to be overlooked that the decision was made long before the era of great corporations in this country, long before what were then private corporations had become of more public

significance than municipal corporations were then, long before our present civilization hinged almost as much on *quasi* private corporations, as HALLAM says early modern civilization did on municipal corporations; before Judge STORY had lived to see a, bank, which he defined to be a private corporation, notwithstanding its public relations, wage war, unequal at last, but long doubtful war, with the federal government itself. The difficulty arises probably from applying old names to new things; applying the ancient definition of private corporations to corporations, of a character unknown when the definition arose, corporations of such great and various public relation and public significance; a definition which, as applied to them, is wearing out, so that courts are beginning to call them *quasi* private corporations and *quasi* public corporations, as in truth they are.

The remarks since made, from time to time, on this decision, by the court which made and has always hitherto sustained it, are perhaps the severest commentary upon it, in the broad sense in which it is applied. It deprives the states of a large measure of their sovereign prerogative, and establishes great corporations as independent powers within the states, a sort of *imperia in imperiis*, baffling state order, state economy, state policy. Well might a distinguished judge of the same great court, when the extent of the evil was becoming apparent, start back, shocked at the claims of corporate immunity from law, and cry out:

"No state, it is declared, shall pass a law impairing the obligation of contracts; yet with this concession constantly yielded, it cannot be justly disputed that in every political sovereign community there inheres necessarily the right and the duty of guarding its own existence, and of protecting and promoting the interests and welfare of the community at large. This power and this duty are to be exerted not only in the highest acts of sovereignty and in the external relations of governments; they reach and comprehend likewise the interior polity and relations of social life, which should be regulated with reference to the advantage of the whole society." And he adds, speaking of

the right of eminent domain: "It would imply an incredible fatuity in the states to ascribe to them the intention to relinquish the power of self-government and self-preservation." *West River Bridge Co. v. Dix*, 6 Howard, 507.

It was lately said by the same court, speaking of this construction and application of the constitutional prohibition: "A departure from it *now* would involve damage to society that cannot be foreseen; would shock the sense of justice of the country, unhinge its business interests, and weaken, if not destroy, that respect which has always been felt for the judicial department of the government." *Binghamton Bridge*, 3 Wallace, 51. Perhaps so; there is always inconvenience and sometimes danger in abandoning old rules of judicial decision. But there is danger in adhering to this rule. And it is not always the better part of wisdom to bear the ills we have, than fly to others that we know not of. And it must be conceded that the language of the court, just quoted, sounds rather like apology than justification.

Be all this as it may, the rule in *Dartmouth College v. Woodward* stands, and we must all yield to it while it does stand. Neither this nor any state court can disregard or evade it, while the court which established it may set fit to adhere to it. And the rule that corporate charters are contracts within the prohibition, has been expressly applied by that court to railroad charters. *Wilmington R. R. v. Reid*, 13 Wallace, 264; *Humphrey v. Pegues*, 16 id., 244.

And we have given some brief history of the rule, and of its application and its mischief, not for any purpose of combating it, but for the purpose of showing the significance and scope of the reserved power over corporate charters in our state constitution. For the very purpose of that reservation of power was to exclude the rule from all application to corporate charters in this state, and to restore to the state all its otherwise inherent authority over its own corporations.

This court has several times had occasion to discuss this re-

served power, as one well understood and of undoubted efficiency. *Madison W. & M. Plank Road Co. v. Reynolds*, 3 Wis., 287; *Pratt v. Brown*, id., 603; *Nazro v. Merchants' M. Ins. Co.*, 14 id., 295; *Kenosha, R. & R. I. R. R. Co. v. Marsh*, 17 id., 13; *Blair v. Milwaukee & P. du C. R. R. Co.*, 20 id., 254; *Whiting v. Sheboygan & F. du L. R. R. Co.*, 25 id., 167; *State v. Milwaukee Gas L. Co.*, 29 id., 454; *Chapin v. Crusen*, 31 id., 209; *West Wisconsin R. R. Co. v. Trempealeau*, ante, p. 257.

As long ago as 1854, six years after the adoption of the constitution, Mr. Justice SMITH observed in *Pratt v. Brown, supra:* "In all instances, however, in which this power to take private property for public use has been delegated to corporations, the parties interested in such grant have been compelled to rely for the perpetuity of the grant, either upon the pledged faith of the sovereign power making the grant, or upon constitutional compacts inhibiting the power of revocation. The doctrine that a charter of incorporation, conferring certain franchises upon a company or individual, was in the nature of a grant, and hence protected from encroachment or attack by the federal constitution, was established after elaborate argument and on full consideration by the supreme court of the United States, in the Dartmouth College case. This doctrine has, since that decision, been acquiesced in by nearly if not quite all the state courts of the union. It is competent, nevertheless, for each state, by constitutional regulation or specific legislative enactment, to reserve the power to modify or repeal all such acts of incorporation. When the power of modification or repeal is reserved, either in the one mode or the other, it is obvious that the grantees must rely, for the perpetuity and integrity of the franchises granted to them, solely on the faith of the sovereign grantor. Hence, since the decision of the Dartmouth College case, some of the states, and our own among the number, have, by constitutional provision, reserved to their legislature the right of modification or repeal of all special acts of incorporation;

and all such corporations now rest upon the faith of the state, taking care to deserve its favor by observing strictly the limits of their powers, and accomplishing by all legitimate means the objects of their incorporation."

In 1863, in *Kenosha R. & R. I. R. R. Co. v. Marsh; supra,* Mr. Justice PAINE said: "The occasion of reserving such a power in the constitution or in the charters themselves, is well understood. It grew out of the decisions of the supreme court of the United States, that charters were contracts within the meaning of the constitutional provision that the states should pass no law impairing the obligation of contracts. This was supposed to deprive the states of that power of control over corporations which was deemed essential to the safety and protection of the public. Hence the practice, which has extensively prevailed since those decisions, of reserving the power of amending or repealing charters. It was solely to avoid the effect of the decision that the charter itself was a contract between the state and the corporation, so as to enable the state to impose such salutary restraint upon those bodies as experience might prove to be necessary. Undoubtedly the legislature might, under this power, impose new duties and new restraints upon corporations in the prosecution of the enterprises already undertaken. And provisions of this nature would be binding, whether assented to or not."

In 1870, in *Whiting v. Sheboygan & F. du L. R. R. Co., supra,* Chief Justice DIXON enters into an able and elaborate consideration of the subject, from which we quote: "And here it occurs to us to observe that, under the principles announced in the Darmouth College case and in the numerous cases which have followed it in the same court, and by the authority of which the courts of all the states are bound, this power of the state to regulate and control the franchise and fix the amount of the tolls has been frequently wholly lost. Be this matter as it may in other states, the question can never arise in this state. Our people, by a most wise and beneficent provision in

their constitution, have perpetually reserved the power to the legislature to alter or repeal all charters or acts of incorporation at any time after their passage.     As yet, we believe, the power has never been exercised with respect to any railroad company organized in this state, and possibly it may never be. It is valuable, however, as a check upon the rapacity which these corporations sometimes exhibit, and the time may come when the legislature will be imperiously required to exert it; but when it does, if ever, it will not be to deprive the corporation or its stockholders of their legitimate rights, but to correct abuses and save the rights of the people.     The legislature will not reduce the tolls or rates to an unreasonably low figure, or so as to disappoint the just expectations of the owners of stock."

In 1874, this sounds like prophecy.

And at the last term, in the case of *West Wis. R. R. Co. v. Trempealeau, supra*, Mr. Justice COLE said: " The validity of these acts . repeating the exemption is mainly rested upon the power reserved to the legislature by sec. 1, art. XI of the constitution, which in terms declares that all general laws or special acts under which corporations without banking powers are created, may be altered or repealed by the legislature at any time after their passage.     If proper force and effect are given to this constitutional provision, it would seem to afford ample authority for the enactment of the repealing statutes above cited, as it reserves the right to the legislature to amend and revoke all corporate franchises and privileges which it might grant.     In this case the legislature first relinquished the right of taxation, so far as the lands in controversy are concerned, and then subsequently resumed it.     But this the learned counsel for the company contend it was not competent for the legislature to do, because it impaired the obligation of a contract which the state had made.     The doctrine that a state may grant or bargain away beyond recall, the right of taxation, a high political and sovereign power, essen-

tial to the very existence of the state, and without which no governmental functions can be exercised or carried on, has always seemed to me to rest upon very unsatisfactory grounds, and I am unable to assent to its general correctness. If the legislature of a state may relinquish for a specified period the right to tax the property of persons or corporations within its jurisdiction, it may do so permanently; and it may, upon the same ground, relinquish its police power, the right of eminent domain, and other sovereign powers, until nothing of the state government remains but a name. I should greatly regret the general recognition of such a doctrine, or even acquiescence in it without protest, as sound constitutional law. And therefore I feel constrained to withhold my assent to it at this time. I do not propose to enter upon any discussion of the question, however, as it is not necessarily the ground upon which our decision in this case is founded. I concede that the supreme court of the United States say that the question whether the legislature has the power to grant away the right of taxation is one not open to discussion in that court, because this power has been affirmed by repeated adjudications made in that court, and the doctrine of the Darmouth College case has been applied in all its extent and rigor to such a legislative grant.
\*    \*    The object and historical origin of the provision in the constitution of this state are matters known to all professional men. They were, through this paramount authority, to retain and secure to the state full power and control over corporate franchises, rights and privileges which it might · grant, — a power and control which the state was in a measure deprived of by the federal constitution, as that instrument had been interpreted in the celebrated Darmouth College case. With the grant of exemption from taxation was annexed the reservation that such grant might be altered or revoked by the legislature at any time after its passage. It was a qualification of the grant, and the subsequent exercise of the reserved power cannot be regarded as an act impairing the obligation of con-

tracts." And the court sustained the exercise of the reserved right.

This has been the unanimous opinion and decision of this court, always, in all cases before it. And, by force of the constitutional power reserved and of the uniform construction and application of it, the rule in the Darmouth College case, as applied to corporations, never had place in this state, never was the law here. The state emancipated itself from the thraldom of that decision, in the act of becoming a state; and·corporations since created here have never been above the law of the land.

Subject to this reserved right, and under the rule in the Dartmouth College case, charters of private corporations are contracts, but contracts which the state may alter or determine at pleasure. Contracts of that character are not unknown in ordinary private dealings; and such we hold to be the sound and safe rule of public policy. It is so in England. It is so under the federal government itself. The material property and rights of corporations should be inviolate, as they are here; but it comports with the dignity and safety of the state that the franchises of corporations should be subject to the power which grants them, that corporations should exist as the subordinates of the state, which is their creator, *durante bene placito.*

This is a question of state law, not of federal law. We give full scope to the federal constitution as interpreted by the federal courts, but we stand clearly outside of both. This question could be brought within the Dartmouth College rule, not by interpretation of the federal constitution, but by interpretation of the state constitution only. That is our function. We accept the construction of the federal constitution as the federal courts give it. But we give construction to our own constitution for ourselves. And there we might well rest.

But the exercise of this reserved power has been sanctioned by the federal and other state courts.

The general banking law of New York, of 1838, provided that stockholders of banks under it should not be personally liable for the debts of their banks, unless they should expressly so declare by their articles of association ; but the law reserved power to the legislature to alter or repeal it at any time, the very words of our constitution.   Under this law, a bank was organized in 1844, and the stockholders declared, by their articles of association, that they should not be liable for the debts of the bank.   Afterwards the constitution of the state, of 1846, declared the stockholders liable, and the legislature of 1849 passed an act to enforce that liability.  The courts of New York held the stockholders liable ; and the supreme court of the United States affirmed the judgment, holding that the constitutional provision and act of 1849 impaired the obligation of no contract, either in the general banking law or in the articles of association, because the reserved power subjected the contract and the stockholders to the change made in their liability. *Sherman v. Smith*, 1 Black, 587.   See also 21 N. Y., *infra*.

In the *Pennsylvania College Cases*, 13 Wallace, 190, the opinion of the court states that:  "Cases often arise, where the legislature, in granting an act of incorporation for a private purpose, either make the duration of the charters conditional, or reserve to the state the power to alter, modify or repeal the same at pleasure.   Where such a provision is incorporated in the charter, it is clear that it qualifies the grant, and that the subsequent exercise of that reserved power cannot be regarded as an act within the prohibition of the constitution.   Such a power, also, that is, the power to alter, modify or repeal an act of incorporation, is frequently reserved to the state by a general law applicable to all acts of incorporation or to certain classes of the same, as the case may be, in which case it is equally clear that the power may be exercised whenever it appears that the act of incorporation is one which falls within the reservation, and the charter was granted subsequent to the passage of the general law, even though the charter contains no such

condition nor any allusion to such a reservation.  Reservations in such a charter, it is admitted, may be made; and it is also conceded that when they exist, the exercise of the power reserved, by a subsequent legislature, does not impair the obligation of the contract created by the original act."

The same point is ruled in many cases, amongst others, in *Miller v. State*, 15 Wallace, 478; *Tomlinson v. Jessup*, 15 id., 454; *Holyoke Co. v. Lyman*, 15 id., 500; *McLaren v. Pennington*, 1 Paige, 102; *Re Oliver Lee's Bank*, 21 N. Y., 9; *Perrin v. Oliver*, 1 Minn., 202; *Mayor etc. v. Norwich & W. R. R. Co.*, 109 Mass., 103; *Parker v. Metropolitan R. R. Co.*, id., 506; *Stevens v. Smith*, 29 Vermont, 160.

In *Olcott v. Supervisors*, 16 Wallace, 678, a case from this state, turning on the relations of a railroad company and the state, the court takes occasion to say of the reserved power in our constitution: "That the legislature may alter or repeal the charter granted to the Sheboygan & Fond du Lac Railroad Company, is certain. This is a power reserved by the constitution. The railroad can, therefore, be controlled and regulated by the state. Its use can be defined; its tolls and rates for transportation may be limited."

It was argued for the defendants that the power is a limited one. It is so said in *Miller v. State*, and *Holyoke v. Lyman*, *supra*, and in some Massachusetts cases, that it must be reasonably exercised. But the remarks in the former cases seem to relate to the property, rather than to the franchise, and are vague. And it seems to us that the legislature is the sole judge of the reasonable nature of the alteration, as it is the sole judge of the reasonable nature of the original charter. And so that court itself says in effect in *Mayor v. Norwich & W. R. R. Co*, *supra*. But these *dicta* are too vague and general for either guidance or authority.

The reserved power in our constitution is a positive provision entering into all charters under it, and must be construed as it is written. We cannot construe away its meaning, or

hold it to mean something else, which we or others might con sider wiser or better. We are bound, in our construction of it, by the very words used. We refer to a large number of cases on this point of construction, collated by DIXON, C. J., in 26 Wis., 451. The power is limited by its own words only. Any limitation of it must come from those words. And we must be guided in our construction of the words used, if the words will admit of it, by the purpose of the provision, to do away in this state the rule in the Dartmouth College case so far as it relates to charters of private corporations. The power to re peal can bear but one construction; for, in this use, the word has but one meaning. The power to alter depends on the meaning of the word, alter. To alter is to make different, with-out destroying identity (Crabb); to vary without entire change (Webster and Imp. Dict.) A corporate charter of one kind cannot be altered to a charter of an entirely different kind. But a corporate charter may be altered so as to make it differ-ent in detail, so long as the general identity of the corporation remains; so that it is varied, without entire change. This is the obvious meaning to lawyer or layman. Arguments *ab in-convenienti* cannot weigh against the manifest meaning of the word used; they may go to impeach the wisdom of the power, but not to impair its import.

We think that Mr. Justice PAINE recognized the true limit, depending on the word used, in *Kenosha R. R. Co. v. Marsh, supra:* " I suppose it would hardly be claimed that the state, even where this power of amendment is reserved, could, by amending the charter of a railroad company so as to provide for a new and entirely different road, impose any obligation on the corporation to build it." That is a particular application of the rule, not to alter so as entirely to change.

But it is unnecessary to pursue this topic further, as there can be no doubt that here is as unquestionable an exercise of the power to alter as can well be. The charters of the defend-ants gave them an unlimited right of toll. The alteration lim-

its the right. This is a strict alteration, or there is no such thing as alteration. This is just what STRONG, J., says, in *Olcott v. Supervisors, supra,* and DIXON, C. J., says, in *Whiting v. S. & F. R. R. Co., supra,* the legislature can do under the power to alter.

We shall not discuss the question whether the defendants have a right to take toll, as intimated by Mr. Justice STRONG in the *State Freight Tax Case,* 15 Wallace, 232, without any franchise to take it, as an attribute of ownership. They certainly could not have a right to exact what they might please. But the question is not here, because these corporations accepted a franchise to take toll, and must be held to take it under the franchise.

And we need hardly notice the point made, that the franchise to take toll without limitation, once granted, inheres in the railroad as property, beyond the reach of the reserved power to alter. Logically considered, this is only a denial in another form of the reserved power to alter. If the franchise inhere in the property by the use of it, and be revocable, then it would be severed from the property by repeal, and, upon alteration, would inhere only as altered. A building is real estate, by being attached to the soil; but if it be taken down, the brick and wood do not still inhere in the land. The reserved power would be nugatory, if the mere use of the franchise could operate to put it beyond alteration or repeal. The position is a mere *petitio principii.*

Of the same type is the argument that ch. 273 violates the contracts of these defendants with their creditors. This position appears to us to rest in the absurdity that the mortgagor can vest in his mortgagee a greater estate than he had himself. Perhaps the statute may lessen the means of payment of the defendants. So would a fine for homicide, under the police power of the state. But to lessen the means of payment of a contract, is not to impair the obligation of the contract. These defendants took their franchises, and their creditors in-

vested their money, subject to the reserved power, and suffer no legal wrong when that is exercised.

It was said that ch. 273 violates the rights of property of these defendants. We cannot perceive that it does. Whether it will lessen the income of their property, we cannot foresee. We only know that it does lessen their rates of toll. But it does not wrongfully touch their property. As far as the franchise is to be considered property, it was subject to this very limitation; and the limitation is the exercise of a right over it, which does not violate it. The right of limitation entered into the property and qualified it. And the act does not at all meddle with the material property, distinct from the franchise. It acts only on the franchise, not at all upon the material property. And it is sufficient to say that they acquired the material property, as distinct from the franchise, subject to the alteration of the franchise under the reserved power. That was a condition under which they chose to hold their property; and they have no right to complain when the condition is enforced. Their rights in their material property are inviolate, and shall never be violated with the sanction of this court. But they are no more violated by this act and its enforcement, than by foreclosure of a mortgage or ejectment by paramount title. It is a right over property which is enforced, not a wrong to right in property.

We listened to a good deal of denunciation of chapter 273, which we think was misapplied. We do not mean to say that the act is not open to criticism. We only say that such criticism is unfounded. It was said that its provisions, which have been noticed, were not within the scope of the legislative function; as if every compilation of statutes, everywhere, in all time, did not contain provisions limiting and regulating tolls; as if the very franchise altered were not a rebuke to such clamor. It was repeated, with a singular confusion of ideas and a singular perversion of terms, that the provisions of the chapter amount to an act of confiscation; a well defined term in the

law, signifying the appropriation, by the state, to itself, for its own use, as upon forfeiture, of the whole thing confiscated. It was denounced as an act of communism. We thank God that communism is a foreign abomination, without recognition or sympathy here. The people of Wisconsin are too intelligent, too staid, too just, too busy, too prosperous, for any such horror of doctrine; for any leaning towards confiscation or communism. And these wild terms are as applicable to a statute limiting the rates of toll on railroads, as the term murder is to the surgeon's wholesome use of the knife, to save life, not to take it. Such objections do not rise to the dignity of argument. They belong to that order of grumbling against legal duty and legal liability, which would rail the seal from off the bond. They were not worthy of the able and learned counsel who repeated them, and are hardly worthy even of this notice in a judicial opinion.

We have, according to our duty, dealt with the questions we have considered as questions of law. We cannot judge of the policy or of the fairness of the act. That is for the legislature. We can only say that it is the law. We cannot judge of the propriety of these informations. That is for the law officers of the state. We are only to determine what the law is, and to administer it as we find it, in causes over which we have no other control. And we can join in no outcry against the law, which it is our duty to administer. Neither can we countenance any outcry against the railroads. We cannot consider any popular excitement against them warranted or useful. The railroads have their rights, and so have the people. Whatever usurpation or abuses, if any, the railroad companies may be guilty of, can find a remedy in calm, just, appropriate legislation. And this court will firmly and impartially protect all the rights of the railroads and of the people, in all litigation which may come here. But we can take no part in popular outcry against these companies, or countenance any prejudice against them. We endorse here the full meaning of what Mr.

Justice PAINE so eloquently said in *Whiting v. Sheboygan R. R. Co., supra:* "Railways are the great public highways of the world, along which its gigantic currents of trade and travel pour — highways compared with which the most magnificent highways of antiquity dwindle into insignificance. They are the most marvelous invention of modern times. They have done more to develop the wealth and resources, to stimulate the industry, reward the labor, and promote the general comfort and prosperity of the country, than any other, and perhaps all other, mere physical causes combined. There is probably not a man, woman or child, whose interest and comfort have not been in some degree subserved by them."

And we endorse and repeat what Chief Justice DIXON well said in the same case: "The power of the legislature to regulate the tolls and charges of such companies is in itself a limited one, if not in a constitutional sense, certainly in the sense of morality and justice. If there be not an express, there is certainly an implied, obligation and promise, on the part of the state, never to reduce the tolls and charges below a standard which will be reasonable, or which will afford a fair and adequate remuneration and return upon the amount of capital actually invested. This obligation and promise, which spring from the act of incorporation and invitation by the state to persons to invest their money in the stock, it is presumed that no legislative body would disregard, except where the company, by gross and wanton abuse of its privileges, had forfeited its rights; and then, instead of legislative action, it is also presumed that the regular course of judicial proceedings would be preferred. The true intent and object of the power is, that the legislature shall be able to protect the rights and interests of the people, but not that it should arbitrarily impair the rights and franchises of the company, or destroy the property of its stockholders. The good faith of the state is pledged against this, and it is not within the range of presumption that it will ever be done. The individuals owning the property, and whom

the corporation represents, purchase it under this pledge and inducement held out by the state. To them it is a matter of mere private business, engaged in under the sanction and encouragement of the state, and for their individual gain and emolument; and the legislature will no more unnecessarily interfere with it, or with the business of the corporations when it is legitimately and properly conducted, than it will with any other private business."

And, fully sustaining the reserved power and this exercise of it, as matter of law, we add to what the judges of this court have said, what Chancellor KENT says, that it should be matter for serious consideration how far the exercise of the reserved power is consistent with justice and policy, and that it ought to be under the guidance of extreme moderation and discretion. 2 Kent's Com., 306.

It is deeply to be regretted that there is just now more or less excitement against railroad corporations, although we believe that its extent is greatly exaggerated. But it seems to us quite safe to say that, though this feeling may be unwise, it is not vindictive; but is rather of the nature of parental anger against those spoiled children of legislation, as our statute books abundantly show them to be, who, after some quarter of a century of legislative favors lavishly showered upon them, unwisely mutiny against the first serious legislative restraint they have met. If it be true that the people are too angry, it is very sure that the companies have been too defiant. But, be all this as it may, there is some excitement against them. We entertain no doubt, however, that through it all, the sound and just views just quoted from their chosen and trusted judges, DIXON and PAINE, are the views of the people of this state to-day; that they always have been; and that these corporations and all interested in them may safely rely on the sense of justice of the people and the legislature. The judgment of both may err. It is said that it has erred in the details of this chapter 273. Of that we are not the judges; but we believe that it is yet to be ver-

ified by experiment. It may well be that the high rates charged by the railroads have lessened their own receipts, by crippling the public interests. The affidavits of experts have been read to the contrary; but they are only opinions, founded indeed on past statistics. Such opinions, founded on such statistics, would have defeated cheap postage, and are helping to-day to defeat a moderate tariff. Experience often contradicts such theories. The interest of the public, in this regard, seems to be identical with the interest of the railroads. We think that there must be a point where the public interest in railroads and the private interest of the corporators meet; where the service of the public at the lowest practicable rate will produce the largest legitimate income to the railroads. It seems to us an utter delusion that the highest tolls will produce the largest income. The companies have hitherto absolutely controlled their own rates. The legislature now limits them. The companies say that the limit is too low. But there is no occasion for heat or passion on either side. The people and the legislature understand well the necessity of the railroads to the state, and the necessity of dealing fairly and justly, and even liberally, with the companies. Time and prudence and wise counsels will set all this right. This very controversy may well bring about a better and more permanent understanding and relation between the state and its corporations. We say so much in deference to an earnest appeal from the bar to counsel moderation. But, in the meantime, we cannot legislate for either party. We can only say what the law is, and administer it as we find it.

An objection was taken to chapter 273, that it is not uniform throughout the state, as required of general laws under the constitutional amendment of 1871. As we think that we have already sufficiently indicated, we sustain and apply this act as an alteration of the special charters of these defendants, and not as an amendment of the general railroad act of 1872. It was said, on the argument, that one of the roads of the *Chicago & Northwestern Company* was organized under the general act.

But that is not pleaded, and does not appear in any of the papers in the case; and of course we cannot act upon a mere verbal suggestion of the kind. So the question whether chapter 273 can be held a valid alteration of the general railroad act of 1872, is not before us, and is not passed upon.

Neither do we express any opinion on the validity of any provision of chapter 273 not expressly involved in the decision of these motions. And, in that connection, it is proper to say that the injunctions prayed for exclude all question here on what is called inter-state commerce.

We only hold the provisions of chapter 273 of 1874, regulating their tolls, to be valid amendments of the special charters of these defendants, obtained from the state under the constitution as it stood before the amendment of 1871.

VI. Supposing chapter 273 to be, on the part of the state, a valid amendment of the charters of the defendants, it was objected that it could not be a valid amendment *quoad* the defendants, without acceptance of it on their part; and until such acceptance, not obligatory upon them. And this proposition is sanctioned by *Yeaton v. Bank*, 21 Grattan, 593, and other cases cited.

It was said in *Kenosha R. R. Co. v. Marsh, supra,* and we think said — certainly implied — in other cases in this court, that valid alterations of a charter, under the reserved power, would bind the corporation, whether assented to or not. The same thing has been said by other courts, is implied in a great many cases, and is expressly decided by the supreme court of Massachusetts in *Mayor v. Norwich & W. R. R. Co., supra.* And we think that the better opinion.

But it appears to us to be here a distinction without a difference. For it is very evident, as it is said in *Yeaton v. Bank,* that if the corporation do not accept the amendment, it must abandon its charter. The court says: "One consequence undoubtedly is, that the corporation cannot conduct its operations in defiance of the power that created it; and if it does not ac-

cept the modification or amendment proposed, must discontinue its operations as a corporate body."

If the amendment be obligatory, the corporation may suspend; if it be not obligatory, the corporation must accept, or suspend; we fail to see the practical difference in such a case as this. Whether or not the defendants had an election to accept or reject, and whether or not they accepted the amendment, they had no right to go on in disregard of the amendment. And we think that their proceeding under their charters, after the passage of the alteration, raises a presumption that, if they had a right of election, they exercised it by accepting the alteration. Otherwise, it was their duty to suspend their operations. In any case, the question cannot weigh in the consideration of our duty to enjoin their actual disobedience of the law.

VII. The defendant *The Chicago, Milwaukee & St. Paul Company* pleads the charter of the territorial legislature of February 11, 1847, incorporating the Milwaukee & Waukesha Railroad Company, and the organization of the corporation thereunder; the act of the territorial legislature of March 11, 1848, extending the road from Waukesha to Prairie du Chien, and the construction of the road from Milwaukee to Prairie du Chien in the years 1850–1856; the act of the state legislature of February 1, 1850, giving the corporation the new name of the Milwaukee & Mississippi Railroad Company; the act of the state legislature of March 31, 1860, to facilitate the formation of a corporation with the franchises of the original company, upon foreclosure of their mortgage, and the formation thereunder, by the purchasers, of the Milwaukee & Prairie du Chien Railway Company; and the conveyance of the road and franchises by that company to the defendant by deed of August 1, 1868; and we find an act of February 15, 1868, ratifying the purchase by the defendant of the road and franchises. We presume that the purchase had been then made, though the deed followed after.

We have not considered the title of the defendant to this road, because we think it immaterial here. The road is actually operated by the defendant, and is, therefore, included in the same class with the other roads of the defendant by chapter 273. And the question before us must rest on the charter of the road, not on the title of the defendant. In saying this, we imply no doubt of the title; we only say that we have not investigated it, because it does not enter into any question before us.

The charter of 1847–1848 appoints commissioners to take subscriptions of stock; and, upon subscription and payment of stock as therein directed, creates the subscribers a corporation vested with the franchises of the act. This act does not create a corporation by its own force only; the prescribed subscription is a condition precedent to the existence of the corporation. The corporation came into existence, probably, upon the election of directors by the subscribers. *Putnam v. Sweet,* 1 Chandler, 286.

It is not pleaded, and does not appear, when the corporation was actually organized. For all that appears here, it may have been at any time between 1847 and 1850. We are inclined to think, however, that under such a charter, when the existence of the corporation appears, as here, there is a presumption that it was organized immediately after the passage of the charter. In this case, there is certainly a presumption that the corporation was *in esse* before the passage of the supplementary act of March 11, 1848, because the act deals with it as an existing corporation by name. This is not, of course, conclusive of the fact, but it is all that we have in this case now; and we must presume, for the purposes of this motion, that the charter was accepted and the corporation organized under it, before the adoption of the state constitution in 1848.

The original charter contains a franchise, upon completion of the road or any ten miles of it, to take such toll as the company should think reasonable.

The road was not constructed till after the adoption of the constitution, but it was constructed under the territorial charter. And the title to the franchise, which runs with the road, dates from the organization of the corporation.

There may be facts which are not before us, or there may be legislation which we have not been able to find, which might operate to make the defendant hold the road built in pursuance of the territorial charter, under franchises granted to the defendant, or to the defendant's grantor, by the state, and so bring the franchises of this road under the reserved power in the constitution. On the argument, we called on the attorney general for information on this point; we were only informed that the territorial charter contained a reserved power to alter or repeal.

On examination, we find this to be a mistake. The only power reserved is in section 20 of the act. And that only provides that in case of violation of the charter by the company, the territorial or state legislature might resume the rights and privileges granted by it.

The right reserved in this section is dependent on violation of the charter. That must first be established. That is clearly a judicial function. We need not stop to inquire whether the territorial legislature could have exercised such a function, under such a clause, and thereupon repeal the charter; nor whether the state legislature could do it now. It is enough that neither has done it. And, in any case, the power reserved is simply one of repeal, which can in no way aid the application of chapter 273 to the road built under the territorial charter.

Sections 1 and 2 of art. XIV of the state constitution provide, if provision were necessary, for the continuance of the territorial charter in force under the state government.

We have carefully examined the several acts of the state legislature applicable to the title of this road, so far as it is disclosed to us; and we find nothing to defeat or impair the franchises of 1847, as appurtenant to this road, to this day. Sec. 1

of the act of 1860, and sec. 33 of ch. 79 of the Revised Statutes, ooth provide that the purchasers on the foreclosure should take the road with the franchises relating to it, as granted to the original company.   And this seems to be recognized by the act of 1868.   This is not a new grant of franchise.   The state had licensed the mortgage of the road and franchise, the corporation had mortgaged the road and franchise, and both were vested in the purchasers by operation of law.   The provision of the act of 1860 was only declaratory of an existing right. And as far as the facts are before us, we see nothing to sever the territorial charter from the road, or to operate as a surrender of that charter or as a relinquishment of the franchises granted by it or as an acceptance of new franchises from the state, to bar the corporation operating the road from relying on the franchises granted by the territory.   Neither party appears to have investigated the facts, and they may not be all before us.   We rest this opinion on what is before us.   And we hold the territorial charter of 1847, enlarged by the territorial act of 1848, to be the existing charter of the road built under it from Milwaukee to Prairie du Chien.

This charter, being accepted — as we are bound here to assume — before the adoption of the state constitution, is not affected by the reserved power in that instrument. And it is undoubtedly a contract within the rule in the Dartmouth College case, which the state legislature cannot impair.   And we have, therefore, the direct question, whether the franchise granted by it, to take such tolls as the company should " from time to time think reasonable," is part of the obligation of the contract which the state cannot impair, and whether it would be impaired by the application to it of the rule of fixed *maximum* tolls prescribed by chapter 273.

We are of opinion that the franchise is not one vesting in the corporation an absolute right of exacting whatever tolls it might see fit.   The courts have authority to limit the right to reasonable tolls; to tolls reasonable, not in the arbitrary

judgment of the corporation, but in fact. That is, indeed, as against a great railroad company, not a very effective remedy. But the law gives the remedy to all aggrieved by the exaction of unreasonable tolls. The question here, however, is not what the courts can do to control the exercise, but what the legislature can do by statute to limit the right of a franchise so broad that it seems to invite extortion.

We have already sustained the power of the legislature to limit rates of toll of railroads subject to legislative control. But that power rests on the authority of the legislature, not on the reasonable rate of tolls fixed. And the restraint of a franchise to take reasonable tolls, to tolls reasonable in fact, is a judicial, not legislative function. Any authority of the legislature, not under the reserved power of the constitution, to regulate tolls under a franchise to take tolls, cannot be derived from the judicial function, but must rest in some proper legislative function.

And therefore, as far as the legislative power over it is concerned, this must be taken as a valid and absolute franchise to take tolls at discretion.

And here, again, we think that the question of the right to take tolls, without a franchise to take them, does not arise. Because the legislature has given and the corporation has accepted a franchise to take them. Whatever right there might have been outside the franchise, is merged in the franchise. Both parties are bound by the franchise. Viewed as a contract, the franchise is the written agreement between the parties on the subject. Had we been able to agree with the defendant's counsel, that the right to take tolls is not derived from the franchise, but is — in the language of Mr. Justice STRONG — an attribute of ownership, we are inclined to think that we might have ruled this point differently. But we have to do here with the right under the franchise, not with a right which might have existed without the franchise.

We have no doubt of the general authority of a state legisla-

ιure to regulate the tolls of a corporation of this character, as a necessity of public welfare and public order, under the sover eign power of police, when the exercise of that power is not in some way suspended or restrained.

But the right of the corporation here to take tolls at discre tion, being thus fixed by express franchise in their charter, there seems to us to be no room for doubt that, viewing the charter as a contract, the franchise is a positive grant to take tolls in the manner and to the extent prescribed by it, subject to such judicial construction and control as it may bear; and is a vital part of the contract of the charter, within the author ities.

We are not considering the charter as a mere statute. We are considering it, in obedience to the Dartmouth College rule, as a contract. We are not giving our own views of its effect. We are looking at it in the mirage of federal construction. Considering this matter of purely state law and state polity, we are sitting *in vinculis*, bound by an interpretation of the prohibition in the federal constitution, on a subject with no federal relation, which we think it ought not to bear, and which, it is admitted, it was not intended to bear; but which, while it stands, emasculates state authority over state corpora tions. We are sitting on this question of state law and state polity, not so much as the supreme court of Wisconsin, as an inferior federal court. And we are bound, on this subject, to rule, not as we think, but as the federal supreme court thinks. The adjudications of this court on state law and state policy, having no possible relation to federal law or federal policy, have been frequently overruled by that court, without excuse found in the federal constitution. We do not mean to give an opportunity now, with excuse. On this point, we admit and defer to their authority. It is an evil example, subversive of judicial order and judicial authority, not becoming judges or courts, to disregard the authority of courts within their pecu liar and appropriate jurisdiction; whether it be of federal by

state courts, or of state courts by federal. We do not propose to follow a bad example. And, in all questions under the federal constitution, it is the duty and choice of this court to follow, as nearly as it can, the principles and spirit of the adjudications of the federal supreme court.

We think that the state ought to possess the same power over this, as over other railroads. And we think that the right of the state to control territorial charters, independently of the reserved power, ought to exist, as one well founded in principle. We are even inclined to think that the weight of state authority is in favor, rather than against it, even under the Dartmouth College rule. We have considered, with great interest, an able and instructive note of Judge Redfield to the *Philadelphia, W. & B. R. R. Co. v. Bowen*, Am. Law Reg., March, 1874. We think, however, that the distinguished jurist had too little in his view the spirit and scope of the decisions of the supreme court of the United States; and that he shows rather what the law ought to be, and would be but for those decisions, than what it is under them. He seems to think that the Dartmouth College rule is being pushed to such an extreme as will ultimately defeat it altogether, by a *reductio ad absurdum*. So many are beginning to think, and so we think. But we think that he errs in laying the blame on those who oppose the extent of the rule, which we think belongs to those who support it. But, after very deliberate consideration, we find that principle and state authority leave us no room for doubt, that this case comes within the prohibition, under the decisions of the supreme court of the United States.

We think that the rule to be gathered from all the decisions, and which should govern us, is accurately stated in Judge Cooley's excellent work, and we give it in his own words:

"The limit to the exercise of the police powers in these cases must be this: the regulations must have reference to the comfort, welfare or safety of society; they must not be in conflict with any provision of the charter; and they must not, un

der pretence of regulation, take from the corporation any of the essential rights or privileges which the charter confers. In short, they must be police regulations in fact, and not amendments of the charter in curtailment of the corporate franchise." Cooley's Const. Law, 577.

The fixed limitations of toll in chapter 273, if applied to the territorial franchise, would limit tolls under the latter, whether the fixed rates be reasonable or not. And we think that we have sufficiently explained the conflict between the two, to show that the state act does essentially limit a right which the territorial charter confers.

The very point which arises here has not, so far as we are aware, been passed upon by the supreme court of the United States. But the principle governing it has been, in many cases. We shall not attempt to review the cases. We will only say that a court which has several times held that state relinquishment of the sovereign right of taxation in favor of a corporation is a valid contract which the state cannot impair by resumption of the right to tax, is not to be expected to sustain such a substantial impairment of a franchise to take toll, which, at its worst, could affect no public power of the state, and could only be abused by individual extortion. And, in view of all their decisions, and in submission to them, we feel bound to hold the territorial charter of 1847, enlarged by the territorial act of 1848, to be a contract within the prohibition of the federal constitution, the obligation of which the state can pass no law to impair; and that the provisions of chapter 273, of 1874, limiting the tolls of railroads operated by the *Chicago, Milwaukee & St. Paul Company*, if applied to the road from Milwaukee to Prairie du Chien, built under that charter, would impair the obligation of the contract of that charter, and that therefore those provisions of chapter 273 do not apply to that road.

If, indeed, that charter was not accepted and the corporation under it was not organized before the adoption of the state

constitution, a grave question would arise of the effect of the reserved power in the state constitution upon the charter accepted and the corporation organized, after that instrument had gone into operation. But that question is not here, and we express no opinion on it.

VIII. Before the commencement of the argument an objection was made to the hearing of these motions on the unverified informations of the attorney general, unsupported by affidavit. We hold, on the authority of the *Attorney General v. The Cohoes Co.*, 6 Paige, 133, and other cases, that an information of the attorney general *ex officio*, acting under the sanction of his oath of office, is equivalent to a bill in chancery verified on information and belief. Like such a bill, it will call, in proper cases, for answer under oath. But, as in case of such a bill, an injunction will not usually go upon it, unsupported by positive affidavit, until after the defendant has had the opportunity to contradict it on oath, and has failed to do so.

We say this now only for the purpose of settling the practice. In these cases the difficulty was cured by affidavits filed by the attorney general before the motions were heard, which the defendants had leave to answer, of which they declined to avail themselves.

These affidavits, uncontradicted, establish what we presume that defendants denied only *pro forma*, the disregard of the *maximum* rates of toll prescribed by chapter 273, of 1874. Indeed some of the affidavits filed by the *Chicago, Milwaukee & St. Paul Company* admit the violation of that rule of rates, and some of those filed by the *Chicago & Northwestern Company* very forcibly imply a similar violation. We therefore take the fact to be undisputed.

IX. These views substantially dispose of these motions. A moving appeal was made to us on the argument, if we should sustain these informations, to withhold the writs in our discretion. The appeal was such and so made as could not fail to leave a deep impression on our minds. It was founded

on very strong affidavits of the injurious effects to these defendants and to the public interest in their well doing, which it was feared would result from the enforcement of the rates of toll prescribed by the statute. These affidavits are entitled to great respect. They are not the affidavits of speculators, at a distance, in the affairs and control of these railroads, reputed to play with the public and private interests involved in them, with cruel success. They are chiefly the affidavits of well known men of high character and standing, of great experience in the affairs of railroads, and specially conversant with these roads. And we may well be permitted to say here that there is great cause for regret that these men and others like them, acquainted with the state and its people, their resources and their needs, and likely to act in sympathy with them as well as for the true interest of the roads, have not been independent in the local management of these corporations. If they had been, we are quite confident that there would have been no cause for this unfortunate controversy. But the affidavits, after all, give us only their theories, which do not satisfy us of the ruin which they foretell. Still the appeals seemed so urgent and so sincere that they left impression enough on our minds to make us somewhat reluctant to grant the writs. But we have no discretion to disregard our plain duty.

It is true that it is said that the granting or withholding of an injunction rests in the sound discretion of the court. But that is judicial discretion, not willful choice. And the rule is applied to injunctions in aid of private remedies. The same rule applies to *mandamus* in cases of private right. But it does not apply to the application of the writ to things *publici juris*. There the writ goes *ex debito justiciæ*. The court has no discretion to withhold it. Tapping, 287.

We need not repeat here the analogies already stated between the two writs, used as prerogative or *quasi* prerogative writs, to protect public right. And we have no more discre-

tion to withhold injunction to restrain violation of public right, than to withhold *mandamus* to enforce public duty.

We have held that here is positive violation of positive public law to positive public injury, and that we have jurisdiction of this writ, as a prerogative writ, to restrain it. There is no room for discretion. The duty is positive, *ex debito justiciæ*. The discretion which we were urged to exercise would be discretion to permit the violation of the laws which we sit here to enforce. It was said to us by counsel, in a professional and not offensive sense, that we dare not issue these injunctions. We reply that, holding what we have held, we dare not face the judgment of the profession for withholding them.

We disregard the appeal made to us reluctantly. But it is not to us that such appeal should be made. We had no part in promoting these cases. We have no voluntary part in the decision of them. We only obey the law as we understand it. We cannot care for consequences. We must do our duty, be the consequences what they may. If such appeal be fit, it is fit to make to the attorney general, not to us. He can heed it. We cannot.

But while we have no discretion, we have power to impose terms which seem to us just. We have already expressed the opinion that the informations in the nature of *quo warranto*, pending in this court against these defendants, are not a bar to these informations, and our reasons why this may be considered the better remedy. But we do not think that the attorney general should have both remedies at once. He has an election, but he must elect. If he has these injunctions, he should dismiss those informations. And time will be necessary to these defendants to arrange the change of rates. We presume that the remaining half of this month will be adequate.

And therefore, before these injunctions issue, we require the attorney general to dismiss the pending informations in the nature of *quo warranto*, and to file in these causes a stipulation signed by him *ex officio*, and approved by the court, or one of

the justices of the court, that the state will not proceed by way of *quo warranto* for forfeiture, or for contempt in violating the injunction to issue against the defendants, for any violation of the provisions of chapter 273, of 1874, involved in these causes, done or suffered to be done prior to the first day of October next.

If the time allowed for the change should be found insufficient, the defendants may move, on notice and proper proofs, to enlarge it, on either of the remaining Tuesdays of this month.

On the terms stated, the injunctions will issue as to all the roads of the *Chicago & Northwestern Company*, and as to all the roads of the *Chicago, Milwaukee & St. Paul Company*, except the road from Milwaukee to Prairie du Chien, built under the territorial charter of 1847–1848.

If the attorney general should be advised that the corporation under the territorial charter was not organized until after the adoption of the state constitution, he will be at liberty to renew his motion as to the road now excluded from the injunction.

If the *Chicago & Northwestern Company* should make it appear that one of the roads now included in the injunction was organized under the general railroad act of 1872, they will be at liberty to move to dissolve the injunction as to such road.

But if such motions should be made, they will be heard only on the particular ground reserved in each case in this opinion.

No statute could have force to abolish any writ given to this court by the constitution, as it existed when the constitution was adopted. And, as our jurisdiction is founded on the writ of injunction, we think it better practice, in such cases, to send out the writ itself.

COLE and LYON, Justices, concurring, an order was made by the court, on the 15th day of September, in accordance with the foregoing opinion. Afterwards the attorney general moved to vacate so much of said order as excepted from the injunction

thereby directed to issue, the railroad of the *Chicago, Milwaukee & St. Paul Railway Company* extending from Milwaukee to Prairie du Chien. The substance of the affidavits used at the hearing of this motion is stated in the opinion, *infra*.

*I. C. Sloan*, Assistant Attorney General, for the motion.

*John W. Cary, contra*, argued that the action of the commissioners named in the act of 1847, in calling a meeting in pursuance of the charter, meeting and organizing by the election of a president and secretary, directing books to be opened for subscriptions to the capital stock of the company, opening said books, and procuring an amendment to the charter by which they were declared a railroad company, was an acceptance of the charter, by which it became a valid contract and irrepealable. An acceptance of a charter is presumed when the grant is beneficial; and certainly any act showing an intention to act under the charter is sufficient. But in this case there was a regular organization, and the commissioners became a legal body capable of acting. Grant on Corp., 13–18.; A. & A. on Corp., §§ 81–83; *State v. Dawson*, 16 Ind., 40. 2. That the act of March 11, 1848, recognized and declared this organized body a company by the name of the "Milwaukee & Waukesha Railroad Company." After such declaration and recognition, the state cannot question their organization as a corporation. *The Black River & Utica R. R. Co. v. Barnard*, 31 Barb., 258: 9 Wend., 380; 3 Coms., 470. 3. That, admitting the company not to have been declared or recognized as a corporation by the charter and its amendment in 1848, and that there had been no acceptance or organization under it until the constitution took effect, still the charter was not repealed, nor its provisions in any manner amended or affected by the constitution. There is nothing in that instrument which purports to amend or affect this or any other charter. Sec. 1, art. XI, is prospective only. It prohibited the passage thereafter of special laws for the creation of corporations, unless the legislature should think that the object of such corporations could

not be obtained under general laws. The last clause of the section reserving the right to repeal and alter is expressly limited to general laws or special acts " enacted under the provisions of this section." The charter of the road in question was *not* enacted under the provisions of that section, and is not subject to its provisions. *State of Ohio v. Roosa*, 11 Ohio St., 16 : *Citizens' Bank v. Wright*, 6 id., 318 ; Statutes of Ohio, 1849–50, 284. This court has already held the same doctrine as to the amendment of 1871 — that its application is restricted not only to future legislation, but to such legislation affecting new corporations, and that it does not apply to existing corporations. 4. That the state, in all subsequent acts amending this charter, has recognized the corporation as formed and existing under the territorial charter of 1847. 5. That § 15 of the " act concerning corporations," found on p. 148, Terr. Stats. of 1839, which provided that acts of incorporation thereafter passed should " at all times be subject to amendment, alteration or repeal at the pleasure of the legislature," has no bearing upon the question at issue, because it was repealed by the statutes of 1849, ch. 157. The repeal of that statute left the law the same as if it never existed. Potter's Dwarris, 160 ; Sedgw. Con. & Stat. Law, 129, 430. Since such repeal the charter stands as if that provision of the general law had been incorporated into the charter, and had been subsequently stricken out. It stands as an unqualified grant of the territorial legislature, without any reserved power. It is not the case of the repeal of one statute and the enactment of the same statute by the repealing act or by a simultaneous act ; for no similar statute has ever been enacted by the state legislature, and the clause of the constitution relied upon has no relation to acts of the territorial legislature. 6. That section 20 of the charter of 1847, which provides that " in case of violation by the company of any of the provisions of this act, the legislature of the territory or state of Wisconsin may resume all and singular the rights hereby granted to said company," operated as a repeal *prc*

*tanto* of § 15, p. 148 of the territorial statutes of 1839. *Mayor etc. of Baltimore v. R. R. Co.*, 1 Abb. (U. S.), 9.

The motion was granted, and the following opinion filed, on the 29th day of September :

RYAN, C. J. In passing upon the principal motion of the attorney general for an injunction against the defendant, we excepted from the writ then allowed, the railroad of the defendant from Milwaukee to Prairie du Chien, built under the territorial charter of 1847–1848. There was then no evidence before us of the time when the Milwaukee & Waukesha Railroad Company was organized under that charter. But we held that, in the circumstances, and especially because there seemed to be a recognition of the corporation as organized in the territorial act of 1848, there was a presumption that the charter was accepted and the corporation organized before the adoption of the state constitution. But there was sufficient doubt of the actual fact to induce us to give leave to the attorney general to renew his motion so as to include that road in the injunction, if he should be so advised.

He has accordingly made this motion, and in support of it he produces a certified copy of the statement of subscription and payment of capital stock, required by sec. 2 of the charter of February 11, 1847, dated April 5, 1849, and filed, as the section required, with the treasurer of Milwaukee county, in the same month ; and also an affidavit of the election of the first board of directors, May 10, 1849.

This is conclusive of the fact that the charter was accepted and the corporation organized many months after the adoption of the constitution and the admission of the state into the Union by congress. It would have saved great trouble had the attorney general presented the fact on the first motion.

It is true that the defendant has filed an affidavit showing that, as early as November, 1847, and from thence till the or-

ganization of the corporation in 1849, action was taken by the commissioners appointed by the charter to receive subscriptions to the capital stock of the proposed corporation, who elected a president and secretary, and opened books of subscription to the stock, and caused application to be made to the territorial legislature for the supplementary act of March 11, 1848, all tending towards the organization of 1849. The affidavit states that by April 5, 1849, the necessary subscriptions and payments were made, but it does not state that any subscription was made before the establishment of the state government.

We do not think that these statements touch the conclusion to which we have come. The proceedings led up to the acceptance of the charter, but could not, by the terms of the charter, operate as an acceptance of it. Even if it had appeared · that there were subscriptions to the stock before the territory had become ·a state, such subscriptions, short of $100,000, required by the charter, could give no right to the subscribers to accept the charter. The terms of the charter expressly exclude such a right. The charter prescribes the conditions of acceptance. It gives no such right · to the commissioners. They were only officers of the territory to fulfill a given function. And it gives no such right to the subscribers, until they should have subscribed the entire capital stock and made certain payments towards it. Then, and then only, the charter confers on them the right of acceptance, in the manner which it provides; that is, by filing the very certificate of April 5, 1849. On and by the doing of that, the charter declares that the subscribers should be created a corporation. And thereupon an election of directors should be had, until which the commissioners should act as directors. There may be some doubt when the corporation actually came *in esse*, whether on the filing of the statement or on the election. *Putnam v. Sweet*, 1 Chandler, 286. That question is not material here. It is very certain that, by the terms of the charter, it was accepted by the making or the filing of the statement, and not before.

We have been referred by the defendant's counsel to some authorities holding that acceptance of a charter applied for, or beneficial to the corporators, may be presumed; and that, in similar cases, slight acts of the corporators looking towards acceptance are sufficient to establish it. But these authorities relate to charters naming the corporators and declaring them incorporated, without preliminary steps, *ipso facto*, by force of the charter. These rules have no application to charters not naming the corporators, and prescribing conditions and formalities by which indeterminate persons may become incorporated. We take the distinction to be correctly stated by Angell & Ames, § 83: "A corporation created by statute which requires certain acts to be done before it can be considered *in esse*, must show such acts to have been done, to establish its existence; but this rule does not apply to corporations declared such by the act of incorporation."

Such a charter is held to be a contract between the political body granting it, and the corporators under it. The territory of Wisconsin proffered such a contract by the charter in question. So proffered, it remained a mere proposal, *in fieri*, until accepted according to its terms. Who could accept it? Not the commissioners, as we have seen. Only the subscribers. When could they accept it? Only upon subscription of the full amount of capital stock. How could they accept it? By making and filing the statement of subscription. And the commissioners could do no act, at any time, tending to prove acceptance, because they had no right to accept. And the subscribers could do no act tending to prove acceptance, before subscription of the whole capital stock; because, until then, they had no right to accept. Such evidences of acceptance as the defendant relies on, must be accompanied by a present right to accept, or they go for nothing.

The territorial charter remained a naked, unaccepted proposition until April 5, 1849, long after the territory had ceased and the state was in existence.

The defendant, however, insisted that, be this as it might, the territorial act of March 11, 1848, recognized the corporation as organized; and that therefore it is not competent for the state now to question its organization prior to the passage of that act. The act of 1848 does *prima facie* imply such a recognition; but as we said in passing on the former motion, that is not conclusive. That is a matter on which the legislature might well be misled or misinformed. And, even if the act declared in terms that the corporation had then been organized, we cannot see how such a declaration could prevail over the manifest fact, that the corporation was not organized for upwards of a year after. But the act contains no such declaration. It is entitled an act supplementary to the original charter, and gives new powers to the corporation authorized by the original charter, giving them throughout to the corporation so authorized, by its corporate name. Without the fact of the subsequent organization, that seems to imply present organization of the corporation. But the language of the act may well go upon either theory, that the legislature understood that the corporation was not organized, or that it was misled into a belief that it was. The use of the corporate name throughout the act does not necessarily imply that the corporation was already *in esse*. It is quite consistent with the truth that it was still only *in posse*. And the fact, now appearing, does away with a different presumption of fact, as we held it would do in our former opinion.

Some cases were cited to show that legislative recognition in a subsequent statute of a corporation *de facto*, will cure irregularities in its organization and waive forfeitures incurred. *People v. Manhattan Co.*, 9 Wend., 351; *Railroad Co. v. Barnard*, 31 Barb., 258. We do not perceive the application of these cases to aid the view of the defendant. The principle on which they rest appears to us to go the other way. Such recognition has relation to a corporation *in esse*, waiving irregularity and forfeiture. An act of the legislature relating to a corporation, not creating or authorizing one, may well have the effect of

condonation, but not of creation. It goes by way of confirmation or release; and there must be a corporation *de facto* to be confirmed or to be released. Here there was no corporation *de facto* to confirm or to release. The inherent trouble of the defendant's position is, that it goes to contradict an admitted fact, and to give life to a corporation a year or so before it was born.

The attorney general having established the fact, as we now hold it to be established, we signified our intention to confine the further discussion of this motion to the legal effect of the fact on the question of the right of the state to alter or repeal the charter. Two other points were discussed, however, which we shall briefly notice.

It was urged, against the views we had before expressed, that the state statutes authorizing the mortgage of the road built under the territorial charter, and authorizing the purchasers on foreclosure to organize anew with the territorial franchises, operated as a grant from the state of the franchises of the territorial charter. We cannot think so, for the reasons assigned in our former opinion. The franchise is *quasi* property; and by whomsoever held, under whatsoever chain of title, is derived from the territorial charter, not from the state statutes. The state statutes did not create it, and do not grant it. They simply authorized the sale and purchase, and the organization by the purchasers of a new corporation, to hold the old franchise, under the old grant. The state statutes are merely enabling acts, conferring no franchise, but only authorizing the transfer of the title to existing franchises. If one purchase under a statute enabling a person, otherwise incompetent, to convey, or enabling a corporation, before unauthorized, to convey, he surely does not take his title from the state; he takes his title by authority of the state, but he takes it from his grantor. The title of the Milwaukee & Prairie du Chien Company to the franchise was derived from the territorial charter, though so derived and held by permission of the state. The question turns on the title of the vendor, not on the license given to him to

convey; on the title to the thing purchased, not on the license to the purchaser to hold it. The authority given to the purchasers to organize a corporation to operate the railroad, is very similar to authority given to an alien to hold real estate. Both take the authority from the state, but not the title. All these state enabling acts might be repealed without impairing the franchises of the territorial charter, however the repeal might affect the title to them. We have no doubt of this position; and we think that it is fairly recognized in *Vilas v. Milwaukee & P. du C. R. R. Co.*, 17 Wis.; 497.

It was suggested with much ingenuity that, as the territory was the creature of the United States, the state upon its organization succeeded to the sovereign rights of the United States in the territory, as well those reserved by the United States as those delegated to the territorial government; full sovereignty subject only to the federal constitution; and that, as the organic act of congress reserved to that body the right to annul all acts of the territorial legislature, the state succeeded to that right. We cannot think so. Waiving all question of the sovereign rights of the United States over the territory, the state came into the union "on an equal footing with the original states in all respects whatever." The United States derive their powers from the states, not the states theirs from the United States. And though Wisconsin became a constituent of the United States 'as one born out of due time,' it is none the less an equal constituent with the original states. On its establishment, it took no governmental rights or powers from the United States, as a state. As a member of the union, it took, in common with all the other states, such rights as the federal constitution confers on the original states, as members of the union. The sovereignty and rights of sovereignty of this state came from no organized power. They are inherent in and are derived from its people. The power of congress over territorial legislation was an incident to the territorial condition, and lapsed, with the territorial government, when the state

came into being. The state, *ipso facto*, assumed all political authority within its boundaries, not limited or surrendered by the constitution of the United States. And the source of all legislative authority within its bounds must now be found in the state and federal constitutions, and nowhere else.

On the argument of the principal motion, it was not suggested at the bar, and it wholly escaped our attention, that a general act concerning corporations in the territorial revision of 1839 reserved to the territorial legislature power to amend, alter or repeal all subsequent acts of incorporation. This act remained in force until the first state revision in 1849, when it, with many others, was repealed; the repeal to take effect January 1, 1850; with a saving clause, that the repeal should not affect any right accrued under any of the statutes so repealed.

The attorney general has now called our attention to this act. And it was argued that the reserved right to amend, alter or repeal the territorial charter, entered into and became a part of the contract of the charter, when accepted; and thus became a right accrued, which was not affected by the repeal; that the repeal could not take effect as to the territorial charter, so long as the charter itself remained unrepealed; the reserved power continuing so far to exist, by force of the charter itself, as a contract. These are nice questions, not necessary to the disposition of this motion, and on which we shall therefore not express an opinion.

If the territorial charter be a contract, as is held, it became such only upon acceptance by the corporators. Before that, as already seen, it rested in proposition, to ripen into a contract upon acceptance in the manner which it provided. And being so accepted after the territory had ceased to exist, it never became a contract between the territory and the corporation. The state constitution, as already observed, continued in force all territorial acts not repugnant to it. The charter thus became a statute of the state. And its acceptance, after the organization of the state, so far as it is a contract, makes it mani-

festly a contract with the state. There was then no other pub-lic authority or political body with which the corporators could contract. It is either not a contract, or it is a contract with the state.

The state adopted the charter, then a mere statute, not a contract, so far only as it was not repugnant to the constitution. With the reserved power of the territorial act of 1839 entering into it and forming part of it, as a proposition, it was in no way repugnant to the constitution. Without that power, it manifestly was. It is true that the language of sec. 1, art. XI, is expressly prospective. But it is prospective not only as to acts of incorporation, but also as to the formation of corpora-tions. "All general and special acts enacted under the provis-ions of this section may be altered or repealed;" and, "corpo-rations may be formed," etc. The whole section, taken to-gether, signifies clearly, not only that no charters should be passed, but also that no corporations should be formed, not subject to the reserved power. It seems to us quite plain that a territorial charter, not subject to the reserved power, and not yet accepted, was "a law in force in the territory, repugnant to this constitution." Art. XIV, sec. 2. And the position that its acceptance from the state, after the adoption of the constitu-tion, was an acceptance subject to the reserved power in the territorial act of 1839, and in sec. 1, art. XI of the constitution, is certainly a very strong one. There is high authority for go-ing even further. After saying that a private corporation may forfeit its franchises by misuser or nonuser, Mr. Justice Story says: "This is the common law of the land, and is a tacit con-dition annexed to the creation of every such corporation. Upon a change of government, too, it may be admitted that such exclusive privileges attached to a private corporation as are inconsistent with the new government, may be abolished." *Terrett v. Taylor*, 9 Cranch, 43. *A fortiori* may this be said of a charter passed before and accepted after a change of govern-ment. There is indeed some conflict between these views and

those expressed in *State v. Roosa*, 11 Ohio St., 16. But we shall not comment on that case, or pursue this consideration further, because we shall not rest our decision wholly on it, as there appears to us to be safer and clearer ground for it to stand upon.

It was quite competent for the state constitution to have repealed all laws of the territory which had not ripened into contracts, under the rule in *Dartmouth College v. Woodward*, 4 Wheat., 518. So was it competent for it to adopt them. So, also, to adopt them *sub modo.* This last is what the constitution did. Sec. 1, art. XIV, provides that all rights, actions, contracts, etc., as well of individuals as of corporations, shall continue and be as valid as if no change from territorial to state government had taken place. This provision is in favor of rights and contracts, and is properly absolute. It might have applied to the territorial charter, if then accepted. Sec. 2 provides that all laws then in force in the territory, not repugnant to the constitution, should remain in force, until they should expire by their own limitation or be altered or repealed by the legislature. This provision has relation to public policy, and is properly subject to absolute legislative control. The distinction is a just one, and is very marked and manifest.

It may be that the territorial laws would have survived the change, without this constitutional provision, as the laws of conquered countries are said to survive conquest. Even in that case, they would have been subject to repeal. But the territorial laws actually survived the change by force of no such principle, but by the express provision of the constitution. That instrument expressly continued them in force, until altered or repealed by the legistature, and no longer. The effect is to render subject to subsequent alteration or repeal, all territorial laws which were then subject to alteration or repeal. This makes all such laws expressly subject to alteration or repeal, the identical words of the reserved power in sec. 1, art. XI. And this use here of the very words used

there, and the provision for laws expiring by their own limitation, raise a very strong presumption that sec. 2, art. XIV, has special relation to corporate charters. For there was probably no statute of the territory which would expire by its own limitation, except such charters. Indeed the whole provision for alteration or repeal is nugatory, except so far as it has relation to charter contracts within the Dartmouth College rule; for all other laws would be subject to repeal without any provision for it. The provision was probably intended to take the place of the reserved power in the territorial R. S. of 1839, which, being so replaced, was accordingly repealed in the first state revision in 1849.

We therefore hold that the unaccepted territorial charter of the Milwaukee & Waukesha Railroad Company, till then subject to alteration or repeal by the territorial legislature, was continued in force by sec. 2, art. XIV of the constitution, subject to alteration or repeal by the state legislature, just as a charter granted by the state; and all the positions of our former opinion in regard to state charters apply equally to the territorial charters of 1847–1848.

The present motion of the attorney general must therefore be granted.

*By the Court.* — So ordered.